1  Elizabeth J. Cabraser (State Bar No. 083151)
   ecabraser@lchb.com
2  Kevin R. Budner (State Bar No. 287271)
   kbudner@lchb.com
3  LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
   275 Battery Street, 29th Floor
4  San Francisco, CA  94111-3339
   Telephone:  (415) 956-1000
5  Facsimile:   (415) 956-1008

6  Jonathan D. Selbin (State Bar No. 170222)
   jselbin@lchb.com
7  LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
   250 Hudson Street, 8th Floor
8  New York, NY  10013
   Telephone:  (212) 355-9500
9  Facsimile:   (212) 355-9592

10 Robert Klonoff (Pro Hac Vice Anticipated)
   klonoff@usa.net
11 ROBERT H. KLONOFF, LLC
   2425 SW 76th Ave.
12 Portland, OR 97225
   Telephone:  (503) 291-1570

13

14 *Attorneys for Plaintiffs, individually and on behalf of all*
   *others similarly situated*

15

16                    UNITED STATES DISTRICT COURT

17                  NORTHERN DISTRICT OF CALIFORNIA

18                       SAN FRANCISCO DIVISION

19

20 KATE MCLELLAN, TERESA BLACK,          Case No.  16-cv-00036-VC
   DAVID URBAN, ROB DUNN, RACHEL
21 SAITO, TODD RUBINSTEIN, RHONDA        CLASS ACTION
   CALLAN, JAMES SCHORR, and BRUCE
22 MORGAN, Individually and on Behalf of All   **AMENDED CLASS ACTION**
   Others Similarly Situated,            **COMPLAINT**

23                  Plaintiffs,          **DEMAND FOR JURY TRIAL**

24 v.

25 FITBIT, INC.,

26                  Defendant.

27

28

1

## **TABLE OF CONTENTS**

2    INTRODUCTION ........................................................................................................ 1

3    JURSIDICTION AND VENUE ................................................................................... 3

4    INTRADISTRICT ASSIGNMENT............................................................................. 3

5    PARTIES ..................................................................................................................... 3

6    COMMON FACTUAL ALLEGATIONS .................................................................. 10

7        I.    Fitbit Falsely Claims the PurePulse Trackers Consistently Record Accurate
              Heart Rate........................................................................................................ 11

8
9        II.   The PurePulse Trackers Fail to Consistently Record Accurate Heart Rate as
              Promised and Warranted. ............................................................................... 16

10       III.  Fitbit Attempted to Keep Class Members Out of Court Through an
              Unconscionable Post-Purchase Agreement, Which Class Members Were
11            Required to Accept in Order to Render Operational the PurePulse Trackers They
              Already Purchased........................................................................................... 19
12
13   CLASS ACTION ALLEGATIONS ........................................................................... 21

     CHOICE OF LAW ALLEGATIONS ........................................................................ 26
14
     CLAIMS FOR RELIEF ............................................................................................. 27
15
16            **FIRST CLAIM FOR RELIEF** Violations of California's Consumers Legal Remedies
              Act ("CLRA"),  Cal. Civ. Code § 1750, *et seq.* ..................................................... 27

17            **SECOND CLAIM FOR RELIEF** Violations of California's Unfair Competition Law,
              Cal. Bus. & Prof. Code § 17200, *et seq. – Based On the Heart Rate Defect*......... 29

18            **THIRD CLAIM FOR RELIEF** Violations of California's Unfair Competition Law, Cal.
              Bus. & Prof. Code § 17200, *et seq. – Based on the Post-Purchase "Terms of
19            Service"*................................................................................................................ 31

20            **FOURTH CLAIM FOR RELIEF** Common Law Fraud ................................................ 32

              **FIFTH CLAIM FOR RELIEF** Fraud in the Inducement .............................................. 35
21
              **SIXTH CLAIM FOR RELIEF** Unjust Enrichment........................................................ 36
22
              **SEVENTH CLAIM FOR RELIEF** Revocation of Acceptance  Cal. Com. Code § 2608
              ................................................................................................................................ 36
23            **EIGHTH CLAIM FOR RELIEF** Breach of Express Warranty ..................................... 37

24            **NINTH CLAIM FOR RELIEF** Violations of the Magnuson-Moss Act – Implied
              Warranty  15 U.S.C. § 2301, *et seq.*...................................................................... 38
25            **TENTH CLAIM FOR RELIEF** Violations of the Song-Beverly Consumer Warranty
              Act for Breach of the Implied Warranty of Merchantability Cal. Civ. Code
26            §§ 1791.1 & 1792.................................................................................................. 40

27            **ELEVENTH CLAIM FOR RELIEF** Violations of the Arizona Consumer Fraud Act
              Arizona Rev. Stat. § 44-1521, *et seq.*.................................................................. 42
28            **TWELFTH CLAIM FOR RELIEF** Violations of the Colorado Consumer Protection
              Act Colo. Rev. Stat. § 6-1-101, *et seq.*................................................................ 44

**THIRTEENTH CLAIM FOR RELIEF** Violations of Florida's Unfair & Deceptive Trade Practices Act  Fla. Stat. § 501.201, *et seq.*.................................................. 46

**FOURTEENTH CLAIM FOR RELIEF** Violations of the Maryland Consumer Protection Act Md. Code Com. Law § 13-101, *et seq.* ........................................... 48

**FIFTEENTH CLAIM FOR RELIEF** Violations of the Michigan Consumer Protection Act Mich. Comp. Laws § 445.903, *et seq.* .............................................. 50

**SIXTEENTH CLAIM FOR RELIEF** Violations of the Ohio Consumer Sales Practices Act Ohio Rev. Code Ann. § 1345.01, *et seq.* ......................................... 53

**SEVENTEENTH CLAIM FOR RELIEF** Violations of the Texas Deceptive Trade Practices Act Tex. Bus. & Com. Code § 17.41, *et seq.* .......................................... 55

**EIGHTEENTH CLAIM FOR RELIEF** Violation of the Wisconsin Deceptive Trade Practices Act Wis. Stat. § 110.18, *et seq.*................................................. 58

PRAYER FOR RELIEF......................................................................................... 59

DEMAND FOR JURY TRIAL................................................................................ 60

**<u>INTRODUCTION</u>**

1.      In widespread national advertising—including, for example, commercials run repeatedly during Major League Baseball's nationally-televised 2015 World Series[1]—defendant Fitbit, Inc. ("Fitbit") touted the purported ability of its wrist-based "activity trackers" to accurately record a wearer's heart rate during intense physical activity.  To perform this function, Fitbit equipped its "Charge HR"[2] and "Surge" fitness watches (the "PurePulse Trackers") with an LED-based technology called "PurePulse™."

2.      Fitbit's representation is repeated in and echoed throughout its advertising of the PurePulse Trackers, which employs such descriptive slogans as "Every Beat Counts" and "Know Your Heart."  But the representation is false.  Far from "counting every beat," the PurePulse Trackers *do not* and *cannot* consistently and accurately record wearers' heart rates during the intense physical activity for which Fitbit expressly markets them.

3.      Plaintiffs and many consumers like them have experienced—and testing confirms—that the PurePulse Trackers consistently mis-record heart rates by a very significant margin, particularly during exercise (described herein as the "Heart Rate Defect").

4.      This failure did not keep Fitbit from heavily promoting the heart rate monitoring feature of the PurePulse Trackers and from profiting handsomely from it.  In so doing, Fitbit defrauded the public and cheated its customers, including Plaintiffs.

5.      The heart rate monitoring function of the PurePulse Trackers is a material—indeed, in some cases, vital—feature of the product.  Not only are accurate heart readings important for all those engaging in fitness, they are critical to the health and well-being of those Class members whose medical conditions require them to maintain (or not to exceed) a certain heart rate.

6.      On behalf of all those who purchased the Fitbit PurePulse Trackers, Plaintiffs Kate McLellan, Teresa Black, David Urban, Rob Dunn, Rachel Saito, Todd Rubinstein, Rhonda

---

[1] Available at https://www.youtube.com/watch?v=vpdHMyvkJxw (last viewed December 1, 2015).

[2] According to reports, in March 2016, Fitbit will be replacing the Charge HR with the "Blaze" model, which employs the same PurePulse technology.

AMENDED CLASS ACTION COMPLAINT;
NO. 16-CV-00036-VC

Callan, James Schorr, and Bruce Morgan bring this action on behalf of themselves and all those similarly situated to seek redress through this proposed class action in the form of injunctive relief, damages, restitution, and all other relief this Court deems equitable.

7. While Fitbit purports to bind all purchasers of its products to an arbitration agreement and class action ban, its method of doing so fails as a matter of law and, in itself, constitutes an unfair and deceptive trade practice.

8. Fitbit sells the PurePulse Trackers through its own website and through many third-party online and brick-and-mortar stores. While Fitbit's own website requires purchasers to agree to be bound by the arbitration clause and class action ban, third-party websites and brick-and-mortar stores do not require any such agreement in advance or at the time of purchase, or give *any* indication that such an agreement will later be required.

9. Instead, Fitbit includes an instruction *inside* the box that requires purchasers (post-purchase) to visit its website and register the PurePulse Tracker online. Such registration is required for the PurePulse Trackers to work. In an affidavit submitted in other litigation, Fitbit admitted that "[a] Fitbit user cannot use their [PurePulse Trackers] as intended until the user has set up an [online] account. In fact, the Charge HR cannot even be used as a watch until the device is first paired to a Fitbit account, which requires the user to agree to the Terms of Service." (*Brickman v. Fitbit, Inc.*, No. 3:15-cv-2077, Doc. 41 at ¶4 (N.D. Cal. Sept. 30, 2015)).

10. Remarkably, Fitbit purports to bind anyone who even visits its website to its arbitration agreement, whether they purchase or register any product at all.[3] Indeed, if the reader of this Complaint visits the link provided in the footnote below, she or he is now deemed by Fitbit to have agreed to arbitration and a class action ban.

11. Fitbit's attempt to bind customers who bought PurePulse Trackers through third-party online and brick-and-mortar stores to an arbitration clause and class action ban post-

[3] The Terms of Service provide: "You must accept these Terms to create a Fitbit account and to use the Fitbit Service. If you do not have an account, you accept these Terms by visiting www.fitbit.com or using any part of the Fitbit Service. IF YOU DO NOT ACCEPT THESE TERMS, DO NOT CREATE AN ACCOUNT, VISIT WWW.FITBIT.COM OR USE THE FITBIT SERVICE." Available at: https://www.fitbit.com/au/terms (last visited December 21, 2015). Of course, by the time one reads the Terms of Service, he or she has already visited Fitbit.com and, per Fitbit, already surrendered his or her Constitutional right to a jury trial.

1290445.3

AMENDED CLASS ACTION COMPLAINT
NO. 16-CV-00036-VC

1  purchase when they register the product—which is required to make the product function as

2  intended—is unconscionable, invalid, and unenforceable.  It is also an unfair and deceptive trade

3  practice in its own right.

4  ## JURSIDICTION AND VENUE

5  12.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28

6  U.S.C. § 1332(d), because many members of the proposed Plaintiff Class, including some named

7  Plaintiffs, are citizens of states different from Fitbit's home states, and the aggregate amount in

8  controversy exceeds $5,000,000.00, exclusive of interest and costs.

9  13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because (1) the only

10  defendant in this action resides in this District and (2) a substantial part of the events and

11  omissions giving rise to Plaintiffs' claims occurred in this District—specifically, Fitbit designed

12  and marketed its product from its headquarters in San Francisco, California, and some Class

13  members reside in and purchased their PurePulse Trackers in this District.

14  ## INTRADISTRICT ASSIGNMENT

15  Pursuant to Local Rule 3-2(c), this civil action should be assigned to the San Francisco

16  Division, because a substantial part of the events or omissions giving rise to the claim occurred in

17  the county of San Francisco, where Fitbit is headquartered.

18  ## PARTIES

19  *Plaintiffs*

20  14.     Plaintiff KATE MCLELLAN is a California citizen and resident domiciled in

21  Murrieta, California.  She holds a PhD in rehabilitation science and currently performs research

22  for a clinical research group.  In early 2015, Plaintiff McLellan was in the market for a heart rate

23  monitor to help her track her fitness goals.  At that time, she saw Fitbit's advertisements on Hulu,

24  which depicted users receiving consistent, real-time, accurate heart rate readings from their

25  PurePulse Trackers.  Relying on those representations, Plaintiff McLellan purchased a Charge HR

26  at Sports Chalet in Temecula, California on February 27, 2015, for $161.94 after tax.  At no point

27  before or during the purchase of her Charge HR was Plaintiff McLellan provided with or required

28  to agree to an arbitration clause or class action ban, nor was she put on notice that she would be

1    required to agree to an arbitration clause or class action ban for her Charge HR to function as

2    intended.  Shortly after purchasing her PurePulse Tracker, she noticed that it was not consistently

3    delivering accurate heart rate readings, particularly during exercise.  She confirmed this by

4    comparing the real-time heart rate readings from her Charge HR with those on stationary

5    cardiovascular exercise machines.  After re-reviewing the product manuals, Plaintiff McLellan

6    called Fitbit and was directed to reboot her Charge HR.  She did so to no avail.  When her Charge

7    HR continued to deliver inaccurate heart readings, Plaintiff McLellan initiated an online chat with

8    a Fitbit representative, who denied her a refund on her defective PurePulse Tracker.  Had Fitbit

9    disclosed that the PurePulse Trackers cannot consistently deliver accurate heart rate readings,

10   even during exercise, Plaintiff McLellan would not have purchased her Charge HR or would have

11   paid significantly less for it.  Plaintiff McLellan is now stuck with a PurePulse Tracker that

12   cannot perform the precise task for which she purchased it and which does not function as Fitbit

13   expressly promised and warranted.

14          15.    Plaintiff TERESA BLACK is a Colorado citizen and resident domiciled in Grand

15   Junction, Colorado.  Plaintiff Black saw Fitbit's advertisements touting the heart rate

16   functionality of the PurePulse Trackers.  Relying on those representations, she told her husband

17   that she wanted a Charge HR, and her husband bought one for her from REI.com on May 25,

18   2015.  At no point before or during the purchase of her Charge HR was Plaintiff Black provided

19   with or required to agree to an arbitration clause or class action ban, nor was she put on notice

20   that she would be required to agree to an arbitration clause or class action ban for her Charge HR

21   to function as intended.  Shortly after that purchase, Plaintiff Black noticed that her Charge HR

22   was not consistently delivering accurate heart rate readings, particularly during exercise.  At an

23   intense part of a personal training session in mid-June 2015, Plaintiff Black's personal trainer

24   manually recorded her heart rate, which was 160 beats per minute ("bpm").  In stark contrast, her

25   Charge HR indicated her heart rate was only 82 bpm.  Plaintiff Black was approaching the

26   maximum recommended heart rate for her age, and if she had continued to rely on her inaccurate

27   PurePulse Tracker, she may well have exceeded it, thereby jeopardizing her health and safety.

28   Had Fitbit disclosed that the PurePulse Trackers cannot consistently deliver accurate heart rate

1    readings, even during exercise, Plaintiff Black would not have purchased her Charge HR or

2    would have paid significantly less for it.  Plaintiff Black is now stuck with a PurePulse Tracker

3    that cannot perform the precise task for which she purchased it and which does not function as

4    Fitbit expressly promised and warranted.

5           16.     Plaintiff DAVID URBAN is a Wisconsin citizen and resident domiciled in

6    Hudson, Wisconsin.  Plaintiff Urban is a fitness enthusiast who signed up for his first marathon in

7    mid-2015.  Given his father's history with heart disease, Plaintiff Urban's doctor recommended

8    that he keep his heart rate from exceeding approximately 160 bpm.  As a result, Plaintiff Urban

9    sought an accurate heart rate monitor for his exercise and training.  At the recommendation of his

10   friends, Plaintiff Urban purchased a Surge at a Target store in Hudson, Wisconsin on October 9,

11   2015, for $248.82.[4]  At no point before or during the purchase of his Surge was Plaintiff Urban

12   provided with or required to agree to an arbitration clause or class action ban, nor was he put on

13   notice that he would be required to agree to an arbitration clause or class action ban for his Surge

14   to function as intended.  Soon after purchasing the Surge, Plaintiff Urban noticed the heart rate

15   function did not work.  Even at high intensities it never displayed a reading over 125 bpm.

16   Plaintiff Urban then cross-referenced his Surge against his chest strap-based triathlon monitor and

17   found that the PurePulse Tracker consistently under-recorded his heart rate at high intensities,

18   often by as many as 15-25 bpm.  In order to train effectively and safely, Plaintiff Urban needs to

19   accurately record his heart rate during exercise so that he can reach, but not exceed, certain

20   intensity levels.  He cannot trust his Surge to deliver those accurate readings.  Had Fitbit

21   disclosed that the PurePulse Trackers cannot consistently deliver accurate heart rate readings,

22   even during exercise, Plaintiff Urban would not have purchased his Surge or would have paid

23   significantly less for it.  Plaintiff Urban is now stuck with a PurePulse Tracker that cannot

24   perform the precise task for which he purchased it and which does not function as Fitbit expressly

25   promised and warranted.

26

27   ───────────────

[4] Plaintiff Urban later exchanged the Surge he purchased in Hudson, Wisconsin, for a larger
28   version of the same model at another Target store in Madison, Wisconsin.

- 5 -                    AMENDED CLASS ACTION COMPLAINT
                                                                          NO. 16-CV-00036-VC

17.    Plaintiff ROB DUNN is an Arizona citizen and resident domiciled in Yuma, Arizona.  Plaintiff Dunn is also a fitness enthusiast.  After conducting research online for fitness trackers, and viewing Fitbit's representations about the PurePulse Trackers' ability to consistently record accurate heart rates, even during exercise, Plaintiff Dunn decided to purchase a Charge HR.  In fact, he bought two, both on December 26, 2015—one for his wife at Bed Bath & Beyond in Yuma, Arizona, and one for himself at Best Buy, also in Yuma, Arizona.  At no point before or during the purchase of either Charge HR was Plaintiff Dunn or his wife provided with or required to agree to an arbitration clause or class action ban, nor were they put on notice that they would be required to agree to an arbitration clause or class action ban for their PurePulse Trackers to function as intended.  Soon after purchasing the Charge HR, Plaintiff Dunn noticed the heart rate function did not work as represented.  During exercise, his PurePulse tracker returned inconsistent and inaccurate readings, often recording well below (and occasionally well over) the readings from the heart rate monitors on his stationary cardiovascular machine.  Had Fitbit disclosed that the PurePulse Trackers cannot consistently deliver accurate heart rate readings, even during exercise, Plaintiff Dunn would not have purchased his Charge HR or would have paid significantly less for it.  Plaintiff Dunn is now stuck with a PurePulse Tracker that cannot perform the precise task for which he purchased it and which does not function as Fitbit expressly promised and warranted.  On January 15, 2016, twenty days after they registered for accounts on Fitbit.com, Plaintiff Dunn and his wife opted out of the arbitration provision in the Terms of Service purportedly governing the use of their PurePulse Trackers.

18.    Plaintiff RACHEL SAITO is a Florida citizen and resident domiciled in Land O' Lakes, Florida.  Plaintiff Saito is a longtime fitness enthusiast who sought to get back in shape after delivering a child in September 2015.  She believed a fitness tracker would help her in this process, and specifically sought one with a heart rate monitor.  Although she already owned a chest strap heart monitor, Plaintiff Saito purchased a PurePulse Tracker based on the anticipated convenience of a wrist-based product, and Fitbit's representations regarding the ability of the PurePulse Trackers to accurately record heart rate during the high-intensity exercises she enjoys.  Relying on those representations, Plaintiff Saito purchased her Charge HR at Kohl's in Brandon,

Florida, on October 18, 2015.  At no point before or during the purchase of her Charge HR was Plaintiff Saito provided with or required to agree to an arbitration clause or class action ban, nor was she put on notice that she would be required to agree to an arbitration clause or class action ban for her Charge HR to function as intended.  Almost immediately after that purchase, Plaintiff Saito noticed that her Charge HR was not consistently delivering accurate heart rate readings, particularly during exercise.  She typically aims for a target heart rate of 150 bpm when exercising and knows what intensity is required to achieve this goal.  Her Charge HR's heart rate readings consistently lagged behind her actual heart rate, and never exceeded approximately 115-120 bpm, even when her actual heart rate reached her target rate of 150 bpm.  Had Fitbit disclosed that the PurePulse Trackers cannot consistently deliver accurate heart rate readings, even during exercise, Plaintiff Saito would not have purchased her Charge HR or would have paid significantly less for it.  Plaintiff Saito feels deceived and is now stuck with a PurePulse Tracker that cannot perform the precise task for which she purchased it and which does not function as Fitbit expressly promised and warranted.

19.     Plaintiff TODD RUBINSTEIN is a Maryland citizen and resident domiciled in Rockville, Maryland.  He and his wife are both fitness enthusiasts who were contemplating buying fitness trackers in early 2015.  Originally, they intended to buy a Charge without the heart rate functionality.  After seeing Fitbit's advertisements regarding the heart rate monitors on the PurePulse Trackers, however, Plaintiff Rubinstein decided to purchase a Charge HR.  Relying on Fitbit's representations about the ability of the PurePulse Trackers to consistently record accurate heart rates, even during exercise, Plaintiff Rubinstein purchased his Charge at Sports Authority in Rockville, Maryland, on February 26, 2015.  At no point before or during the purchase of his Charge HR was Plaintiff Rubinstein provided with or required to agree to an arbitration clause or class action ban, nor was he put on notice that he would be required to agree to an arbitration clause or class action ban for his Charge HR to function as intended.  Shortly after that purchase, Plaintiff Rubinstein noticed that his Charge HR was not consistently delivering accurate heart rate readings, particularly during exercise.  When his heart rate rose above 90 bpm, he found the PurePulse tracker to be effectively useless, providing wildly inaccurate readings, or none at all.

1    Had Fitbit disclosed that the PurePulse Trackers cannot consistently deliver accurate heart rate

2    readings, even during exercise, Plaintiff Rubinstein would not have purchased his Charge HR or

3    would have paid significantly less for it.  Plaintiff Rubinstein is now stuck with a PurePulse

4    Tracker that cannot perform the precise task for which he purchased it and which does not

5    function as Fitbit expressly promised and warranted.

6          20.     Plaintiff RHONDA CALLAN is a Michigan citizen and resident domiciled in

7    Battle Creek, Michigan.  Plaintiff Callan suffers from dysautonomia, a condition that requires her

8    to monitor her heart rate in real time, as her heart rate can spike and drop suddenly.  If she exerts

9    herself too much during one of these extremes, she can cause herself serious physical injury.

10   Plaintiff Callan saw Fitbit's representations regarding the purported ability of the PurePulse

11   Trackers to provide continuous and automatic accurate heart rate readings.  Relying on those

12   representations, Plaintiff Callan purchased a Charge HR from Amazon.com on June 4, 2015.  At

13   no point before or during the purchase of her Charge HR was Plaintiff Callan provided with or

14   required to agree to an arbitration clause or class action ban, nor was she put on notice that she

15   would be required to agree to an arbitration clause or class action ban for her Charge HR to

16   function as intended.  As soon as Plaintiff Callan started wearing her PurePulse Tracker, she

17   suspected it was not delivering the accurate heart rate readings that Fitbit had promised.  This

18   suspicion was confirmed when her doctor performed a stress test on her and compared the heart

19   rate readings from the Charge HR to an electrocardiogram.  As expected, the PurePulse Tracker

20   was off by a significant margin.  Plaintiff Callan could have seriously jeopardized her health and

21   safety by continuing to rely on the heart rate readings from her PurePulse Tracker.  Had Fitbit

22   disclosed that the PurePulse Trackers cannot consistently deliver accurate heart rate readings,

23   even during exercise, Plaintiff Callan would not have purchased her Charge HR or would have

24   paid significantly less for it.  Plaintiff Callan is now stuck with a PurePulse Tracker that cannot

25   perform the precise and vital task for which she purchased it and which does not function as Fitbit

26   expressly promised and warranted.

27         21.     Plaintiff JAMES SCHORR is an Ohio citizen and resident domiciled in

28   Beachwood, Ohio.  Plaintiff Schorr suffers from mild atrial fibrillation.  His doctor advised him

1   to lose weight to help combat the condition, but cautioned that he should keep his heart rate under

2   120 bpm while exercising in order stay safe.  To that end, his doctor recommended that he

3   purchase a PurePulse Tracker.  Based on that recommendation, and Fitbit's representations about

4   the ability of the PurePulse Trackers to consistently record accurate heart rate, even during

5   exercise, Plaintiff Schorr purchased a Charge HR on Amazon.com on November 20, 2015.  At no

6   point before or during the purchase of his Charge HR was Plaintiff Schorr provided with or

7   required to agree to an arbitration clause or class action ban, nor was he put on notice that he

8   would be required to agree to an arbitration clause or class action ban for his Charge HR to

9   function as intended.  Soon after purchasing the Charge HR, Plaintiff Schorr noticed the heart rate

10   function did not work as represented and consistently under-recorded his heart rate by significant

11   margins.  He confirmed the inaccuracy by comparing it to his home blood pressure monitor,

12   among other instruments.  Plaintiff Schorr is concerned that he cannot safely exercise without

13   accurate heart rate readings, which his PurePulse Tracker cannot provide.  Had Fitbit disclosed

14   that the PurePulse Trackers cannot consistently deliver accurate heart rate readings, even during

15   exercise, Plaintiff Schorr would not have purchased his Charge HR or would have paid

16   significantly less for it.  Plaintiff Schorr is now stuck with a PurePulse Tracker that cannot

17   perform the precise and vital task for which he purchased it and which does not function as Fitbit

18   expressly promised and warranted.

19          22.     Plaintiff BRUCE MORGAN is a Texas citizen and resident domiciled in Royse

20   City, Texas.  Plaintiff Morgan is a fitness enthusiast who sought to monitor his heart rate during

21   exercise.  Although he owned a chest strap heart rate monitor, he was attracted to Fitbit's

22   representations about the ability of the PurePulse Trackers to consistently record accurate heart

23   rate, even during exercise, combined with the apparent convenience of a wrist-based device.

24   Relying on Fitbit's representations, Plaintiff Morgan purchased a Charge HR at Kohl's in

25   Rockwall, Texas, on December 4, 2015.  At no point before or during the purchase of his Charge

26   HR was Plaintiff Morgan provided with or required to agree to an arbitration clause or class

27   action ban, nor was he put on notice that he would be required to agree to an arbitration clause or

28   class action ban for his Charge HR to function as intended.  Plaintiff Morgan noticed almost

AMENDED CLASS ACTION COMPLAINT
NO. 16-CV-00036-VC

1    immediately after purchasing his Charge HR that the heart rate function did not work as

2    represented.  Following intense workouts, his actual pulse would approach 160 bpm; his

3    PurePulse Tracker, in contrast, would display no more than 120 bpm, or give no reading at all.

4    Plaintiff Morgan took every effort to comply with Fitbit's fitting instructions, but no matter how

5    hard he tried, the results were always the same: his Charge HR's heart rate readings were

6    inaccurate to the point of being useless during exercise.  Had Fitbit disclosed that the PurePulse

7    Trackers cannot consistently deliver accurate heart rate readings, even during exercise, Plaintiff

8    Morgan would not have purchased his Charge HR or would have paid significantly less for it.

9    Plaintiff Morgan is now stuck with a PurePulse Tracker that cannot perform the precise task for

10   which he purchased it and which does not function as Fitbit expressly promised and warranted.

11            ***Defendant***

12            23.     Defendant Fitbit, Inc. is a corporation doing business in all 50 states.  Fitbit

13   designs, manufactures, promotes, and sells the PurePulse Trackers described herein.  Fitbit is

14   organized and incorporated under the laws of Delaware, and its principal place of business is in

15   San Francisco, California.  It is therefore a citizen of Delaware and California.  *See* 28 U.S.C.

16   § 1332(c)(1).

17            **COMMON FACTUAL ALLEGATIONS**

18            24.     Fitbit is a manufacturer of activity trackers founded in 2007 and headquartered in

19   San Francisco, California.  Its products' functions have included, among other things, step

20   counting, distance calculating, calorie calculating, and sleep monitoring.

21            25.     In October 2014, Fitbit announced a new feature: wrist-based heart rate

22   monitoring.  The two products equipped with this technology, dubbed PurePulse, are the Charge

23   HR and the Surge, which typically retail at approximately $150[5] and $250 respectively.  Those

24   products are shown below:

25

26

27   _____

28   [5] In contrast, the Charge model without a heart rate monitor originally retailed for approximately
     $130 and now sells for approximately $100.

AMENDED CLASS ACTION COMPLAINT
                                                       NO. 16-CV-00036-VC



## I.    Fitbit Falsely Claims the PurePulse Trackers Consistently Record Accurate Heart Rate.

26.    Heart rate monitoring is an important feature for exercisers.  Among other things, it can help users achieve and maintain proper intensity, measure effort, track progress, and stay motivated.  And for those with certain health conditions—like Plaintiffs Urban, Schorr, Rubinstein, and Callan—monitoring one's heart rate can be essential to staying safe. Traditionally, however, accurate heart rate monitoring required a chest strap, which can be uncomfortable, distracting, difficult to clean, and may not work with dry skin.

27.    Fitbit attempted to circumvent these problems with its wrist-based PurePulse technology, which it expressly contrasts with "uncomfortable" chest straps.

28.    Per Fitbit's promotional materials, PurePulse uses LED lights to detect changes in capillary blood volume.  It then applies "finely tuned algorithms" to "measure heart rate automatically and continuously" and allow users to "accurately track workout intensity."[6]

29.    Unsurprisingly, the feature is the centerpiece of Fitbit's promotional efforts.  The widely-circulated advertisements include slogans like: "The Difference Between Good and Great…Is Heart"; "For Better Fitness, Start with Heart"; "Get More Benefits with Every Beat—Without An Uncomfortable Chest Strap"; "Know Your Heart"; and "Every Beat Counts."

---

[6] Available at: http://help.fitbit.com/articles/en_US/Help_article/Heart-rate-FAQs#How (last visited January 5, 2016).

AMENDED CLASS ACTION COMPLAINT
NO. 16-CV-00036-VC

30.     These representations feature in an extensive and widespread advertising campaign.  As noted, the "Know Your Heart" commercial, for example, appeared prominently throughout Major League Baseball's nationally-televised 2015 World Series, which averaged 14.7 million viewers per game.

31.     Importantly, these advertisements and product descriptions do not state or even remotely suggest that the PurePulse technology works only at low or resting heart rates.  To the contrary, Fitbit expressly markets the PurePulse Trackers for activity and fitness, and depicts them in use during high-intensity workouts.

32.     The following advertisement, for example, shows a user wearing a Charge HR and jumping rope.  That, combined with the elevated heart rate shown on the featured device—135 bpm—and the tag line's promise that "Every beat counts," indicates that the product accurately records every beat, even during high-intensity exercise.



33.     Similarly, the following commercial screenshots purport to show the PurePulse Trackers delivering real-time, elevated heart rate readings during strenuous activity:

AMENDED CLASS ACTION COMPLAINT
NO. 16-CV-00036-VC

1
2
3
4
5
6
7
8
9
10
11
12



13
14
15
16
17
18
19
20
21



22    34.    In addition, the following promotional materials tout the PurePulse Trackers'

23 ability to monitor "real-time heart rate" at intensity, and to "track[] your heart rate all day and

24 during exercise."

25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





35.     Fitbit's representations are also present at many points of sale.  Some Best Buy locations, for example, maintain a full comparative display with an interactive touchscreen and video feature, as shown below.

1
2
3
4
5
6
7
8

 

36.   Some Target sites feature a similar, though lower-tech, display:

9
10
11
12
13
14
15
16
17
18
19
20
21
22



23
24
25
26
27
28

37.   Fitbit's representations even permeate electronic points of sale of third-party online retailers.  For example, in advertising the Charge HR, the Kohl's website encourages consumers to "Make every beat count!" and promises that the  "Charge HR delivers continuous,

wrist-based heart rate and activity tracking during workouts and beyond."[7]  These representations

track Fitbit's advertisements verbatim.

38.      In sum, Fitbit's representations regarding the ability of the PurePulse Trackers to

consistently record accurate heart rates, even during exercise, are unambiguous and widespread.

## II.      The PurePulse Trackers Fail to Consistently Record Accurate Heart Rate as Promised and Warranted.

39.      Unfortunately, the PurePulse Trackers do not work, and their heart rate readings

are wildly inaccurate.

40.      Plaintiff Black, for example, observed that her Charge HR under-recorded her

heart rate while exercising with her personal trainer.  Shortly after a high-intensity routine, they

compared her Charge HR's heart reading with a manual heart rate test, and found the PurePulse

Tracker significantly under-recorded her heart rate.

41.      Plaintiff McLellan had the same problem.  She cross-referenced the heart rate

readings from her Charge HR with the readings from a stationary cardiovascular machine.  Again,

the readings from her PurePulse Tracker were too low.

42.      Plaintiff Urban had the same problem, which he verified by checking his Surge

against his chest strap heart rate monitor.

43.      Indeed, every named Plaintiff observed significant inaccuracies, which rendered

their PurePulse Trackers effectively worthless as high-intensity heart rate monitors.

44.      Scores of customer complaints confirm these are not isolated incidents.  The

following, for example, is a non-exhaustive sampling of complaints about the PurePulse Trackers

drawn from user reviews on Amazon.com:

- "The HR technology is not accurate. It's close enough below 100bpm. But 100+ and it's consistently off by 30-50%. I tested this multiple times against my chest strap and other monitors in the gym."

- "The FitBit is regularly lower than the Polar [chest strap monitor] or cannot capture a reading at all."

---

[7] Available at: http://www.kohls.com/product/prd-2389728/fitbit-charge-hr-wireless-activity-heart-rate-wristband.jsp (last visited January 28, 2016).

- "Workouts I know I've kept my heart rate in the 140-170 range, Fitbit says an average of 100 bpm and a max of 120. I've measure it against a chest strap as well as machines at the gym. It's just not accurate, simple as that. Huge disappointment. Not to mention it randomly stops tracking heart rate during the workout…"

- "I checked the HR accuracy of the new fitbit Charge by using it along with my Zephyr HRM which is worn on the chest and I have used for several years now. The accuracy of the fitbit swung wildly even when I switched the HR controls of the Charge from 'auto' to 'on'. It could be off by as much as 20 BPM! That's fricken robbing me of my workout!"

- "I followed all the directions very closely as far as placement, etc, but there is a 30 beat/min difference between the fitbit and my Timex HR chest strap HR monitor with the discrepancy increasing as my heart rate increased."

- "[A]s soon as my HR got above 120 [the Charge HR] either shuts down or just sits on 120. On a couple different occasions I wore my Polar at the same time. Polar had my highest heart rate at 160 BPM while the charge hr had me resting at 75."

- "Paid extra money for HR function and it's useless….If accuracy is important to you, this isn't for you."

- "If you are buying the HR version you are essentially just buying a more expensive Charge that has two green lights on the back and has a nicer strap because the heart rate function is useless."

- "While working out, the heart rate jumps around for no reason. I have tried many different positions and modified the tightness. Nothing seems to help….What good is tracking your heart rate when it's mostly wrong[?]"

- "I am a 82 year old with a resting heart rate of 50 BPM just trying to stay in good basic shape using a stationary bike and rowing machine. I do 30-60 minute sessions at about 100-110 BPM…When I am working the exercise machines the reading is far short of my actual heart rate. I have tried all the suggestions here and on the Fitbit site. No luck. I am reminded of the proverbial broken clock which is 100% accurate twice a day."

45.     Expert analysis has further corroborated the inability of the PurePulse Trackers to perform as promised and warranted.  A board-certified cardiologist tested the PurePulse Trackers against an electrocardiogram ("ECG"), the gold standard of heart rate monitoring, on a number of subjects at various exercising intensities.

46.     The results were as expected: the PurePulse Trackers consistently mis-recorded the heart rates by a significant degree.  At intensities over 110 bpm, the PurePulse Trackers often failed to record any heart rate at all.  And even when they did record heart rates, the PurePulse Trackers were inaccurate by an average of 24.34 bpm, with some readings off by as many as 75

bpm.  With those margins of error, the PurePulse Trackers are effectively worthless as heart rate monitoring devices.

47.     Several independent reviews reached similar conclusions.  Wareable.com, for instance, concluded that the Charge HR heart rate readings were "criminally wide of the mark," even at rest. [8]  Similarly, it found that the Surge took between five and eight minutes to get even close to the proper heart rate during exercise, and even then, it failed to record heart rates in even the right "zone" about twenty percent of the time.[9]  Ultimately, the review concluded that the PurePulse Trackers offer nothing more than an "estimate" of heart rate, and the publication could not recommend the PurePulse Trackers for "those doing training based on heart rate zones."[10]

48.     A German consumer organization, Stiftung Warentest, conducted a comparable test pitting a PurePulse Tracker against an ECG on five subjects at a variety of intensities.  After the testing, the reviewers found the heart rate readings "imprecise" and gave the heart rate functionality a "D" grade.[11]

49.     Upon information and belief, Fitbit has not responded publicly to these studies. Fitbit has responded, however, to the allegations in this Complaint.  It repeatedly told the press that "our team has performed and continues to perform internal studies to validate our products' performance."[12]  Yet Fitbit has not referenced a single, specific study which it contends in fact validates its products' performance, nor has it disclosed the details of *any* study to Plaintiffs' counsel, despite their repeated requests.

50.     Instead, in discussions with Plaintiffs' counsel, Fitbit has relied on a recent, two-subject test conducted by Consumer Reports,[13] which post-dates Plaintiffs' original Complaint

---

[8] James Stables, *Fitbit Charge HR review, UPDATED: Fitbit's flagship tracker now lags behind the competition*, Wareable (Dec. 15, 2015), http://www.wareable.com/fitbit/fitbit-charge-hr-review.

[9] Shane Richmond, *The real world wrist-based heart rate monitor test: Are they accurate enough? Fitbit, Mio and Basis versus the trusty chest strap*, Wareable (July 3, 2015), http://www.wareable.com/fitness-trackers/heart-rate-monitor-accurate-comparison-wrist.

[10] *Id.*

[11] *Noch nicht in Topform*, Stiftung Warentest (Jan. 2016), https://www.test.de/Fitnessarmbaender-Nur-zwei-von-zwoelf-sind-gut-4957497-0/

[12] *See, e.g.*, Jason Cipriani, *Lawsuit Says Fitbit Fitness Trackers Are Inaccurate*, Fortune (Jan. 6, 2016), http://fortune.com/2016/01/06/fitbit-heart-rate-accuracy-lawsuit/.

[13] Patrick Austin, *Taking the Pulse of Fitbit's Contested Heart Rate Monitors*, Consumer Reports

*Footnote continued on next page*

1   and Fitbit's representations about its internal studies.  But the Consumer Reports experiment

2   suffers from serious flaws—it employed only two subjects and compared the PurePulse Trackers

3   to a chest strap monitor, not an ECG—and does not begin to counter the overwhelming evidence

4   demonstrating the inaccuracy of the PurePulse Trackers.

5          51.     Fitbit's other public defense to the allegations in this Complaint is an (irrelevant)

6   after-the-fact disclaimer.  Fitbit has pleaded with the press that the PurePulse Trackers "are not

7   intended to be scientific or medical devices."[14]  Of course, whether the PurePulse Trackers are

8   "medical devices" is beside the point.  Representations regarding the accuracy of heart rate

9   monitors do have significant health and safety implications regardless of how the devices are

10  labeled.  Regardless, what matters in this case is that Fitbit represented to Plaintiffs and the Class

11  that the PurePulse Trackers could consistently record accurate heart rates when in fact they

12  cannot.  This is classic consumer fraud.

13         52.     Interestingly, Fitbit even *admitted* informally to some Class members that the

14  PurePulse Trackers are inaccurate during high-intensity workouts.  As such, the PurePulse

15  Trackers fail to perform the precise task for which they are expressly marketed, and Class

16  members are deprived of the clear benefit of the bargain.

17  **III.   Fitbit Attempted to Keep Class Members Out of Court Through an Unconscionable
        Post-Purchase Agreement, Which Class Members Were Required to Accept in
18      Order to Render Operational the PurePulse Trackers They Already Purchased.**

19         53.     Plaintiffs and Class members did not sacrifice their constitutional rights to a jury

20  trial, their right to join a class action, or any substantive statutory rights when they purchased

21  their PurePulse Trackers.  No agreement to so limit their rights was requested by anyone or

22  represented to be necessary to complete the purchase transactions, nor was there any indication at

23  the point of sale or on the product packaging that such an agreement would be necessary to render

24  their PurePulse Trackers operational.

25  _____

*Footnote continued from previous page*

26  (Jan. 22, 2016), http://www.consumerreports.org/fitness-trackers/taking-the-pulse-of-fitbits-
    contested-heart-rate-monitors.

27  [14] *Fitbit accused of putting customers in danger with 'wildly inaccurate' heart rate readings*, ITV
    Report (Jan. 8, 2016), http://www.itv.com/news/2016-01-08/fitbit-accused-of-putting-customers-
28  in-danger-with-wildly-inaccurate-heart-rate-readings/.

54.     Only *after* purchasing their PurePulse Trackers were Plaintiffs and Class members informed that in order to render their PurePulse Trackers functional, they must first register and create an online account through Fitbit.com and, in doing so, purportedly bind themselves to an adhesive arbitration clause and class action ban.

55.     Fitbit's Vice President for Customer Support, Jay Kershner, recently conceded under oath that because the PurePulse Trackers are "wireless-enabled wearable devices . . . [a] Fitbit user cannot use their [PurePulse Trackers] as intended until the user has set up an [online] account.  In fact, the Charge HR cannot even be used as a watch until the device is first paired to a Fitbit account, which requires the user to agree to the Terms of Service."  (*Brickman v. Fitbit, Inc.*, No. 3:15-cv-2077-JD, Doc. 41 at ¶4 (N.D. Cal. Sept. 30, 2015)).[15]

56.     Agreeing to those Terms of Service, in turn, comes at a high and hidden cost.  The Terms of Service contain a section entitled "Dispute Resolution" which, among other things, purports to:

   a.     eliminate the consumer's constitutional rights to a jury trial by designating binding arbitration as the only forum for dispute resolution (with a one-sided exception allowing Fitbit to utilize the courts to prosecute intellectual property claims);

   b.     prohibit class actions; and

   c.     impose an extra-judicial, one-year statute of limitations on every one of the Class members' potential causes of action relating to use of the PurePulse Trackers.

57.     Notably, the Terms of Service claims to govern not just the services offered through the online account, but also any conceivable grievance that might arise from use of the PurePulse Trackers themselves, regardless of whether that use implicates the wireless service.

58.     Even more remarkably, Fitbit maintains that the Terms of Service bind anyone who so much as visits Fitbit's website, even if they do not register for an account.

---

[15] As defined below, the proposed Class definition excludes those who purchased their PurePulse Trackers directly from Fitbit.com.  Upon information and belief, those consumers were the only ones even informed of Fitbit's Terms of Service prior to finalizing their PurePulse Tracker purchases.

1          59.     This unilateral and unconscionable attempt to curtail Class members'

2    constitutional and statutory rights is buried near the end of a long document and, unlike the

3    preceding section, is not highlighted or emphasized in any way.

4          60.     Moreover, while the Dispute Resolution section contains an inconspicuous

5    provision outlining a limited procedure for opting out of the arbitration agreement, no such opt-

6    out possibility exists for the class action waiver, the one-year statute of limitation, or the clauses

7    governing selection of law and forum.[16]

8          61.     To reiterate, there is no mention on the product packaging or anywhere else at the

9    point of sale that the PurePulse Trackers will work as intended only after setting up an online

10   account or, critically, that such an account will be governed by Terms of Service including the

11   unconscionable provisions detailed above.

12         62.     Those post-purchase clauses are therefore invalid and unenforceable as a matter of

13   law to Plaintiffs and Class members.

## CLASS ACTION ALLEGATIONS

15         63.     Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of

16   all other persons similarly situated as members of the proposed Class, pursuant to Federal Rules

17   of Civil Procedure 23(a) and (b)(3), and/or (b)(1), (b)(2), and/or (c)(4).  This action satisfies the

18   numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of

19   those provisions.

20         64.     The proposed Class is defined as:

21                              **Nationwide Class**

22              All persons or entities in the United States who purchased a Fitbit
                PurePulse Tracker, as defined herein, excluding those who
23              purchased their PurePulse Trackers directly from Fitbit on
                Fitbit.com and who did not opt out of the arbitration agreement.
24
           65.     California law applies to the claims of all Class members, for the reasons outlined
25
     below.  In the alternative, however, the proposed Subclasses are defined as:
26

27
   _____

28   [16] As noted above, Plaintiff Dunn opted out of arbitration within the prescribed thirty-day period.

**Arizona Subclass**

All persons or entities in Arizona who purchased a Fitbit PurePulse Tracker, as defined herein, excluding those who purchased their PurePulse Trackers directly from Fitbit on Fitbit.com and who did not opt out of the arbitration agreement.

**California Subclass**

All persons or entities in California who purchased a Fitbit PurePulse Tracker, as defined herein, excluding those who purchased their PurePulse Trackers directly from Fitbit on Fitbit.com and who did not opt out of the arbitration agreement.

**Colorado Subclass**

All persons or entities in Colorado who purchased a Fitbit PurePulse Tracker, as defined herein, excluding those who purchased their PurePulse Trackers directly from Fitbit on Fitbit.com and who did not opt out of the arbitration agreement.

**Florida Subclass**

All persons or entities in Florida who purchased a Fitbit PurePulse Tracker, as defined herein, excluding those who purchased their PurePulse Trackers directly from Fitbit on Fitbit.com and who did not opt out of the arbitration agreement.

**Maryland Subclass**

All persons or entities in Maryland who purchased a Fitbit PurePulse Tracker, as defined herein, excluding those who purchased their PurePulse Trackers directly from Fitbit on Fitbit.com and who did not opt out of the arbitration agreement.

**Michigan Subclass**

All persons or entities in Michigan who purchased a Fitbit PurePulse Tracker, as defined herein, excluding those who purchased their PurePulse Trackers directly from Fitbit on Fitbit.com and who did not opt out of the arbitration agreement.

**Ohio Subclass**

All persons or entities in Ohio in who purchased a Fitbit PurePulse Tracker, as defined herein, excluding those who purchased their PurePulse Trackers directly from Fitbit on Fitbit.com and who did not opt out of the arbitration agreement.

**Texas Subclass**

All persons or entities in Texas who purchased a Fitbit PurePulse Tracker, as defined herein, excluding those who purchased their PurePulse Trackers directly from Fitbit on Fitbit.com and who did not opt out of the arbitration agreement.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Wisconsin Subclass**

All persons or entities in Wisconsin who purchased a Fitbit
PurePulse Tracker, as defined herein, excluding those who
purchased their PurePulse Trackers directly from Fitbit on
Fitbit.com and who did not opt out of the arbitration agreement.

66.     Excluded from the Nationwide Class and Subclasses (the "Classes") are:

(A) Fitbit, any entity or division in which Fitbit has a controlling interest, and their legal

representatives, officers, directors, assigns, and successors; (B) the Judge to whom this case is

assigned and the Judge's staff; (C) governmental entities; and (D) those persons who have

suffered personal injuries or actionable emotional distress as a result of the facts alleged herein.

Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation

reveal that any Class should be expanded, divided into additional subclasses, or modified in any

other way.

**Numerosity and Ascertainability**

67.     Although the exact number of Class members is uncertain, the size of the Classes

can be estimated with reasonable precision, and the number is great enough that joinder is

impracticable.

68.     Fitbit sold 3,866,000 units in the first quarter of 2015.[17]  Analysts suggest that

most of these sales were generated by the Charge HR,[18] and Fitbit attributes 78% of its first

quarter revenue to the Charge HR and Surge together.  Fitbit's second quarter of 2015 was even

stronger, recording approximately 4.5 million units sold, and bringing in revenue of

approximately $400 million.[19]  The number of Class members is therefore likely in the millions,

and the disposition the Class members' claims in a single action will provide substantial benefits

to all parties and to the Court.  Class members are readily identifiable from information and

---

[17] Fitbit's Amendment No. 2 to Form S-1 Registration Statement (June 2, 2015), available at
https://www.sec.gov/Archives/edgar/data/1447599/000119312515209758/d875679ds1a.htm.

[18] Mark Sullivan, *Fitbit's first earnings since IPO reveals $400M in revenue and 4.5M wearables
sold in Q2*, VentureBeat (Aug. 5, 2015), http://venturebeat.com/2015/08/05/fitbits-first-earnings-
since-ipo-reveals-400m-in-revenue-and-4-5m-wearables-sold-in-q2/.

[19] Sam Ashcroft, *Fitbit sold 4.5 million trackers last quarter and smashed financial estimates*,
Wareable, (Aug. 6, 2015), http://www.wareable.com/fitbit/tracker-sales-q2-2015-financial-
results-1488.

1   records in possession, custody, or control of Fitbit, the Class members, and the PurePulse Tracker

2   retailers.

3                                        **Typicality**

4            69.     The claims of the representative Plaintiffs are typical of the claims of the Classes

5   in that the representative Plaintiffs, like all Class members, purchased a PurePulse Tracker

6   designed, manufactured, and distributed by Fitbit.  The representative Plaintiffs, like all Class

7   members, were damaged by Fitbit's misconduct in that they have suffered actual damages as a

8   result of their purchase of the PurePulse Trackers.  Furthermore, the factual bases of Fitbit's

9   misconduct are common to all Plaintiffs and represent a common thread of misconduct resulting

10  in injury to all Class members.

11                                  **Adequate Representation**

12           70.     Plaintiffs are members of the Classes and will fairly and adequately represent and

13  protect the interests of the Classes.  Plaintiffs have retained counsel with substantial experience in

14  prosecuting consumer class actions, including actions involving defective products.

15           71.     Plaintiffs and their counsel are committed to vigorously prosecuting this action on

16  behalf of the Classes and have the financial resources to do so.  Neither Plaintiffs nor their

17  counsel have interests adverse to those of the Classes.

18                              **Predominance of Common Issues**

19           72.     There are numerous issues of law and fact common to Plaintiffs and Class

20  members that predominate over any issue affecting only individual Class members.  Resolving

21  these common issues will advance resolution of the litigation as to all Class members.  These

22  common legal and factual issues include:

23                   a.      whether the PurePulse Trackers fail to consistently deliver accurate heart

24  rate monitoring, as advertised and warranted;

25                   b.      whether Fitbit knew or should have known that the PurePulse Trackers do

26  not consistently deliver accurate heart rate monitoring;

27                   c.      whether the inability of the PurePulse Trackers to consistently record

28  accurate heart rates constitutes a material fact that reasonable consumers would have considered

1    important in deciding whether to purchase a PurePulse Tracker or pay an increased price for

2    them;

3                    d.      whether Fitbit's concealment of the Heart Rate Defect in the PurePulse

4    Trackers induced reasonable consumers to act to their detriment by purchasing a PurePulse

5    Tracker;

6                    e.      whether Fitbit made material misrepresentations regarding PurePulse

7    Trackers;

8                    f.      whether Fitbit had a duty to disclose the true nature of the PurePulse

9    Trackers to Plaintiffs and Class members;

10                   g.      whether Fitbit omitted and failed to disclose material facts about the

11   PurePulse Trackers;

12                   h.      whether Plaintiffs and Class members are entitled to a declaratory

13   judgment;

14                   i.      whether Plaintiffs and Class members are entitled to equitable relief,

15   including, but not limited to, a preliminary and/or permanent injunction, and /or rescission;

16                   j.      whether Plaintiffs and Class members are entitled to restitution and/or

17   disgorgement and the amount of such;

18                   k.      whether Plaintiffs and Class members are entitled to actual damages and

19   the amount of such; and

20                   l.      whether Plaintiffs and Class members are entitled to punitive or exemplary

21   damages and the amount of such.

22                                           **Superiority**

23           73.     Plaintiffs and Class members all suffered—and will continue to suffer—harm and

24   damages as a result of Fitbit's uniformly unlawful and wrongful conduct.  A class action is

25   superior to other available methods for the fair and efficient adjudication of this controversy.

26           74.     Absent a class action, most Class members would likely find the cost of litigating

27   their claims prohibitively high and would have no effective remedy at law.  Because of the

28   relatively small size of the individual Class members' claims, it is likely that few, if any, Class

1   members could afford to seek legal redress for Fitbit's misconduct.  Absent a class action, Class

2   members' damages will go uncompensated, and Fitbit's misconduct will continue without

3   remedy.

4         75.     Class treatment of common questions of law and fact would also be a superior

5   method to multiple individual actions or piecemeal litigation in that class treatment will conserve

6   the resources of the courts and the litigants, and will promote consistency and efficiency of

7   adjudication.

8         76.     Fitbit has acted in a uniform manner with respect to the Plaintiffs and Class

9   members.

10        77.     Classwide declaratory, equitable, and injunctive relief is appropriate under

11  Rule 23(b)(1) and/or (b)(2) because Fitbit has acted on grounds that apply generally to the class,

12  and inconsistent adjudications with respect to the Fitbit's liability would establish incompatible

13  standards and substantially impair or impede the ability of Class members to protect their

14  interests.  Classwide relief assures fair, consistent, and equitable treatment and protection of all

15  Class members, and uniformity and consistency in Fitbit's discharge of their duties to perform

16  corrective action regarding the PurePulse Trackers.

17                          **CHOICE OF LAW ALLEGATIONS**

18        78.     Because this Complaint is brought in California, California's choice of law regime

19  governs the state law allegations in this Complaint.

20        79.     Under California's governmental interest/comparative impairment choice of law

21  rules, California law applies to the claims of all Class members, regardless of their state of

22  residence or state of purchase.

23        80.     Because Fitbit is headquartered—and made all decisions relevant to these

24  claims—in California, California has a substantial connection to, and materially greater interest

25  in, the rights, interests, and policies involved in this action than any other state.

26        81.     Nor would application of California law to Fitbit and the claims of all Class

27  members be arbitrary or unfair.  Indeed, in its Terms of Service, Fitbit declares that, regardless of

28  any state's conflict of law principles, "the resolution of any Disputes shall be governed by and

1   construed in accordance with the laws of the State of California."  Although the Terms of Service

2   are void and unenforceable as to Plaintiffs and Class members in other respects, this provision

3   demonstrates Fitbit's awareness and agreement that California law should apply to the claims in

4   this Complaint, and Fitbit is estopped from contending otherwise.

5   **CLAIMS FOR RELIEF**

6   **FIRST CLAIM FOR RELIEF**

Violations of California's Consumers Legal Remedies Act ("CLRA"),
7   Cal. Civ. Code § 1750, *et seq.*

8         82.    Plaintiffs hereby incorporate by reference the allegations contained in the

9   preceding paragraphs of this Complaint.

10         83.    This claim is brought on behalf of the Nationwide Class and California Subclass to

11   seek injunctive  relief as well as monetary damages against Fitbit under California's Consumers

12   Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*

13         84.    Fitbit is a "person" as defined by the CLRA.  Cal. Civ. Code § 1761(c).

14         85.    Plaintiffs and Class members are "consumers" within the meaning of the CLRA,

15   as defined by Cal. Civ. Code § 1761(d), who purchased one or more PurePulse Trackers.

16         86.    The CLRA prohibits "unfair or deceptive acts or practices undertaken by any

17   person in a transaction intended to result or which results in the sale or lease of goods or services

18   to any consumer[.]"  Cal. Civ. Code § 1770(a).

19         87.    Fitbit engaged in unfair or deceptive trade practices that violated Cal. Civ. Code §

20   1770(a), as described above and below, by, among other things, failing to disclose the defective

21   nature of the PurePulse Trackers, representing that the PurePulse Trackers had characteristics and

22   benefits that they do not have (e.g., the ability to consistently record accurate heart rates, even

23   during high-intensity exercise), representing that the PurePulse Trackers were of a particular

24   standard, quality, or grade when they were of another, and advertising PurePulse Trackers with

25   the intent not to sell them as advertised.  *See* Cal. Civ. Code §§ 1770(a)(5), (a)(7), (a)(9).

26         88.    Fitbit knew, should have known, or was reckless in not knowing that its products

27   did not have the qualities, characteristics, and functions it represented, warranted, and advertised

28   them to have.

1      89.    Fitbit's unfair and deceptive acts or practices occurred repeatedly in Fitbit's course

2   of trade or business, were material, were capable of deceiving a substantial portion of the

3   purchasing public, and imposed a safety risk to Plaintiffs and Class members.

4      90.    Fitbit was under a duty to Plaintiffs and Class members to disclose the deceptive

5   and defective nature of the PurePulse Trackers because:

6          a.    The defect in the PurePulse Trackers presents a safety hazard because

7   Class members could jeopardize their health by relying on the inaccurate heart rate readings and

8   potentially achieving dangerous heart rates;

9          b.    Fitbit was in a superior position to know the true state of facts about the

10   Heart Rate Defect in the PurePulse Trackers;

11         c.    Plaintiffs and Class members could not reasonably have been expected to

12   learn or discover that the PurePulse Trackers contained the Heart Rate Defect; and

13         d.    Fitbit knew that Plaintiffs and Class members could not reasonably have

14   been expected to learn or discover the defect in the PurePulse Trackers.

15     91.    In failing to disclose the defective nature of the PurePulse Trackers, Fitbit

16   knowingly and intentionally concealed material facts and breached its duty not to do so.

17     92.    The facts that were misrepresented, concealed, or not disclosed by Fitbit to

18   Plaintiffs and Class members are material in that a reasonable consumer would have considered

19   them to be important in deciding whether or not to purchase a PurePulse Tracker.  Had Plaintiffs

20   and other Class members known about the true nature and quality of the PurePulse Trackers, they

21   would not have purchased a PurePulse Tracker or would have paid significantly less than they did

22   for their PurePulse Trackers.

23     93.    Plaintiffs and Class members are reasonable consumers who expect that their

24   PurePulse Trackers will consistently record accurate heart rates, as represented.

25     94.    As a result of Fitbit's conduct and unfair or deceptive acts or practices, Plaintiffs

26   and Class members suffered actual damages in that the PurePulse Trackers do not function as

27   represented and are not worth the amount paid and Fitbit has deprived Plaintiffs and Class

28   members the benefit of the bargain.

95.     Plaintiffs and the Class seek an order enjoining Defendant's unfair or deceptive acts or practices, equitable relief, an award of attorneys' fees and costs under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

96.     In addition, many Class members are senior citizens or disabled persons, as defined by Cal. Civ. Code §§ 1761(f) and (g), who suffered substantial economic damage resulting from the Fitbit's fraudulent representations regarding the PurePulse Trackers.  Each of those Class members is entitled to up to an additional $5,000.  Cal. Civ. Code § 1780(b).

97.     In accordance with section 1782(a) of the CLRA, on November 16, 2015, Plaintiffs' counsel served Fitbit with notice of its alleged violations of Cal. Civ. Code § 1770(a) relating to the Heart Rate Defect in the PurePulse Trackers purchased by Plaintiffs and Class members.  Plaintiffs' letter is attached to this Complaint as Exhibit A, for reference.  Fitbit did not correct or agree to correct the actions described in the letter and in this Complaint within thirty (30) days of the notice.  Fitbit's response is attached as Exhibit B.  Plaintiffs and Class members thus seek an award of compensatory, monetary, and punitive damages based on the conduct described herein, as well as any other relief the Court deems proper.

**SECOND CLAIM FOR RELIEF**
Violations of California's Unfair Competition Law,
Cal. Bus. & Prof. Code § 17200, *et seq. – Based On the Heart Rate Defect*

98.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

99.     Plaintiffs bring this cause of action for themselves and on behalf of the Nationwide Class and California Subclass.

100.     California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."  Fitbit's conduct related to the Heart Rate Defect violated each of this statute's three prongs.

101.     Fitbit committed an unlawful business act or practice in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, by their violations of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, as set forth above, by the acts and practices set forth in this Complaint.

1    102.    Fitbit committed unfair business acts and practices in violation of Cal. Bus. &
2    Prof. Code § 17200, *et seq.*, when it represented that the PurePulse Trackers could consistently
3    record accurate heart rate, even during exercise, when in fact they cannot.  The Heart Rate Defect
4    also presents a safety hazard as it can jeopardize the health and safety of users who rely on the
5    inaccurate heart rate readings and unknowingly achieve dangerous heart rates.

6    103.    Fitbit committed fraudulent business acts and practices in violation of Cal. Bus. &
7    Prof. Code § 17200, *et seq.*, when it affirmatively and knowingly misrepresented that the
8    PurePulse Trackers consistently record accurate heart rates, even during high-intensity exercise,
9    when in fact they do not.  Fitbit's representations and concealment of the Heart Rate Defect are
10   likely to mislead the public with regard to the true defective nature of the PurePulse Trackers.

11   104.    Fitbit also disseminated unfair, deceptive, untrue and/or misleading advertising in
12   violation of Cal. Bus. & Prof. Code § 17200, *et seq.* and § 17500, *et seq.* when it distributed
13   advertisements falsely representing that the PurePulse Trackers consistently record accurate heart
14   rates, even at high intensity, when in fact they do not.

15   105.    Fitbit's unfair or deceptive acts or practices occurred repeatedly in the course of
16   Fitbit's trade or business, and were capable of deceiving a substantial portion of the purchasing
17   public.

18   106.    As a direct and proximate result of Fitbit's unfair and deceptive practices,
19   Plaintiffs and Class members suffered and will continue to suffer actual damages.

20   107.    As a result of its unfair and deceptive conduct, Fitbit has been unjustly enriched
21   and should be required to disgorge its unjust profits and make restitution to Plaintiffs and Class
22   members pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

23   108.    Plaintiffs and the Class further seek an order enjoining Fitbit's unfair or deceptive
24   acts or practices, and an award of attorneys' fees and costs under Cal. Code of Civ. Proc. §
25   1021.5.

26

27

28

1

**THIRD CLAIM FOR RELIEF**
Violations of California's Unfair Competition Law,
Cal. Bus. & Prof. Code § 17200, *et seq. – Based on the Post-Purchase "Terms of Service"*

2

3    109.    Plaintiffs hereby incorporate by reference the allegations contained in the

4    preceding paragraphs of this Complaint.

5    110.    Plaintiffs bring this cause of action for themselves and on behalf of the Nationwide

6    Class and California Subclass.

7    111.    California Business & Professions Code § 17200 prohibits acts of "unfair

8    competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair,

9    deceptive, untrue or misleading advertising."

10    112.    Fitbit's conduct related to the post-purchase Terms of Service—unilaterally

11    imposing Terms of Service in a post-purchase agreement that included an arbitration clause with

12    a one-sided exception, forum selection clause, choice of law provision, class action ban, and

13    claim period limitation—constitutes an additional violation of the statute's unfair and fraudulent

14    prongs.

15    113.    Specifically, Fitbit committed unfair and fraudulent business acts and practices in

16    violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, by concealing and failing to alert Plaintiffs

17    and Class members at the point of sale either expressly, or by reference to the Terms of Service,

18    that in order to make full use of the PurePulse Trackers—and, indeed, even to render them

19    operable—they would be required to register for an online account, and that the account would be

20    accompanied by clickwrap terms of service that purport to significantly curtail the Class

21    members' legal rights.

22    114.    Fitbit further advanced this unfair and fraudulent business act and practice by

23    attempting to compel arbitration and preclude class action litigation based on the unconscionable

24    post-purchase agreement. Indeed, in this case, Fitbit instructed Plaintiffs' counsel that "Ms.

25    McLellan cannot litigate her claim and cannot represent a class," despite the fact that she never

26    was presented with or agreed to any such "agreement" prior to purchasing her PurePulse Tracker.

27

28

115.    Fitbit's unfair or deceptive acts or practices occurred repeatedly in the course of Fitbit's trade or business, and were capable of deceiving a substantial portion of the purchasing public.

116.    As a direct and proximate result of Fitbit's unfair and deceptive practices, Plaintiffs and Class members suffered and will continue to suffer actual damages.

117.    As a result of its unfair and deceptive conduct, Fitbit has been unjustly enriched and should be required to disgorge its unjust profits and make restitution to Plaintiffs and Class members pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

118.    Plaintiffs and the Class further seek an order enjoining Fitbit's unfair or deceptive acts or practices, and an award of attorneys' fees and costs under Cal. Code of Civ. Proc. § 1021.5.

## FOURTH CLAIM FOR RELIEF
### Common Law Fraud

119.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

120.    Plaintiffs bring this cause of action for themselves and on behalf of the Nationwide Class and all the Subclasses.

121.    Fitbit engaged in both speaking and silent fraud, and in fraudulent and deceptive conduct.  As described above, Fitbit's conduct defrauded Plaintiffs and Class members, by intentionally leading them to believe, through affirmative misrepresentations, omissions, suppressions, and concealments of material fact, that the PurePulse Trackers possessed important characteristics that they in fact do not possess—namely that they could consistently record accurate heart rate, even during high-intensity exercise—and inducing their purchases.

122.    Fitbit's intentional and material misrepresentations included, among other things, its advertising, marketing materials and messages, and other standardized statements claiming the PurePulse Trackers consistently record accurate heart rates.

123.    The foregoing misrepresentations were uniform across all Class members.  The same extensive and widespread advertising campaign was promoted nationwide, and all of the

- 32 -

1   promotional materials contained the same material representations regarding the PurePulse

2   Trackers' ability consistently record accurate heart rates.

3        124.    These representations were false, as detailed herein.  Fitbit knew the

4   representations were false when it made them and intended to defraud purchasers thereby.

5        125.    Fitbit also had a duty to disclose, rather than conceal and suppress, the full scope

6   and extent of the Heart Rate Defect because:

7              a.    Fitbit had exclusive knowledge of the Heart Rate Defect in the PurePulse

8   Trackers and concealment thereof;

9              b.    The details regarding the Heart Rate Defect in the PurePulse Trackers and

10   concealment thereof were known and/or accessible only to Fitbit;

11              c.    Fitbit knew Plaintiffs and Class members did not know about the Heart

12   Rate Defect in the PurePulse Trackers and concealment thereof; and

13              d.    Fitbit made general representations about the qualities of the PurePulse

14   Trackers, including statements about their performance and abilities that were misleading,

15   deceptive, and incomplete without the disclosure of the fact that the PurePulse Trackers could not

16   consistently record accurate heart rates, particularly during exercise.

17        126.    Fitbit's actions constitute "actual fraud" within the meaning of Cal. Civ. Code §

18   1572 because Fitbit did the following with the intent to deceive Plaintiffs and Class member and

19   to induce them to enter into their contracts:

20              a.    Suggested that the PurePulse Trackers can consistently record accurate

21   heart rates, even at high intensities, even though it knew this to be not true;

22              b.    Positively asserted that the PurePulse Trackers can consistently record

23   accurate heart rates, even at high intensities, in a manner not warranted by the information

24   available to Fitbit;

25              c.    Suppressed the true nature of the Heart Rate Defect from Plaintiffs and

26   Class members; and

27              d.    Promised it would deliver PurePulse Trackers that consistently record

28   accurate heart rates, even at high intensities, with no intention of so doing.

1          127.    Fitbit's actions, listed above, also constituted "deceit" as defined by Cal. Civ.

2    Code § 1710 because Fitbit willfully deceived Plaintiffs and Class members with intent to induce

3    them to alter their positions to their detriment by purchasing defective PurePulse Trackers.

4          128.    Fitbit's fraud and concealment were also uniform across all Class members; Fitbit

5    concealed from everyone the true nature of the Heart Rate Defect in the PurePulse Trackers.

6          129.    Fitbit's misrepresentations and omissions were material in that they would affect a

7    reasonable consumer's decision to purchase a PurePulse Tracker.  Consumers paid a premium for

8    the PurePulse Trackers precisely because they purportedly offered continuous, accurate heart rate

9    readings.

10         130.    Fitbit's intentionally deceptive conduct induced Plaintiffs and Class members to

11   purchase the PurePulse Trackers and resulted in harm and damage to them.

12         131.    Plaintiffs believed and relied upon Fitbit's misrepresentations and concealment of

13   the true facts.  Class members are presumed to have believed and relied upon Fitbit's

14   misrepresentations and concealment of the true facts because those facts are material to a

15   reasonable consumer's decision to purchase the PurePulse Trackers.

16         132.    As a result of Fitbit's inducements, Plaintiffs and Class members sustained actual

17   damages including but not limited to receiving a product that performs as promised and not

18   receiving the benefit of the bargain of their PurePulse Tracker purchases.  If Plaintiffs and Class

19   members had known about the Heart Rate Defect, they would not have purchased the PurePulse

20   Trackers or would have paid significantly less for them.  Fitbit is therefore liable to Plaintiffs and

21   Class members in an amount to be proven at trial.

22         133.    Fitbit's conduct was systematic, repetitious, knowing, intentional, and malicious,

23   and demonstrated a lack of care and reckless disregard for Plaintiffs' and Class members' rights

24   and interests.  Fitbit's conduct thus warrants an assessment of punitive damages under Cal. Civ.

25   Code § 3294 and other applicable states' laws, consistent with the actual harm it has caused, the

26   reprehensibility of its conduct, and the need to punish and deter such conduct.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIFTH CLAIM FOR RELIEF**
Fraud in the Inducement

134.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

135.     Plaintiffs bring this cause of action for themselves and on behalf of the Nationwide Class and all the Subclasses.

136.     Fitbit's fraud and false affirmations of fact, described herein, induced Plaintiffs and Class members to purchase the PurePulse Trackers and thereby enter into a contract with Fitbit.

137.     As described above, Fitbit had a duty to disclose the Heart Rate Defect in the PurePulse Trackers to Plaintiffs and Class members.

138.     As described above, Fitbit's actions constituted actual fraud and deceit as defined by Cal. Civ. Code §§ 1572 and 1710.

139.     Plaintiffs justifiably relied to their detriment on the truth and completeness of Fitbit's material representations regarding the PurePulse Trackers. Class members are presumed to have relied upon Fitbit's misrepresentations and concealment of the true facts because those facts are material to a reasonable consumer's decision to purchase the PurePulse Trackers.

140.     Fitbit's fraud and concealment was also uniform across all Class members; Fitbit concealed from everyone the true nature of the Heart Rate Defect in the PurePulse Trackers.

141.     Plaintiffs and Class members would not have agreed to purchase their PurePulse Trackers, or would have paid less for them, if they had not been deceived by Fitbit.

142.     As a result of Fitbit's inducements, Plaintiffs and Class members sustained actual damages including but not limited to not receiving a product that performs as promised and not receiving the benefit of the bargain of their PurePulse Tracker purchases.

143.     Fitbit's conduct was systematic, repetitious, knowing, intentional, and malicious, and demonstrated a lack of care and reckless disregard for Plaintiffs' and Class members' rights and interests.  Fitbit's conduct thus warrants an assessment of punitive damages under Cal. Civ.

1   Code § 3294 and other applicable states' laws, consistent with the actual harm it has caused, the

2   reprehensibility of its conduct, and the need to punish and deter such conduct.

3                                   **SIXTH CLAIM FOR RELIEF**
                                        Unjust Enrichment
4

5           144.    Plaintiffs hereby incorporate by reference the allegations contained in the

6   preceding paragraphs of this Complaint.

7           145.    Plaintiffs bring this cause of action for themselves and on behalf of the Nationwide

8   Class and all the Subclasses.

9           146.    Fitbit has been unjustly enriched in that it sold the PurePulse Trackers with

10  defective heart rate monitors that do not consistently record accurate heart rates as represented.

11          147.    When purchasing their PurePulse Trackers, Plaintiffs and Class members

12  reasonably believed that the PurePulse Trackers would perform as advertised and as warranted

13  and would consistently record accurate heart rates, even during high-intensity exercise.

14          148.    Plaintiffs and Class members received less than what they paid for in that the

15  PurePulse Trackers do not consistently record accurate heart rates as represented and therefore do

16  not deliver as promised.

17          149.    Plaintiffs and Class members conferred a benefit on Fitbit by purchasing, and

18  paying a premium for, the PurePulse Trackers.  Had Plaintiffs and Class members known about

19  the Heart Rate Defect, they would not have purchased the PurePulse Trackers or would have paid

20  significantly less for them.

21          150.    Fitbit should therefore be required to disgorge all profits, benefits, and other such

22  compensation it obtained through its wrongful conduct.

23                                  **SEVENTH CLAIM FOR RELIEF**
                                        Revocation of Acceptance
24                                        Cal. Com. Code § 2608

25          151.    Plaintiffs hereby incorporate by reference the allegations contained in the

26  preceding paragraphs of this Complaint.

27          152.    Plaintiffs bring this cause of action for themselves and on behalf of the Nationwide

28  Class and the California Subclass.

153.    Plaintiffs and Class members revoke their acceptance of the PurePulse Trackers.

154.    Plaintiffs and Class members had no knowledge of the Heart Rate Defect when they purchased their PurePulse Trackers, and their acceptance of the goods was reasonably induced by the difficulty of discovering the Heart Rate Defect and Fitbit's false representations that the PurePulse Trackers could consistently record accurate heart rates, and therefore were not defective.

155.    The Heart Rate Defect substantially impairs the value of the PurePulse Trackers to Plaintiffs and Class members.

156.    There has been no substantial change in the condition of the PurePulse Trackers not caused by the Heart Rate Defect.

157.    As described herein, Plaintiffs notified Fitbit of the Heart Rate Defect.

158.    Consequently, Plaintiffs and Class members are entitled to revoke their acceptances, receive all payments made to Fitbit, and to all incidental and consequential damages, and all other damages allowable under law, all in amounts to be proven at trial.

## EIGHTH CLAIM FOR RELIEF
### Breach of Express Warranty

159.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

160.    Plaintiffs bring this cause of action for themselves and on behalf of the Nationwide Class and all the Subclasses.

161.    By advertising the heart rate function of the PurePulse Trackers, Fitbit expressly warranted to Plaintiffs and Class members that the PurePulse Trackers would record heart rate accurately, even during exercise.

162.    By way of non-exhaustive example, Fitbit represented that

a.      the PurePulse Trackers provide "continuous, automatic . . . heart rate" monitoring which allows users to "maintain intensity";

b.      "Surge tracks your heart rate all day and ***during exercise***" (emphasis added); and

c.      Charge HR "is an advanced heart rate and activity-tracking wristband, built for all-day activity, **workouts** and beyond." (emphasis added).

163.    Such statements became the basis of the bargain for Plaintiffs and other Class members because such statements are among the facts a reasonable consumer would consider material in the purchase of a heart rate monitoring fitness product.

164.    Fitbit breached this express warranty by delivering PurePulse Trackers that do not deliver as promised and fail to consistently record accurate heart rates, especially during exercise.

165.    As a result of the foregoing breaches of express warranty, Plaintiffs and other Class members have been damaged in that they purchased PurePulse Trackers that could not perform as warranted and did not receive the benefit of the bargain of their PurePulse Tracker purchases.

166.    Plaintiffs and Class members seek all damages permitted by law in an amount to be proven at trial.

<u>NINTH CLAIM FOR RELIEF</u>
Violations of the Magnuson-Moss Act – Implied Warranty
15 U.S.C. § 2301, *et seq.*

167.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

168.    Plaintiffs bring this cause of action for themselves and on behalf of the Nationwide Class and all the Subclasses.

169.    The PurePulse Trackers are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

170.    Plaintiffs and Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3), because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

171.    Fitbit is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

172.     Section 2310(d)(1) of Chapter 15 of the United States Code provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

173.     Fitbit provided Plaintiffs and the other Class members with an implied warranty of merchantability in connection with the purchase or lease of the PurePulse Trackers is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).   As a part of the implied warranty of merchantability, Fitbit warranted that the PurePulse Trackers would pass without objection in the trade as designed, manufactured, and marketed, and were adequately labeled.

174.     Fitbit breached these implied warranties, as described in more detail above, and are therefore liable to Plaintiffs and the Class pursuant to 15 U.S.C. § 2310(d)(1).

175.     Any efforts to limit the implied warranties in a manner that would exclude coverage of the PurePulse Trackers is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the PurePulse Trackers is null and void.

176.     Plaintiffs and the other Class members have had sufficient direct dealings with either Fitbit or its agents to establish privity of contract.

177.     Nonetheless, privity is not required here because Plaintiffs and other Class members are intended third-party beneficiaries of contracts between Fitbit and its retailers, and specifically, of the implied warranties.  The retailers were not intended to be the ultimate consumers of the PurePulse Trackers and have no rights under the warranty agreements provided with the PurePulse Trackers; the warranty agreements were designed for and intended to benefit consumers.

178.     Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Fitbit notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

179.     Furthermore, to the extent such notice is required, it has been provided through the letter sent to Fitbit by Plaintiffs' counsel on November 16, 2015 (Ex. A), described herein, as well

as through complaints lodged by Plaintiff McLellan and other Class members.  Fitbit refused to

remedy its wrongs after receiving these notifications and any further notice would be futile.

180.    Plaintiffs' individual claims place into controversy an amount equal to or

exceeding $25.00.  The amount in controversy of this entire action exceeds the sum of

$50,000.00, exclusive of interest and costs, computed on the basis of all claims to be determined

in this lawsuit.  Plaintiffs, individually and on behalf of the other Class members, seek all

damages permitted by law in an amount to be proven at trial.

181.    In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Class

members are entitled to recover a sum equal to the aggregate amount of costs and expenses

(including attorneys' fees based on actual time expended) determined by the Court to have

reasonably been incurred by Plaintiffs and the other Class members in connection with the

commencement and prosecution of this action.

182.    Further, Plaintiffs and the Class are also entitled to equitable relief under 15 U.S.C.

§ 2310(d)(1).

## TENTH CLAIM FOR RELIEF
Violations of the Song-Beverly Consumer Warranty Act for Breach of the Implied Warranty of
Merchantability
Cal. Civ. Code §§ 1791.1 & 1792

183.    Plaintiffs hereby incorporate by reference the allegations contained in the

preceding paragraphs of this Complaint.

184.    Plaintiffs bring this cause of action for themselves and on behalf of the Nationwide

Class and the California Subclass.

185.    Plaintiffs and members of the Class are "buyers" within the meaning of Cal. Civ.

Code § 1791(b).

186.    The PurePulse Trackers are "consumer goods" within the meaning of Cal. Civ.

Code § 1791(a).

187.    Fitbit is a "manufacturer" of the PurePulse Trackers within the meaning Cal. Civ.

Code § 1791(j).

1      188.    Fitbit impliedly warranted to Plaintiffs and Class members that its PurePulse

2  Trackers were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) and 1792;

3  however, the PurePulse Trackers do not have the quality that a buyer would reasonably expect,

4  and were therefore not merchantable.

5      189.    Cal. Civ. Code § 1791.1(a) states:

6          "Implied warranty of merchantability" or "implied warranty that
           goods are merchantable" means that the consumer goods meet each
7          of the following:

8          (1)    Pass without objection in the trade under the contract
                  description.
9
           (2)    Are fit for the ordinary purposes for which such goods are
10                used.

11         (3)    Are adequately contained, packaged, and labeled.

12         (4)    Conform to the promises or affirmations of fact made on the
                  container or label.
13

14     190.    The PurePulse Trackers would not pass without objection in the trade because they

15  do not perform as warranted because they do not provide consistent, accurate heart rate readings,

16  even during exercise.

17     191.    Similarly, the PurePulse Trackers' inability to consistently record accurate heart

18  rates renders them unfit for the ordinary purpose of a heart rate monitor.

19     192.    The PurePulse Trackers are not adequately labeled because the labeling represents

20  that they consistently record accurate heart rates, which they do not do.

21     193.    For the same reason, the PurePulse Trackers do not conform to the promises or

22  affirmations of fact made on the container or label.

23     194.    Fitbit thus breached the implied warranty of merchantability.

24     195.    As a direct and proximate result of Fitbit's breach of the implied warranty of

25  merchantability, Plaintiffs and the other Class members did not receive the benefit of their

26  bargain and received goods with a defect that substantially impairs their value to Plaintiffs and

27  Class members.  Plaintiffs and Class members were damaged as a result of the defect in the

28  PurePulse Trackers, the products' malfunctioning, and the nonuse of their PurePulse Trackers.

196.     Notice of breach is not required because Plaintiffs and the other Class members did not purchase their PurePulse Trackers directly from Fitbit.

197.     Nevertheless, Plaintiffs notified Fitbit of its breach via a November 16, 2015, letter to its general counsel.

198.     Pursuant to Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs and Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their PurePulse Trackers or the overpayment or diminution in value of their PurePulse Trackers.

199.     Pursuant to Cal. Civ. Code § 1794, Plaintiffs and the other Class members are entitled to costs and attorneys' fees.

**ELEVENTH CLAIM FOR RELIEF**
Violations of the Arizona Consumer Fraud Act
Arizona Rev. Stat. § 44-1521, *et seq.*

200.     Plaintiff Dunn hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

201.     As described above, California law applies to the claims of all Plaintiffs and Class members.  In the alternative, Plaintiff Dunn brings this cause of action for himself and on behalf of the Arizona Subclass, and reserves the right to bring additional and/or different state-law claims should the Court determine that California law does not apply to all Class members.

202.     Fitbit and the Arizona Subclass members are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), Ariz. Rev. Stat. § 44-1521(6).

203.     The PurePulse Trackers are "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

204.     The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, . . . misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale . . . of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A).

205.   In the course of its business, Fitbit willfully failed to disclose and actively concealed the Heart Rate Defect in the PurePulse Trackers as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  Fitbit also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of PurePulse Trackers.

206.   As alleged above, Fitbit made material statements about the characteristics and efficacy of the PurePulse Trackers that were either false or misleading.

207.   Fitbit knew, should have known, or was reckless in not knowing that its products did not have the qualities, characteristics, and functions it represented, warranted, and advertised them to have.

208.   Fitbit owed the Arizona Subclass a duty to disclose the defective nature of PurePulse Trackers, including the Heart Rate Defect because it:

a.   Possessed exclusive knowledge of the Heart Rate Defect in the PurePulse Trackers;

b.   Intentionally concealed the Heart Rate Defect in the PurePulse Trackers through their deceptive marketing campaign; and/or

c.   Made incomplete representations about the characteristics of the PurePulse Trackers, while purposefully withholding material facts from the Arizona Subclass that contradicted these representations.

209.   Fitbit's unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Arizona Subclass, about the true characteristics of the PurePulse Trackers.  Fitbit intentionally and knowingly misrepresented material facts regarding the PurePulse Trackers with an intent to mislead the Arizona Subclass.

210.   The inability of the PurePulse Trackers to consistently record accurate heart rates, even during exercise, was material to the Arizona Subclass.  Had the Arizona Subclass known of the Heart Rate Defect, they would either not have purchased their PurePulse Trackers, or would have paid less for them than they did.

211. All members of the Arizona Subclass suffered ascertainable loss caused by Fitbit's failure to disclose material information. The Arizona Subclass did not receive the benefit of their bargain.

212. The Arizona Subclass members risk irreparable injury as a result of Fitbit's acts and omissions in violation of the Arizona CFA, and these violations present a continuing risk to the Arizona Subclass as well as to the general public. Fitbit's unlawful acts and practices complained of herein affect the public interest.

213. As a direct and proximate result of Fitbit's violations of the Arizona CFA, Plaintiff Dunn and the Arizona Subclass have suffered injury-in-fact and/or actual damage.

214. The Arizona Subclass seeks monetary relief against Fitbit in an amount to be determined at trial. The Arizona Subclass also seeks punitive damages because Fitbit engaged in aggravated and outrageous conduct with an evil mind.

215. The Arizona Subclass also seeks an order enjoining Fitbit's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

**TWELFTH CLAIM FOR RELIEF**
Violations of the Colorado Consumer Protection Act
Colo. Rev. Stat. § 6-1-101, *et seq.*

216. Plaintiff Black hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

217. As described above, California law applies to the claims of all Plaintiffs and Class members. In the alternative, Plaintiff Black brings this cause of action for herself and on behalf of the Colorado Subclass, and reserves the right to bring additional and/or different state-law claims should the Court determine that California law does not apply to all Class members.

218. Colorado's Consumer Protection Act (the "CCPA") prohibits a person from engaging in a "deceptive trade practice," which includes knowingly making "a false representation as to the source, sponsorship, approval, or certification of goods," or "a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods." Colo. Rev. Stat. § 6-1-105(1)(b),(e). The CCPA further prohibits "represent[ing] that

1    goods … are of a particular standard, quality, or grade … if he knows or should know that they

2    are of another," and "advertis[ing] goods … with intent not to sell them as advertised." Colo.

3    Rev. Stat. § 6-1-105(1)(g), (i).

4          219.    Fitbit is a "person" as defined by § 6-1-102(6) of the CCPA. Col. Rev. Stat. § 6-1-

5    101, *et seq.*

6          220.    Plaintiff Black and Colorado Subclass members are "consumers" under the CCPA.

7          221.    In the course of business, Fitbit wilfully misrepresented and failed to disclose the

8    Heart Rate Defect in the PurePulse Trackers.  Fitbit therefore engaged in unlawful trade practices

9    proscribed by the CCPA, including representing that the PurePulse Trackers have characteristics,

10   uses, benefits, and qualities which they do not have; representing that PurePulse Trackers are of a

11   particular standard and quality when they are not; advertising the PurePulse Trackers with the

12   intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

13         222.    Plaintiff Black and Colorado Subclass members were deceived by Fitbit's failure

14   to disclose the Heart Rate Defect in the PurePulse Trackers.

15         223.    Plaintiff Black and Colorado Subclass members reasonably relied upon Fitbit's

16   false and misleading misrepresentations and had no way of knowing that the representations were

17   false and misleading before purchasing their PurePulse Trackers.

18         224.    Fitbit intentionally and knowing misrepresented material facts regarding the Heart

19   Rate Defect in the PurePulse Trackers with an intent to mislead Plaintiff Black and Colorado

20   Subclass members.

21         225.    Fitbit knew, should have known, or was reckless in not knowing that its products

22   did not have the qualities, characteristics, and functions it represented, warranted, and advertised

23   them to have.

24         226.    Fitbit's actions as set forth above occurred in the conduct of trade or commerce.

25         227.    Fitbit's conduct proximately caused injuries to Plaintiff Black and Colorado

26   Subclass members

27         228.    Plaintiff Black and Colorado Subclass members were injured as a direct and

28   natural consequence of Fitbit's conduct in that they purchased PurePulse Trackers they would

1  have not otherwise purchased, or would have paid significantly less for, and did not receive the

2  benefit of their bargain.

3       229.    Pursuant to Col. Rev. Stat. § 6-1-113, Plaintiff Black and the Colorado Subclass

4  seek monetary relief against Fitbit measured as the greater of (a) actual damages in an amount to

5  be determined at trial and the discretionary trebling of such damages, or (b) statutory damages in

6  the amount of $500 for each Colorado Subclass member.

7       230.    Plaintiff Black and Colorado Subclass members also seek an order enjoining

8  Fitbit's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any

9  other just and proper relief available under the CCPA.

10                     **THIRTEENTH CLAIM FOR RELIEF**
                 Violations of Florida's Unfair & Deceptive Trade Practices Act
11                        Fla. Stat. § 501.201, *et seq.*

12       231.    Plaintiff Saito hereby incorporates by reference the allegations contained in the

13  preceding paragraphs of this Complaint.

14       232.    As described above, California law applies to the claims of all Plaintiffs and Class

15  members.  In the alternative, Plaintiff Saito brings this cause of action for herself and on behalf of

16  the Florida Subclass, and reserves the right to bring additional and/or different state-law claims

17  should the Court determine that California law does not apply to all Class members.

18       233.    Plaintiff Saito and the Florida Subclass members are "consumers" within the

19  meaning of Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), Fla. Stat.

20  § 501.203(7).

21       234.    Fitbit engaged in "trade or commerce" within the meaning of Fla. Stat.

22  § 501.203(8).

23       235.    The FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or

24  practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce…."

25  Fla. Stat. § 501.204(1).  Fitbit participated in unfair and deceptive trade practices that violated the

26  FUDTPA as described herein.

27       236.    In the course of its business, Fitbit willfully failed to disclose and actively

28  concealed the Heart Rate Defect in the PurePulse Trackers as described herein and otherwise

1    engaged in activities with a tendency or capacity to deceive.  Fitbit also engaged in unlawful trade

2    practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or

3    concealment, suppression or omission of any material fact with intent that others rely upon such

4    concealment, suppression or omission, in connection with the sale of PurePulse Trackers.

5            237.    As alleged above, Fitbit made material statements about the characteristics and

6    efficacy of the PurePulse Trackers that were either false or misleading.

7            238.    Fitbit knew, should have known, or was reckless in not knowing that its products

8    did not have the qualities, characteristics, and functions it represented, warranted, and advertised

9    them to have.

10           239.    Fitbit owed Plaintiff Saito and the Florida Subclass a duty to disclose the defective

11   nature of PurePulse Trackers, including the Heart Rate Defect because it:

12                   a.      Possessed exclusive knowledge of the Heart Rate Defect in the PurePulse

13   Trackers;

14                   b.      Intentionally concealed the Heart Rate Defect in the PurePulse Trackers

15   through their deceptive marketing campaign; and/or

16                   c.      Made incomplete representations about the characteristics of the PurePulse

17   Trackers, while purposefully withholding material facts from the Florida Subclass that

18   contradicted these representations.

19           240.    Fitbit's unfair or deceptive acts or practices were likely to deceive reasonable

20   consumers, including the Florida Subclass, about the true characteristics of the PurePulse

21   Trackers.  Fitbit intentionally and knowingly misrepresented material facts regarding the

22   PurePulse Trackers with an intent to mislead the Florida Subclass.

23           241.    The inability of the PurePulse Trackers to consistently record accurate heart rates,

24   even during exercise, was material to the Florida Subclass.  Had Plaintiff Saito and the Florida

25   Subclass known of the Heart Rate Defect, they would either not have purchased their PurePulse

26   Trackers, or would have paid less for them than they did.

27

28

1    242.    All members of the Florida Subclass suffered ascertainable loss caused by Fitbit's

2    failure to disclose material information.  The Florida Subclass did not receive the benefit of their

3    bargain.

4    243.    Plaintiff Saito and the Florida Subclass members risk irreparable injury as a result

5    of Fitbit's acts and omissions in violation of the FUDTPA, and these violations present a

6    continuing risk to the Florida Subclass as well as to the general public.  Fitbit's unlawful acts and

7    practices complained of herein affect the public interest

8    244.    Plaintiff Saito and the Florida Subclass members are entitled to recover their actual

9    damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

10   245.    Plaintiff Saito and the Florida Subclass also seek an order enjoining Fitbit's unfair,

11   unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and

12   proper relief available under the FUDTPA.

13
                      **FOURTEENTH CLAIM FOR RELIEF**
                   Violations of the Maryland Consumer Protection Act
14                       Md. Code Com. Law § 13-101, *et seq.*

15   246.    Plaintiff Rubinstein hereby incorporates by reference the allegations contained in

16   the preceding paragraphs of this Complaint.

17   247.    As described above, California law applies to the claims of all Plaintiffs and Class

18   members.  In the alternative, Plaintiff Rubinstein brings this cause of action for himself and on

19   behalf of the Maryland Subclass, and reserves the right to bring additional and/or different state-

20   law claims should the Court determine that California law does not apply to all Class members.

21   248.    Fitbit and the Maryland Subclass members are "persons" within the meaning of

22   Md. Code Com. Law § 13-101(h).

23   249.    The Maryland Consumer Protection Act ("Maryland CPA") provides that a person

24   may not engage in any unfair or deceptive trade practice in the sale of any consumer good.  Md.

25   Code Com. Law § 13-303.  Fitbit participated in misleading, false, or deceptive acts that violated

26   the Maryland CPA, by failing to disclose and actively concealing the Heart Rate Defect in the

27   PurePulse Trackers.

28   250.    Fitbit's actions as set forth above occurred in the conduct of trade or commerce.

251.     In the course of its business, Fitbit willfully failed to disclose and actively concealed the Heart Rate Defect in the PurePulse Trackers as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  Fitbit also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of PurePulse Trackers.

252.     As alleged above, Fitbit made material statements about the characteristics and efficacy of the PurePulse Trackers that were either false or misleading.

253.     Fitbit knew, should have known, or was reckless in not knowing that its products did not have the qualities, characteristics, and functions it represented, warranted, and advertised them to have.

254.     Fitbit owed Plaintiff Rubinstein and the Maryland Subclass a duty to disclose the defective nature of PurePulse Trackers, including the Heart Rate Defect because it:

        a.     Possessed exclusive knowledge of the Heart Rate Defect in the PurePulse Trackers;

        b.     Intentionally concealed the Heart Rate Defect in the PurePulse Trackers through their deceptive marketing campaign; and/or

        c.     Made incomplete representations about the characteristics of the PurePulse Trackers, while purposefully withholding material facts from the Maryland Subclass that contradicted these representations.

255.     Fitbit's unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Maryland Subclass, about the true characteristics of the PurePulse Trackers.  Fitbit intentionally and knowingly misrepresented material facts regarding the PurePulse Trackers with an intent to mislead the Maryland Subclass.

256.     The inability of the PurePulse Trackers to consistently record accurate heart rates, even during exercise, was material to the Maryland Subclass.  Had Plaintiff Rubinstein and the Maryland Subclass known of the Heart Rate Defect, they would either not have purchased their PurePulse Trackers, or would have paid less for them than they did.

257.    All members of the Maryland Subclass suffered ascertainable loss caused by Fitbit's failure to disclose material information.  The Maryland Subclass did not receive the benefit of their bargain.

258.    Plaintiff Rubinstein and the Maryland Subclass members risk irreparable injury as a result of Fitbit's acts and omissions in violation of the Maryland CPA, and these violations present a continuing risk to the Maryland Subclass as well as to the general public.  Fitbit's unlawful acts and practices complained of herein affect the public interest

259.    Pursuant to Md. Code Com. Law § 13-408, the Maryland Subclass members seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

**FIFTEENTH CLAIM FOR RELIEF**
Violations of the Michigan Consumer Protection Act
Mich. Comp. Laws § 445.903, *et seq.*

260.    Plaintiff Callan hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

261.    As described above, California law applies to the claims of all Plaintiffs and Class members.  In the alternative, Plaintiff Callan brings this cause of action for herself and on behalf of the Michigan Subclass, and reserves the right to bring additional and/or different state-law claims should the Court determine that California law does not apply to all Class members.

262.    Plaintiff Callan and Michigan Subclass members are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

263.    Fitbit is a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

264.    The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce.…" Mich. Comp. Laws § 445.903(1).  Fitbit engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including: "(c) Representing that goods or services have… characteristics… that they do not have.…"; "(e) Representing that goods or services are of a particular standard… if they are of another"; "(i) Making false or

misleading statements of fact concerning the reasons for, existence of, or amounts of price

reductions"; "(s) Failing to reveal a material fact, the omission of which tends to mislead or

deceive the consumer, and which fact could not reasonably be known by the consumer";

"(bb) Making a representation of fact or statement of fact material to the transaction such that a

person reasonably believes the represented or suggested state of affairs to be other than it actually

is"; and "(cc) Failing to reveal facts that are material to the transaction in light of representations

of fact made in a positive manner."  Mich. Comp. Laws § 445.903(1).

265.    By failing to disclose and actively concealing the Heart Rate Defect in the

PurePulse Trackers, Fitbit participated in unfair, deceptive, and unconscionable acts that violated

the Michigan CPA.

266.    In the course of its business, Fitbit willfully failed to disclose and actively

concealed the Heart Rate Defect in the PurePulse Trackers as described herein and otherwise

engaged in activities with a tendency or capacity to deceive.  Fitbit also engaged in unlawful trade

practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or

concealment, suppression or omission of any material fact with intent that others rely upon such

concealment, suppression or omission, in connection with the sale of PurePulse Trackers.

267.    Fitbit knew, should have known, or was reckless in not knowing that its products

did not have the qualities, characteristics, and functions it represented, warranted, and advertised

them to have.

268.    Fitbit owed Plaintiff Callan and the Michigan Subclass a duty to disclose the

defective nature of PurePulse Trackers, including the Heart Rate Defect because it:

a.    Possessed exclusive knowledge of the Heart Rate Defect in the PurePulse

Trackers;

b.    Intentionally concealed the Heart Rate Defect in the PurePulse Trackers

through their deceptive marketing campaign; and/or

c.    Made incomplete representations about the characteristics of the PurePulse

Trackers, while purposefully withholding material facts from the Michigan Subclass that

contradicted these representations.

269.    Fitbit's unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Michigan Subclass, about the true characteristics of the PurePulse Trackers.  Fitbit intentionally and knowingly misrepresented material facts regarding the PurePulse Trackers with an intent to mislead the Michigan Subclass.

270.    The inability of the PurePulse Trackers to consistently record accurate heart rates, even during exercise, was material to the Michigan Subclass.  Had Plaintiff Callan and the Michigan Subclass known of the Heart Rate Defect, they would either not have purchased their PurePulse Trackers, or would have paid less for them than they did.

271.    All members of the Michigan Subclass suffered ascertainable loss caused by Fitbit's failure to disclose material information.  The Michigan Subclass did not receive the benefit of their bargain.

272.    Plaintiff Callan and the Michigan Subclass members risk irreparable injury as a result of Fitbit's acts and omissions in violation of the Michigan CPA, and these violations present a continuing risk to the Michigan Subclass as well as to the general public.  Fitbit's unlawful acts and practices complained of herein affect the public interest

273.    Plaintiff Callan and the Michigan Subclass seek injunctive relief to enjoin Fitbit from continuing its unfair and deceptive acts; monetary relief against Fitbit measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for each Michigan Subclass member; reasonable attorneys' fees; declaratory relief in the nature of a judicial determination of whether Fitbit's conduct violated the Michigan CPA, the just total amount of penalties to be assessed against each thereunder, and the formula and procedure for fair and equitable allocation of statutory penalties among the Michigan Subclass; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

274.    Plaintiff Callan and the Michigan Subclass also seek punitive damages against Fitbit because it carried out despicable conduct with willful and conscious disregard of the rights and safety of others.  Fitbit's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## SIXTEENTH CLAIM FOR RELIEF
Violations of the Ohio Consumer Sales Practices Act
Ohio Rev. Code Ann. § 1345.01, *et seq.*

275.    Plaintiff Schorr hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

276.    As described above, California law applies to the claims of all Plaintiffs and Class members.  In the alternative, Plaintiff Schorr brings this cause of action for himself and on behalf of the Ohio Subclass, and reserves the right to bring additional and/or different state-law claims should the Court determine that California law does not apply to all Class members.

277.    Fitbit is a "supplier" as that term is defined in Ohio Rev. Code § 1345.01(C).

278.    Plaintiff Schorr and the Ohio Subclass members are "consumer[s]" as that term is defined in Ohio Rev. Code § 1345.01(D), and their purchases of the PurePulse Trackers are "consumer transaction[s]" within the meaning of Ohio Rev. Code § 1345.01(A).

279.    The Ohio Consumer Sales Practices Act ("Ohio CSPA"), Ohio Rev. Code § 1345.02, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction.  Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing (i) that goods have characteristics or uses or benefits which they do not have; (ii) that their goods are of a particular quality or grade they are not; and (iii) the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not.  *Id.*  Fitbit's conduct as alleged above and below constitutes unfair and/or deceptive consumer sales practices in violation of Ohio Rev. Code § 1345.02.

280.    By failing to disclose and actively concealing the Heart Rate Defect in the PurePulse Trackers, Fitbit engaged in deceptive business practices prohibited by the Ohio CSPA, including: representing that the PurePulse Trackers have characteristics, uses, benefits, and qualities which they do not have; representing that the PurePulse Trackers are of a particular standard, quality, and grade when they are not; representing that the subject of a transaction involving the PurePulse Trackers has been supplied in accordance with a previous representation when it has not; and engaging in other unfair or deceptive acts or practices.

281.    Fitbit's actions as set forth above occurred in the conduct of trade or commerce.

1      282.   In the course of its business, Fitbit willfully failed to disclose and actively

2  concealed the Heart Rate Defect in the PurePulse Trackers as described herein and otherwise

3  engaged in activities with a tendency or capacity to deceive.  Fitbit also engaged in unlawful trade

4  practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or

5  concealment, suppression or omission of any material fact with intent that others rely upon such

6  concealment, suppression or omission, in connection with the sale of PurePulse Trackers.

7      283.   Fitbit knew, should have known, or was reckless in not knowing that its products

8  did not have the qualities, characteristics, and functions it represented, warranted, and advertised

9  them to have.

10     284.   Fitbit owed Plaintiff Schorr and the Ohio Subclass a duty to disclose the defective

11  nature of PurePulse Trackers, including the Heart Rate Defect because it:

12         a.     Possessed exclusive knowledge of the Heart Rate Defect in the PurePulse

13  Trackers;

14         b.     Intentionally concealed the Heart Rate Defect in the PurePulse Trackers

15  through their deceptive marketing campaign; and/or

16         c.     Made incomplete representations about the characteristics of the PurePulse

17  Trackers, while purposefully withholding material facts from the Ohio Subclass that contradicted

18  these representations.

19     285.   Fitbit's unfair or deceptive acts or practices were likely to deceive reasonable

20  consumers, including the Ohio Subclass, about the true characteristics of the PurePulse Trackers.

21  Fitbit intentionally and knowingly misrepresented material facts regarding the PurePulse Trackers

22  with an intent to mislead the Ohio Subclass.

23     286.   The inability of the PurePulse Trackers to consistently record accurate heart rates,

24  even during exercise, was material to the Ohio Subclass.  Had Plaintiff Schorr and the Ohio

25  Subclass known of the Heart Rate Defect, they would either not have purchased their PurePulse

26  Trackers, or would have paid less for them than they did.

27

28

287.    All members of the Ohio Subclass suffered ascertainable loss caused by Fitbit's failure to disclose material information.  The Ohio Subclass did not receive the benefit of their bargain.

288.    Plaintiff Schorr and the Ohio Subclass members risk irreparable injury as a result of Fitbit's acts and omissions in violation of the Ohio CSPA, and these violations present a continuing risk to the Ohio Subclass as well as to the general public.  Fitbit's unlawful acts and practices complained of herein affect the public interest.

289.    Plaintiff Schorr and the Ohio Subclass members seek punitive damages against Fitbit because its conduct was egregious.

290.    Fitbit on notice pursuant to Ohio Rev. Code § 1345.09(B) that their actions constituted unfair, deceptive, and unconscionable practices.

291.    As a result of the foregoing wrongful conduct of Fitbit, the Ohio Subclass has been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, an order enjoining Fitbit's deceptive and unfair conduct, treble damages, court costs and reasonable attorneys' fees, pursuant to Ohio Rev. Code § 1345.09, *et seq.*

## SEVENTEENTH CLAIM FOR RELIEF
Violations of the Texas Deceptive Trade Practices Act
Tex. Bus. & Com. Code § 17.41, *et seq.*

292.    Plaintiff Morgan hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

293.    As described above, California law applies to the claims of all Plaintiffs and Class members.  In the alternative, Plaintiff Morgan brings this cause of action for himself and on behalf of the Texas Subclass, and reserves the right to bring additional and/or different state-law claims should the Court determine that California law does not apply to all Class members.

294.    Plaintiff Morgan and Texas Subclass members are individuals, partnerships, and corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets). *See* Tex. Bus. & Com. Code § 17.41,

295.    The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA")
prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or
commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of
action," which means "an act or practice which, to a consumer's detriment, takes advantage of the
lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree."
Tex. Bus. & Com. Code § 17.45(5); Tex. Bus. & Com. Code § 17.50(a)(3).  Fitbit committed
false, misleading, unconscionable and deceptive acts or practices in the conduct of trade or
commerce.

296.    Fitbit also violated the Texas DTPA by (1) representing that the PurePulse
Trackers have characteristics, uses, benefits, and qualities which they do not have;
(2) representing that the PurePulse Trackers are of a particular standard, quality, and grade when
they are not; (3) advertising the PurePulse Trackers with the intent not to sell them as advertised;
and (4) failing to disclose information concerning the PurePulse Trackers with the intent to
induce consumers to purchase the PurePulse Trackers.

297.    Fitbit's actions as set forth above occurred in the conduct of trade or commerce.

298.    In the course of its business, Fitbit willfully failed to disclose and actively
concealed the Heart Rate Defect in the PurePulse Trackers as described herein and otherwise
engaged in activities with a tendency or capacity to deceive.  Fitbit also engaged in unlawful trade
practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or
concealment, suppression or omission of any material fact with intent that others rely upon such
concealment, suppression or omission, in connection with the sale of PurePulse Trackers.

299.    Fitbit knew, should have known, or was reckless in not knowing that its products
did not have the qualities, characteristics, and functions it represented, warranted, and advertised
them to have.

300.    Fitbit owed Plaintiff Morgan and the Texas Subclass a duty to disclose the
defective nature of PurePulse Trackers, including the Heart Rate Defect because it:

a.    Possessed exclusive knowledge of the Heart Rate Defect in the PurePulse
Trackers;

1             b.      Intentionally concealed the Heart Rate Defect in the PurePulse Trackers

2 through their deceptive marketing campaign; and/or

3             c.      Made incomplete representations about the characteristics of the PurePulse

4 Trackers, while purposefully withholding material facts from the Texas Subclass that contradicted

5 these representations.

6      301.    Fitbit's unfair or deceptive acts or practices were likely to deceive reasonable

7 consumers, including the Texas Subclass, about the true characteristics of the PurePulse Trackers.

8 Fitbit intentionally and knowingly misrepresented material facts regarding the PurePulse Trackers

9 with an intent to mislead the Texas Subclass.

10     302.    The inability of the PurePulse Trackers to consistently record accurate heart rates,

11 even during exercise, was material to the Texas Subclass.  Had Plaintiff Morgan and the Texas

12 Subclass known of the Heart Rate Defect, they would either not have purchased their PurePulse

13 Trackers, or would have paid less for them than they did.

14     303.    Pursuant to Tex. Bus. & Com. Code § 17.50(a)(1) and (b), the Plaintiff Morgan

15 and the Texas Subclass seek monetary relief against Fitbit measured as actual damages in an

16 amount to be determined at trial, treble damages for Fitbit's knowing violations of the Texas

17 DTPA, and any other just and proper relief available under the Texas DTPA.

18     304.    For those Texas Subclass members who wish to rescind their purchases, they are

19 entitled under Tex. Bus. & Com. Code § 17.50(b)(4) to rescission and other relief necessary to

20 restore any money or property that was acquired from them based on violations of the Texas

21 DTPA.

22     305.    The Texas Subclass also seeks court costs and attorneys' fees under § 17.50(d) of

23 the Texas DTPA.

24     306.    Plaintiff Morgan and the Texas Subclass members have complied with the notice

25 requirement set forth in Tex. Bus. & Com. Code § 17.505(a) by virtue of the letter sent by

26 Plaintiffs' counsel on November 16, 2015, described herein.

27

28

1    307.    Upon filing this Amended Complaint and as required by TEX. BUS. & COM. CODE

2    § 17.501, Plaintiffs will provide the consumer protection division of the Texas Attorney General's

3    office a copy of the demand letter and a copy of the complaint.

4                        **EIGHTEENTH CLAIM FOR RELIEF**
                   Violation of the Wisconsin Deceptive Trade Practices Act
5                              Wis. Stat. § 110.18, *et seq.*

6    308.    Plaintiff Urban hereby incorporates by reference the allegations contained in the

7    preceding paragraphs of this Complaint.

8    309.    As described above, California law applies to the claims of all Plaintiffs and Class

9    members.  In the alternative, Plaintiff Urban brings this cause of action for himself and on behalf

10   of the Wisconsin Subclass, and reserves the right to bring additional and/or different state-law

11   claims should the Court determine that California law does not apply to all Class members.

12   310.    The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits a

13   "representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat.

14   § 100.18(1).

15   311.    Fitbit is a "person, firm, corporation or association" within the meaning of the

16   Wisconsin DTPA.  Wis. Stat. § 100.18(1).

17   312.    Plaintiff Urban and the Wisconsin Subclass members, or their spouses, purchased

18   PurePulse Trackers and are members of "the public" within the meaning of the Wisconsin DTPA.

19   Wis. Stat. § 100.18(1).

20   313.    In the course of its business, Fitbit engaged in unfair and deceptive acts and

21   practices that violated the Wisconsin DTPA, including misrepresenting the nature of the

22   PurePulse Trackers and concealing and suppressing information about the Heart Rate Defect in

23   the PurePulse Trackers with intent that others rely upon such concealment, suppression, or

24   omission, in connection with their PurePulse Tracker purchases.

25   314.    Fitbit intentionally and knowingly misrepresented material facts regarding the

26   Heart Rate Defect in the PurePulse Trackers with an intent to mislead Plaintiff Urban and

27   Wisconsin Subclass members.

28

315.    Fitbit's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Urban, and are presumed to have deceived Wisconsin Subclass members.

316.    Fitbit knew, should have known, or was reckless in not knowing that its products did not have the qualities, characteristics, and functions it represented, warranted, and advertised them to have.

317.    Fitbit had an ongoing duty to refrain from unfair and deceptive trade practices.

318.    Fitbit's violations affect the public interest and present a continuing risk to Plaintiff Urban, Wisconsin Subclass members, and the public.

319.    Plaintiff Urban and the Wisconsin Subclass suffered ascertainable loss caused by Fitbit's misrepresentations and its concealment of and failure to disclose material information regarding the Heart Rate Defect in the PurePulse Trackers.

320.    Plaintiff Urban and Wisconsin Subclass members were injured as a direct and proximate result of Fitbit's conduct in that they purchased PurePulse Trackers they would have not otherwise purchased, or would have paid significantly less for, and did not receive the benefit of their bargain.

321.    Plaintiff Urban and the Wisconsin Subclass seek monetary relief and other relief provide for under Wis. Stat. § 100.18(11)(b)(2), including treble damages, because Fitbit committed its deceptive and unfair practices knowingly and/or intentionally.

322.    Plaintiff Urban and the Wisconsin Subclass also seek court costs and attorneys' fees under Wis. Stat. § 100.18(11)(b)(2).

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of all others similarly situated, request the Court to enter judgment against Fitbit, as follows:

A.    an order certifying an appropriate Class and/or Subclasses, designating Plaintiffs as Class Representatives, and designating their counsel of record jointly as Class Counsel;

B.    an order enjoining Fitbit from engaging in further deceptive distribution and sales practices with respect to the PurePulse Trackers;

C.      a declaration that Fitbit is financially responsible for notifying all Class members about the true nature of the PurePulse Trackers;

D.      an order requiring Fitbit to notify the Class that the PurePulse Trackers are defective and cannot consistently record accurate heart rates;

E.      an order permitting Plaintiffs and Class members to elect to affirm their contracts or alternatively demand rescission and seek damages;

F.      a declaration that the Fitbit must disgorge, for the benefit of Plaintiffs and Class members, all or part of the ill-gotten profits received from the sale or lease of the PurePulse Trackers, and make full restitution to Plaintiffs and Class members;

G.      Restitution in the amount of monies paid by Plaintiffs and Class members for the PurePulse Trackers;

H.      an award to Plaintiffs and Class members of compensatory, exemplary, punitive, and statutory penalties and damages as allowed by law, including interest, in an amount to be proven at trial;

I.      an award of attorneys' fees and costs, as allowed by law;

J.      an award of pre-judgment and post-judgment interest, as provided by law;

K.      leave to amend this Complaint to conform to the evidence produced at trial; and

L.      such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs, individually and on behalf of the Class, demand a trial by jury of any and all issues in this action so triable of right.

1    Dated:  January 29, 2016          Respectfully submitted,

2                                        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

3

4                                        By: _____

5                                            Jonathan Selbin

6                                        Jonathan D. Selbin (State Bar No. 170222)
                                         jselbin@lchb.com

7                                        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                         250 Hudson Street, 8th Floor

8                                        New York, NY  10013
                                         Telephone:  (212) 355-9500

9                                        Facsimile:   (212) 355-9592

10                                       Elizabeth J. Cabraser (SBN 083151)
                                       Kevin R. Budner (SBN 287271)

11                                      LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                       275 Battery Street, 29th Floor

12                                       San Francisco, CA  94111-3339
                                       Telephone:  (415) 956-1000

13                                       Facsimile:  (415) 956-1008
                                       Email: ecabraser@lchb.com

14                                       Email: kbudner@lchb.com

15                                       Robert Klonoff (Pro Hac Vice Anticipated)
                                       ROBERT H. KLONOFF, LLC

16                                       2425 SW 76th Ave.
                                       Portland, OR 97225

17                                       Telephone:  (503) 291-1570

18                                       *Attorneys for Plaintiffs*

19

20

21

22

23

24

25

26

27

28