1   Elizabeth J. Cabraser (CA SBN 083151)
    ecabraser@lchb.com
2   Kelly M. Dermody (CA SBN 171716)
    kdermody@lchb.com
3   Kevin R. Budner (CA SBN 287271)
    kbudner@lchb.com
4   LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP
5   275 Battery Street, 29th Floor
    San Francisco, CA  94111-3339
6   Telephone:  (415) 956-1000
    Facsimile:   (415) 956-1008
7
    Jonathan D. Selbin (CA SBN 170222)
8   jselbin@lchb.com
    LIEFF CABRASER HEIMANN &
9   BERNSTEIN, LLP
    250 Hudson Street, 8th Floor
10  New York, NY  10013
    Telephone:  (212) 355-9500
11  Facsimile:  (212) 355-9592

12  Robert Klonoff (*pro hac vice*)
    klonoff@usa.net
13  ROBERT H. KLONOFF, LLC
    2425 SW 76th Ave.
14  Portland, OR 97225
    Telephone:  (503) 291-1570

Adam C. McCall (CA SBN 302130)
amccall@zlk.com
LEVI & KORSINSKY LLP
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Telephone: (213) 985-7290
Facsimile: (866) 367-6510

Lori G. Feldman (*pro hac vice*)
lfeldman@zlk.com
Andrea Clisura (*pro hac vice*)
aclisura@zlk.com
Courtney E. Maccarone (*pro hac vice*)
cmaccarone@zlk.com
LEVI & KORSINSKY LLP
30 Broad Street, 24th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

15  *Attorneys for Plaintiffs, individually and on behalf of all others similarly situated*

16              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF CALIFORNIA
17                SAN FRANCISCO DIVISION

18  KATE MCLELLAN, TERESA BLACK,            Case Nos. 16-cv-00036-JD; 16-cv-00777-JD
    DAVID URBAN, ROB DUNN, RACHEL
19  SAITO, TODD RUBINSTEIN, RHONDA          **PLAINTIFFS' BRIEF ON CONTRACT**
    CALLAN, JAMES SCHORR, BRUCE             **FORMATION DEFENSES TO**
20  MORGAN, and AMBER JONES, Individually   **ENFORCEMENT OF ARBITRATION**
    and on Behalf of All Others Similarly Situated,  **CLAUSE**
21
                    Plaintiffs,            Date: To Be Decided
22  v.                                     Time: To Be Decided
                                           Ctrm: 11, 19th Floor
23  FITBIT, INC.,

                    Defendant.             The Honorable James Donato
24  JUDITH LANDERS, LISA MARIE BURKE,
    and JOHN MOLENSTRA, Individually and on
25  Behalf of All Others Similarly Situated,

26                  Plaintiffs,
    v.
27
    FITBIT, INC.,
28
                    Defendant.

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT .............................................................. 1

STATEMENT OF FACTS ................................................................................................................ 2

    I.     Fitbit Provides No Notice of the Terms of Service or Arbitration Before or During the Purchase Transaction. ............................................................................ 2

    II.    The Devices Offer Little or No Functionality Unless Users Register Them and Agree to Arbitrate.......................................................................................... 3

    III.   The Terms of Service Require No Actual Agreement: Users Are Deemed to Have Consented Simply by Visiting the Website or Opening the App. ................... 4

ARGUMENT ........................................................................................................................ 5

    I.     Plaintiffs Did Not Unambiguously Assent to the Arbitration Agreement, and Thus No Agreement to Arbitrate Was Created. .......................................... 6

    II.    Plaintiffs' Purported "Agreement" to Arbitrate—Unilaterally Required by Fitbit in Order to Render the Devices Operational—Lacked Adequate Consideration. ................................................................................................... 10

    III.   Fitbit Procured the "Agreement" to Arbitrate by Fraud........................................... 12

    IV.   Even if an Agreement Was Formed, the Terms Do Not Apply to Plaintiffs' Claims. .................................................................................................................. 13

CONCLUSION .................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page**

## CASES

*Am. Exp. Co. v. Italian Colors Rest.,*
    133 S. Ct. 2304 (2013) ................................................................................................. 5

*Armendariz v. Found. Health Psychcare Servs., Inc.,*
    24 Cal.4th 83 (2000) .................................................................................................... 6

*AT&T Mobility LLC v. Concepcion,*
    563 U.S. 333 (2011) ................................................................................................. 1, 5

*Berkson v. Gogo LLC,*
    97 F. Supp. 3d 359 (E.D.N.Y. 2015) .................................................................... 7, 10

*Burch v. Premier Homes, LLC,*
    199 Cal. App. 4th 730 (2011) ..................................................................................... 6

*Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC,*
    816 F.3d 1208 (9th Cir. 2016) ............................................................................. 5, 13

*Circuit City Stores, Inc. v. Najd,*
    294 F.3d 1104 (9th Cir. 2002) ........................................................................... 10, 11

*Engalla v. Permanente Med. Grp., Inc.,*
    15 Cal.4th 951 (1997) ............................................................................................ 6, 12

*First Options of Chicago, Inc. v. Kaplan,*
    514 U.S. 938 (1995) ................................................................................................. 1, 6

*Granite Rock Co. v. Int'l Bhd. of Teamsters,*
    561 U.S. 287 (2010) .......................................................................................... 1, 5, 13

*In re IKO Roofing Shingle Prod. Liab. Litig.,*
    757 F.3d 599 (7th Cir. 2014) ..................................................................................... 14

*Kassbaum v. Steppenwolf Prods., Inc.,*
    236 F.3d 487 (9th Cir. 2000) ..................................................................................... 15

*Knutson v. Sirius XM Radio Inc.,*
    771 F.3d 559 (9th Cir. 2014) ............................................................................... 5, 6, 7

*Lewis v. Epic Sys. Corp.,*
    No. 15-2997, 2016 WL 3029464 (7th Cir. May 26, 2016) ......................................... 5

*Mazza v. Am. Honda Motor Co.,*
    666 F.3d 581 (9th Cir. 2012) ..................................................................................... 14

*McManus v. Fleetwood Enterprises, Inc.,*
    320 F.3d 545 (5th Cir. 2003) ..................................................................................... 14

*Meyer v. Kalanick,*
    No. 15 CIV. 9796, 2016 WL 4073012 (S.D.N.Y. July 29, 2016) ..................... 7, 9, 10

*Mike Rose's Auto Body, Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.,*
    No. 16-CV-01864-EMC, 2016 WL 5407898 (N.D. Cal. Sept. 28, 2016) ................ 15

*Mortensen v. Bresnan Commc'ns, LLC,*
    722 F.3d 1151 (9th Cir. 2013) ........................................................................... 10, 11

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Nguyen v. Barnes & Noble Inc.*,
   763 F.3d 1171 (9th Cir. 2014)..................................................................... 7, 13

4

*Norcia v. Samsung Telecomms Am., LLC*,
   No. 14-CV-00582-JD, 2014 WL 4652332 (N.D. Cal. Sept. 18, 2014) ..................................... 5

5

6

*Offshore Rental Co. v. Continental Oil Co.*,
   22 Cal.3d 157 (1978) ................................................................................... 6

7

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
   388 U.S. 395 (1967).................................................................................... 12

8

*Rosenthal v. Great W. Fin. Sec. Corp.*,
   14 Cal.4th 394 (1996)................................................................................. 12

9

10

*Schnabel v. Trilegiant Corp.*,
   697 F.3d 110 (2d Cir. 2012)........................................................................... 7

11

*Sgouros v. TransUnion Corp.*,
   817 F.3d 1029 (7th Cir. 2016)..................................................................... 5, 8, 9

12

*Specht v. Netscape Commc'ns Corp.*,
   306 F.3d 17 (2d Cir. 2002)........................................................................... 6, 7

13

*Stolt–Nielsen S.A. v. Animalfeeds Int'l Corp.*,
   559 U.S. 662 (2010).................................................................................. 5

14

15

*Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*,
   925 F.2d 1136 (9th Cir. 1991)....................................................................... 5, 8

16

*Tompkins v. 23andMe, Inc.*,
   840 F.3d 1016 (9th Cir. 2016)....................................................................... 11

17

*Tompkins v. 23andMe, Inc.*,
   No. 5:13-CV-05682-LHK, 2014 WL 2903752 (N.D. Cal. June 25, 2014) ....................... 10, 11

18

*Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*,
   830 F.3d 1335 (Fed. Cir. 2016)...................................................................... 13

19

**STATUTES**

20

Cal. Civ. Code § 1550 ................................................................................ 6, 10

21

Cal. Civ. Code § 1641 .................................................................................. 15

22

Cal. Civ. Code § 1647 .................................................................................. 15

23

Cal. Civ. Code § 1648 .................................................................................. 15

Cal. Civ. Code § 1650 .................................................................................. 15

24

25

26

27

28

1

**<u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>**

2

Plaintiffs—all consumers who purchased heart-rate-monitoring fitness trackers (the

3

"Heart Rate Monitors," "Devices," or "Products") sold by Defendant Fitbit, Inc. ("Fitbit")—

4

allege in the Amended Consolidated Master Class Action Complaint ("Complaint") that Fitbit

5

deceptively marketed the Heart Rate Monitors, which cannot provide accurate heart rate data

6

when worn during the very exercise for which they were expressly marketed.  Dkt. 42.  Recent

7

independent expert testing by no less than the renowned Cleveland Clinic confirmed these

8

allegations and findings.  Declaration of Jonathan D. Selbin ("Selbin Decl."), Ex. 1.  As relevant

9

here, Plaintiffs also allege that Fitbit tricked and fraudulently induced them and other consumers

10

into a post-purchase arbitration agreement to shield itself from liability.  In prior briefing,

11

Plaintiffs argued that the purported arbitration agreement does not clearly and unmistakably

12

delegate the threshold question of arbitrability to an arbitrator.  Dkt. 60.  Plaintiffs now address

13

why that arbitration agreement was never properly formed in the first place—a determination that

14

rests solely within the Court's purview.

15

Nothing in the Supreme Court's holding in (or following) *AT&T Mobility LLC v.*

16

*Concepcion*, 563 U.S. 333 (2011), alters a few core principles regarding arbitration clauses.  First,

17

it remains critical that before determining that someone waived her Seventh Amendment right to

18

a jury trial, the court must determine that she knowingly *consented* to do so.  *Granite Rock Co. v.*

19

*Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010).  Second, while courts cannot single out

20

arbitration clauses in consumer contracts for special *disfavor* simply because they involve

21

arbitration, *Concepcion*, 563 U.S. at 352, the Supreme Court also has made clear that "[w]hen

22

deciding whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . should

23

apply ordinary state-law principles that govern the formation of contracts."  *First Options of*

24

*Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also Granite Rock*, 561 U.S. at 297 ("[A]

25

court may order arbitration of a particular dispute only where the court is satisfied that the parties

26

*agreed* to arbitrate that dispute.") (emphases altered).

27

Here, Fitbit cannot meet its burden of showing that Plaintiffs knowingly consented to

28

waive their Seventh Amendment rights and to arbitrate their claims.  This is true for at least four

- 1 -

1    reasons.

2            First, Fitbit cannot establish that Plaintiffs manifested unequivocal assent to the post-

3    purchase arbitration agreement because, among other reasons, Fitbit deceptively represented to

4    Plaintiffs that they would be bound by the Terms of Service (the "Terms") and the arbitration

5    agreement *regardless* of whether they actually agreed to them *simply by visiting its website*.

6    Once Fitbit told consumers they would be bound *whether or not they actually agreed* to the

7    Terms, any subsequent conduct that might imply "consent" by the consumers (including

8    continuing with the transaction) became meaningless.  Put differently, if, Fitbit informed

9    consumers it did not matter whether they agreed to arbitrate (because Fitbit deemed them to have

10   done so regardless of consent), those consumers cannot be said to have consented.

11           Second, Fitbit forced Plaintiffs to accept the Terms of Service in order to render the

12   Devices Plaintiffs already purchased operational, and provided no valid consideration for this

13   extra-contractual demand.  As detailed below, the Devices could not function for the purpose for

14   which they were sold (or *at all*), until Plaintiffs agreed, post-purchase, to the Terms.

15           Third, Fitbit induced Plaintiffs' assent by fraud and deceit.  By misrepresenting the

16   characteristics of the Devices and deceiving customers into believing they already agreed to the

17   Terms, Fitbit intended to, and did in fact, fraudulently induce Plaintiffs' "agreement" to arbitrate.

18           Fourth, even if the Terms of Service and arbitration agreement were properly formed, by

19   their own terms, they do not cover Plaintiffs' claims, which arise from a latent defect in the

20   Devices, not from Plaintiffs' "use of" those Devices or of Fitbit's online services.  Fitbit cannot,

21   by introducing vague language into an arbitration provision, expand the application of the Terms

22   to cover the defect claims alleged here.  As Fitbit was the sole drafter of the Terms, its scope of

23   coverage is construed against Fitbit, not the consumers.

24                                    **STATEMENT OF FACTS**

25   I.     **Fitbit Provides No Notice of the Terms of Service or Arbitration Before or During**
            **the Purchase Transaction.**
26

27           When a consumer picks a Fitbit Heart Rate Monitor off the shelf, this is the packaging

28

she sees:[1]



Nowhere does Fitbit communicate that the Devices must be activated online before they function, or that such activation will require the user to agree to *any* additional terms. Nowhere is there any reference at all to the Terms of Service that Fitbit later imposes, nor to the purportedly binding arbitration clause contained therein. Indeed, consumers who purchase a Fitbit Heart Rate Monitor from third-party vendors—either online or through brick-and-mortar locations—are given no opportunity to review the Terms of Service, no indication that such Terms even exist, and no warning at any point during the purchase transaction that in order to actually use the Products they purchase, they will later have to agree to those Terms. *See, e.g.*, Selbin Decl. Exs. 2–4. This is true for the named Plaintiffs, all of whom purchased from third parties. Dkt. 42 ¶¶ 18–30.

## II. The Devices Offer Little or No Functionality Unless Users Register Them and Agree to Arbitrate.

When, after purchasing the Devices, consumers return home, or receive the Devices in the mail, they are in for a big surprise. They learn for the first time that in exchange for the purchase price, they receive, at best, a Device that performs fewer than half the functions advertised, and at worst, a $200 or $250 bracelet that (literally) cannot do a thing. Indeed, out of the box, two of the three models (the Surge and the Blaze) *do not work at all*, and the third model (the Charge HR) has very limited capability. This is reflected in the chart below, and in a similar chart produced

---

[1] The model depicted is the Surge, but there are no relevant differences in the two other models in question, the Charge HR and the Blaze. The packaging for all three Products is attached as Exhibits 2–4 to the Selbin Declaration.

by Fitbit, *see* Selbin Decl. Ex. 5, which lists the Devices' functionalities and indicates which of
them the Devices offer once purchased.

| Functions Available Before Pairing with Online Account | | | |
|---|---|---|---|
| | Charge HR | Blaze | Surge |
| Steps, Distance, Calories Burned | Yes | No | No |
| Floors Climbed | Yes | No | No |
| Active Minutes | No | No | No |
| Sleep Tracking and Alarms | No | No | No |
| Caller ID | No | No | No |
| Continuous Heart Rate | Yes | No | No |
| GPS Tracking | N/A | No | No |
| Music Control and Notifications | N/A | No | No |
| Clock | No | No | No |
| Syncs Wirelessly | No | No | No |

Soon after turning on their Heart Rate Monitors, consumers discover for the first time that
in order to acquire the functioning Devices they already paid for, they must first create an account
and register the Devices at www.fitbit.com (the "Fitbit website") or through the Fitbit Mobile
Application (the "Fitbit app").  *See, e.g.*, Selbin Decl. Exs. 6–8.  To complete the account creation
process, in turn, consumers must click to "agree" to Fitbit's Terms of Service which are presented
as hyperlinks both online and through the Fitbit App.  *Id.*

**III.    The Terms of Service Require No Actual Agreement: Users Are Deemed to Have Consented Simply by Visiting the Website or Opening the App.**

The first paragraph of those Terms of Service advises purchasers that the Terms "govern
*your use* of our personal fitness and electronic body monitoring products, our websites, including
www.fitbit.com, the software embedded in Fitbit devices, the Fitbit Connect software, the Fitbit
mobile applications, memberships and other Fitbit services (collectively, the "Fitbit Service")."
Selbin Decl. Exs. 9, 10 (emphasis added).  The next paragraph provides that, *regardless of
whether consumers complete the registration process*, they "accept these Terms by visiting
www.fitbit.com (https://www.fitbit.com) or using any part of the Fitbit Service."  *Id.*  Although
the next sentence tells consumers not to create an account or use the Fitbit Service if they do not
accept the Terms, by that time, consumers have necessarily already visited the Fitbit website or
used part of the Fitbit Service (which includes the Fitbit app)—as this is the only way to access

1    the Terms in the first place.

2          In other words, after reading the first section of the Terms of Service, consumers have

3    learned (1) that they must agree to additional, post-purchase Terms in order to render operational

4    the Devices they already purchased, and (2) according to Fitbit, they are already bound by the

5    Terms anyway by virtue of visiting the Fitbit website or downloading the Fitbit app.

6          Thirty-four paragraphs later, the Terms contain a "Dispute Resolution" section that

7    includes an arbitration clause and a class action waiver.

8                                       **ARGUMENT**

9          "As the Supreme Court repeatedly has emphasized, arbitration is a creature of contract."

10   *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033 (7th Cir. 2016) (Wood, J.) (citing

11   *Concepcion*, 563 U.S. at 339; *Stolt–Nielsen S.A. v. Animalfeeds Int'l Corp.*, 559 U.S. 662, 684

12   (2010)).  As such, "defenses to contract formation" are no less applicable if the contract contains

13   an arbitration clause.  *See Lewis v. Epic Sys. Corp.*, No. 15-2997, 2016 WL 3029464, at *8 (7th

14   Cir. May 26, 2016) (citing *Am. Exp. Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2312 (2013)

15   (Thomas, J., concurring)); accord *Concepcion*, 563 U.S. at 339 (agreements to arbitrate may "be

16   invalidated by 'generally applicable contract defenses'").

17         "Arbitration is strictly a matter of consent."  *Casa del Caffe Vergnano S.P.A. v.

18   ItalFlavors, LLC*, 816 F.3d 1208, 1211 (9th Cir. 2016).  This fundamental principle requires that

19   courts, not arbitrators, decide the threshold issue of whether an agreement to arbitrate exists.

20   *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140-41 (9th Cir. 1991);

21   *see also Granite Rock*, 561 U.S. at 298 (issues for the court "always include whether the clause

22   was agreed to").  In deciding whether an agreement was entered into, courts apply a summary

23   judgment-like standard and should give the party opposing arbitration "the benefit of all

24   reasonable doubts and inferences that may arise."  *Three Valleys*, 925 F.2d at 1141.  It is the party

25   seeking to compel arbitration that bears "the burden of proving the existence of an agreement to

26   arbitrate by a preponderance of the evidence."  *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559,

27   565 (9th Cir. 2014); *see also Norcia v. Samsung Telecommunications Am., LLC*, No. 14-CV-

28   00582-JD, 2014 WL 4652332, at *4 (N.D. Cal. Sept. 18, 2014) (Donato, J.) ("[T]he party seeking

1  to compel arbitration . . . bears the burden of establishing the existence of a valid agreement

2  to arbitrate.").

3         Whether the parties agreed to arbitrate a particular matter is contingent on "ordinary state-

4  law principles that govern the formation of contracts." *First Options*, 514 U.S. at 944; *see also*

5  *Knutson*, 771 F.3d at 565 ("State contract law controls whether the parties have agreed to

6  arbitrate.").  Here, California law applies to all Plaintiffs' claims, both because of the choice-of-

7  law provision in the Terms of Service, *see* Selbin Decl. Exs. 9, 10, and pursuant to California's

8  governmental interest/comparative impairment choice of law rules, *Offshore Rental Co. v.*

9  *Continental Oil Co.*, 22 Cal.3d 157, 161-62 (1978).

10        "[U]nder California law, as under federal law, an arbitration agreement may only be

11 invalidated for the same reasons as other contracts." *Armendariz v. Found. Health Psychcare*

12 *Servs., Inc.*, 24 Cal.4th 83, 98 (2000).  Such grounds include lack of mutual assent and

13 insufficient consideration.  Cal. Civ. Code § 1550.  Fitbit's arbitration agreement enjoys neither

14 of these essential elements, and any purported agreement was induced by fraud.  *See Engalla v.*

15 *Permanente Med. Grp., Inc.,* 15 Cal.4th 951, 974 (1997).  Even if a valid contract was formed,

16 moreover, by its own terms, it does not cover the claims Plaintiffs bring here.

17 **I.**    **Plaintiffs Did Not Unambiguously Assent to the Arbitration Agreement, and Thus**
          **No Agreement to Arbitrate Was Created.**
18

19        "Mutual assent is required for there to be an enforceable agreement to arbitrate disputes."

20 *Burch v. Premier Homes, LLC*, 199 Cal. App. 4th 730, 745–46 (2011).  "There is no public policy

21 favoring arbitration of disputes which the parties have not agreed to arbitrate."  *Id.*  Whether

22 mutual assent exists depends on the reasonable interpretation of the "outward conduct of the

23 parties."  *Id.* at 746.  "California's common law is clear that 'an offeree, regardless of apparent

24 manifestation of his consent, is not bound by inconspicuous contractual provisions of which he is

25 unaware, contained in a document whose contractual nature is not obvious.'"  *Specht v. Netscape*

26 *Commc'ns Corp.*, 306 F.3d 17, 30 (2d Cir. 2002) (Sotomayor, J.) (citations omitted).  Although a

27 person can be held to have assented to terms even if he or she did not read them, an "offer must

28 nonetheless make clear to a reasonable consumer both that the terms are being presented and that

- 6 -

1   they can be adopted through the conduct that the offeror alleges constituted assent." *Schnabel v.*

2   *Trilegiant Corp.*, 697 F.3d 110, 123 (2d Cir. 2012) (internal alterations omitted) (applying

3   California law).  Thus, before a party is found to waive her right to a jury, courts insist that the

4   manifestation of assent be clear and "unambiguous."  *See Knutson*, 771 F. 3d at 569.  Only then

5   can a court be satisfied that "this fundamental principle of contract law has been vindicated."

6   *Meyer v. Kalanick*, No. 15 CIV. 9796, 2016 WL 4073012, at *6 (S.D.N.Y. July 29, 2016).

7           There is no such manifestation here.  Indeed, the very first section of the Terms

8   confusingly (and incorrectly) informs consumers that they *already agreed* to the Terms simply

9   "by visiting www.fitbit.com (https://www.fitbit.com) or using any part of the Fitbit Service."  *See*

10  Selbin Decl. Exs. 9, 10.  That is not true: Fitbit cannot create a binding arbitration agreement by

11  ambush, as this Court and others in this District have recognized.  *See, e.g.*, November 10, 2016,

12  Hr'g. Tr. 14:15–19 (Court: . . . There are some older cases where if you had just visited the

13  website, those companies tried to say you were then bound.  I mean, literally if you just peeked at

14  the website. And the Ninth Circuit has said you can't do that."); *Nguyen v. Barnes & Noble Inc.*,

15  763 F.3d 1171, 1178–79 (9th Cir. 2014); *Specht*, 306 F.3d 17, 34–35 (2d Cir. 2002).

16  Nevertheless, any reasonable consumer in this situation would take Fitbit at its word, and would

17  believe that, whether or not she clicked the box agreeing to the Terms, she was already bound by

18  them.  By purporting to bind visitors who do not even create an account, Fitbit renders

19  meaningless any supposed subsequent "agreement" to those Terms.

20          This same provision also has the effect of discouraging consumers from reading the

21  remainder of the Terms.  Indeed, Fitbit made it a virtual certainty that consumers would conclude

22  that reading the Terms was a waste of time because they were bound whether or not they

23  consented.  This, too, is fatal to any finding of mutual assent: if the drafting party does not

24  "clearly draw the consumers' attention to material terms that would alter what a reasonable

25  consumer would understand to be her default rights when initiating an online transaction . . . then

26  [those terms] should not be enforced against the consumer."  *Berkson v. Gogo LLC*, 97 F. Supp.

27  3d 359, 402 (E.D.N.Y. 2015); accord *Knutson*, 771 F.3d at 568.

28          Here, Fitbit not only failed to clearly draw consumers' attention to the arbitration clause, it

1    also signaled to consumers that reading the Terms was a futile act that would have no effect on

2    their rights, since they were bound anyway.  The fact that users need not actually scroll through

3    the Terms to create an account and that the first mention of arbitration does not come until

4    paragraph thirty-six of the Terms' dense and legalistic language makes any purported assent even

5    less clear.  And, of course, this entire process takes place only *after* consumers have completed

6    the purchase transaction that gave no advance notice or warning that an additional "agreement"

7    would be necessary to render the Devices operational.  In other words, Fitbit tells consumers they

8    cannot get the Devices they already paid for unless they agree to additional terms, including an

9    arbitration clause, and, simultaneously, that any such agreement is meaningless since they are

10   bound by the Terms anyway.  Under these facts, and as a result of its own misleading tactics,

11   Fitbit cannot meet its burden to show unambiguous assent by Plaintiffs, who are entitled to "the

12   benefit of all reasonable doubts and inferences that may arise." *Three Valleys*, 925 F.2d at 1141.

13          The Seventh Circuit recently confirmed in *Sgouros v. TransUnion Corp.* that this kind of

14   obfuscation and trickery renders consent meaningless.  817 F.3d at 1035.  There, one step of the

15   account creation process featured a rectangular scroll window in which certain words were visible

16   including, "Service Agreement…This Service Agreement ('Agreement') contains the terms and

17   conditions upon which you ('you' or 'the member') may access and use…." *Id.* at 1032.  Directly

18   under this scroll box, was a five-line paragraph stating in pertinent part, "You understand that by

19   clicking on the 'I Accept & Continue to Step 3' button below, you are providing 'written

20   instructions' to TransUnion…authorizing TransUnion to obtain information from your personal

21   credit profile…." *Id.* at 1033.  The Seventh Circuit noted that the "I Accept & Continue to Step

22   3" button did not require the plaintiff to first click on the scroll box, or scroll through its complete

23   contents, and observed that "we cannot presume that a person who clicks on a box that appears on

24   a computer screen has notice of all contents not only of that page but of other content that

25   requires further action (scrolling, following a link, etc.)." *Id.* at 1035.  The Seventh Circuit found

26   that the webpage fell short of providing the requisite notice and concluded that "what clinches the

27   case…is the fact that TransUnion's site actively misleads the customer." *Id.*  Given the layout

28   and the language used, "[n]o reasonable person would think that hidden within that disclosure

1   was also the message that the same click constituted acceptance of the Service Agreement." *Id.*

2          Fitbit's Terms of Service and arbitration clause agreement process suffer from similar

3   defects.  No reasonable consumer would think that buried in the Fitbit Terms of Service is a

4   provision purporting to bind users to a dispute resolution process through which they relinquish

5   their right to a jury trial, as well as their ability to assert their claims on a classwide basis.  Fitbit

6   was free to design its user interface to provide clear and conspicuous notice both of contract terms

7   and the means of acceptance.  Rather than encouraging users to read the Terms and conveying to

8   users that they may be giving up important rights by proceeding, however, Fitbit actively

9   diminished the importance of the Terms by the layout of its interface, through its false

10  representation that consumers who do read the Terms are bound by them regardless of whether

11  they express assent, and by making its own performance of its obligations under the already-

12  completed purchase transaction contingent on consumers' additional assent.

13         Judge Rakoff's recent decision in *Meyer v. Kalanick* further illustrates the level of clarity

14  and precision required to establish mutual assent in a similar electronic agreement, and further

15  demonstrates that such assent is lacking here.  In *Meyer*, the court found assent was lacking under

16  California law and thus that no contract had been formed during an Uber rider registration

17  process.  *See* 2016 WL 4073012, at *4-10.  The user interface at issue featured a prominent

18  button labeled "Register," two additional buttons underneath labeled "PayPal" and "Google

19  Wallet," and then featured the statement "By creating an Uber account, you agree to the Terms of

20  Service & Privacy Policy."  *Id.* at *4.  Judge Rakoff noted that a user could complete registration

21  without having seen the terms and conditions and the layout of the interface did not encourage the

22  user to do so.  *Id.*  He explained:

23              The Court cannot simply assume that the reasonable (non-lawyer)
              smartphone user is aware of the likely contents of "Terms of
24            Service," especially when that phrase is placed directly alongside
              "Privacy Policy." . . . The reasonable user might be forgiven for
25            assuming that "Terms of Service" refers to a description of the types
              of services that Uber intends to provide, not to the user's waiver of
26            his constitutional right to a jury trial or his right to pursue legal
              redress in court should Uber violate the law.  *In other words, "the*
27            *importance of the details of the contract" was "obscured or*
              *minimized by the physical manifestation of assent expected of a*
28            *consumer seeking to purchase or subscribe to a service or product."*

1    *Id.* at *9 (citations omitted) (emphasis added).

2         This is exactly what Fitbit does here.  Moreover, even if a consumer recognizes that the

3    phrase "Terms of Service" is a hyperlink to a user agreement—as opposed to a description of the

4    services Fitbit intends to provide—once they reach the Terms, they are immediately misled to

5    believe that they automatically agreed to Fitbit's terms anyway, simply by visiting the website.

6         These cases together send a strong message: before a party to a lawsuit can be ordered to

7    arbitrate, there must be a clear and unequivocal agreement to so.  This Court should hold Fitbit to

8    its burden of showing unambiguous manifestation of asset to the Terms of Service, while

9    construing any ambiguity in that regard against Fitbit.  *See, e.g.*, *Berkson*, 97 F. Supp. 3d at 388.

10   Plaintiffs respectfully submit Fitbit cannot meet that burden.

11   **II.   Plaintiffs' Purported "Agreement" to Arbitrate—Unilaterally Required by Fitbit in**
12        **Order to Render the Devices Operational—Lacked Adequate Consideration.**

13        Adequate consideration is a fundamental element of contract formation; without it, no

14   contract exists.  Cal. Civ. Code § 1550.  There is no valid consideration here.

15        As detailed above, Fitbit did not perform its end of the purchase contracts with Plaintiffs.

16   Plaintiffs tendered the purchase price for functioning Devices, and in return, Fitbit delivered

17   Products with extremely limited functionality (the Charge HR) or no functionality at all (the

18   Surge and Blaze).  Plaintiffs had an absolute right to use the Products they purchased as

19   represented, and Fitbit was under a contractual obligation to provide those working Products.

20   Fitbit's attempt to extract additional, post-purchase concessions from Plaintiffs in exchange for

21   Products already purchased was fundamentally "unfair," *see Tompkins v. 23andMe, Inc.*, No.

22   5:13-CV-05682-LHK, 2014 WL 2903752, *7 (N.D. Cal. June 25, 2014), and Plaintiffs received

23   no additional consideration for those forced concessions, including the agreement to arbitrate.

24        This conclusion is not undermined by either *Circuit City Stores, Inc. v. Najd*, 294 F.3d

25   1104 (9th Cir. 2002) or *Mortensen v. Bresnan Commc'ns, LLC*, 722 F.3d 1151 (9th Cir. 2013), as

26   Fitbit argued previously.  In *Circuit City*, Circuit City exercised its right to place conditions on

27   the continued employment of its at-will employees, and instituted a "resolution program"

28   requiring those employees to arbitrate employment-related disputes with the company.  One of

those employees later resisted the company's efforts to compel arbitration of a discrimination and wrongful termination claim by arguing, among other things, that the arbitration agreement lacked consideration because Circuit City was not bound to bring its own claims in arbitration.  The Ninth Circuit rejected that argument, holding that Circuit City's agreement to be bound by the arbitration of its employee's claims was sufficient consideration.  *Circuit City*, 294 F.3d at 1108. Thus, *Circuit City* stands merely for the proposition that when two parties enter freely into a contract with an arbitration agreement, one party's agreement to be bound by arbitration is sufficient consideration for another party's agreement to arbitrate.

*Circuit City* does not address the facts here, however, where one party to the contract withholds something owed to another party under that contract (here, a functioning Product) until that other party capitulates to additional demands (here, an agreement to give up a constitutional right to a jury trial).  Circuit City had the right to impose conditions on its employees and to establish terms for their continued employment.  Fitbit did not have the right to extract additional concessions from Plaintiffs after they already bought their Devices, and in that context, Fitbit provided no valid consideration for those additional concessions.[2]

*Mortensen* does not foreclose this common-sense application of contract law.  *See* 722 F. 3d at 1161.  In *Mortensen*, the plaintiffs subscribed to an internet service.  Before that service began, however, the service provider needed to install the necessary equipment.  At the outset of that installation, the internet company provided the plaintiffs with a service contract that contained an arbitration clause.  Those plaintiffs later resisted the company's efforts to compel arbitration of their privacy claims, arguing that the arbitration clause was invalidated by Montana's Reasonable Expectations/Fundamental Rights Rule, which disfavored terms in adhesive contracts.  The Ninth Circuit concluded that Montana's rule disproportionately affected arbitration agreements and was thus preempted by the Federal Arbitration Act under *Concepcion*. The parties did not advance, and the Court did not consider, an argument that the consideration

---

[2] To the extent *Tompkins* takes a more expansive view of *Circuit City*'s limited consideration analysis, it is unpersuasive.  *Tompkins*, 2014 WL 2903752, at *8.  This issue was not before the Ninth Circuit in its recent opinion in *Tompkins v. 23andMe, Inc.*, 840 F.3d 1016 (9th Cir. 2016).

1   for the arbitration agreement was illusory—likely because, unlike here, the arbitration clause was

2   introduced and agreed to before the underlying transaction was complete and, therefore, was a

3   legitimate part of the service agreement.

4   **III.    Fitbit Procured the "Agreement" to Arbitrate by Fraud.**

5          An agreement is fraudulently induced, and therefore invalid, if a party knowingly

6   misrepresents a fact with intent to defraud or to induce the other party's reliance. *Engalla,* 15

7   Cal.4th at 974.  "[A] presumption, or at least an inference, of reliance arises wherever there is a

8   showing that a misrepresentation was material." *Id.* at 977.  "There is no requirement to show

9   pecuniary damages when fraud is the basis for a defense to a petition to compel arbitration, rather

10  than a suit for damages." *Id.* at 975.  Claims relating to fraudulent inducement of an arbitration

11  agreement are for the court to decide. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S.

12  395, 403–04 (1967); *Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal.4th 394, 419 (1996).

13         Here, Fitbit made several fraudulent statements to Plaintiffs in an attempt to induce an

14  agreement to arbitrate their claims.  These include Fitbit's representations that the Heart Rate

15  Monitors can consistently record accurate heart rates when they cannot, *see* Dkt. 42 at ¶¶ 34-67,

16  as well as representations that Plaintiffs were already bound to an agreement to arbitrate simply

17  by visiting the Fitbit website or opening the Fitbit app.

18         Although Plaintiffs have not yet had the opportunity for discovery into what Fitbit knew

19  about the Heart Rate Monitors' true abilities or into Fitbit's intentions for inserting the arbitration

20  clause, the evidence suggests that Fitbit knew its Heart Rate Monitors did not work, and inserted

21  an arbitration clause to shield itself from resulting liability.  Notwithstanding heated criticism

22  from the media and from multiple independent researchers, for example, Fitbit has repeatedly

23  stated only that "our team has performed and continues to perform internal studies to validate our

24  products' performance."  Dkt. 42 at ¶ 68.  Fitbit notably failed to reference a single, specific study

25  which it contends *in fact* validates the Devices' performance and has not it disclosed the details of

26  *any* study despite Plaintiffs' counsel's repeated requests.  The timing of Fitbit's first ever

27  introduction of an arbitration clause—which coincides precisely with the release of the first

28  models of Heart Rate Monitors—further supports the inference that Fitbit falsely represented that

1   its Devices worked as advertised to induce its customers into an arbitration agreements that would

2   insulate Fitbit from anticipated liability.

3          It is also reasonable to conclude that Fitbit falsely represented to Plaintiffs that they were

4   bound by the Terms even before agreeing to them in order to induce their agreement to arbitrate.

5   It was clear to Fitbit since well before it began contemplating its arbitration agreement that

6   "browsewrap" terms almost identical to the ones Fitbit attempted to impose on its consumers

7   were not valid or enforceable.  *See, e.g.*, *Nguyen*, 763 F.3d at 1178–79.  Of course, a reasonable

8   consumer who believed (incorrectly) that she was already bound by the Terms would have no

9   incentive to read the arbitration clause or to withhold her consent to arbitrate—since such consent

10  would be superfluous and meaningless.  This is especially true given that Fitbit introduces the

11  Terms only after the purchase transaction is complete.

12         These misrepresentations go to the heart of the agreement to arbitrate.  They are therefore

13  material, and give rise to an inference that Plaintiffs relied on them to their detriment.  As such,

14  Plaintiffs' purported arbitration agreements were induced by fraud and cannot be enforced.

15  **IV.     Even if an Agreement Was Formed, the Terms Do Not Apply to Plaintiffs' Claims.**

16         "[A] court may order arbitration of a particular dispute only where the court is satisfied

17  that the parties agreed to arbitrate *that dispute*."  *Granite Rock*, 561 U.S. at 297 (emphasis in

18  original); *Casa del Caffe Vergnano*, 816 F.3d at 1211 ("[A] party cannot be required to submit to

19  arbitration any dispute which he has not agreed so to submit."); *Verinata Health, Inc. v. Ariosa*

20  *Diagnostics, Inc.*, 830 F.3d 1335, 1339 (Fed. Cir. 2016); *Osprey Partners RSF LLC v. UBS Fin.*

21  *Servs. Inc.*, No. C 16-04894 WHA, 2016 WL 6679682, at *3 (N.D. Cal. Nov. 14, 2016).  Here,

22  Fitbit cannot demonstrate that Plaintiffs agreed to arbitrate the specific claims at issue, even if the

23  arbitration contracts were otherwise properly formed.

24         The opening paragraph of Fitbit's Terms of Service provides:

25             These Terms of Service ("Terms") govern ***your use of*** our personal
                fitness and electronic body monitoring products, our websites,
26             including fitbit.com, the software embedded in Fitbit devices, the
                Fitbit   Connect   software,   the   Fitbit   mobile   applications,
27             memberships and other Fitbit services (collectively, the "Fitbit
                Service").
28

1    Selbin Decl. Exs. 9, 10 (emphasis added).  Plaintiffs' claims do not arise from Plaintiffs' *use* of the

2    Heart Rate Monitors; they arise from the sale of a defective product.  Each Plaintiff purchased a

3    Fitbit Heart Rate Monitor based on Fitbit's representations that the Devices were capable of

4    consistently delivering accurate heart rate readings.  Plaintiffs allege that those representations were

5    false, as the Devices are incapable of providing meaningful active heart rate data, no matter how

6    Plaintiffs use those Devices.  Plaintiffs further allege they would not have purchased their Devices,

7    or would have paid significantly less for them, had they known that they could not perform as

8    promised.  Thus, each of the basic elements of Plaintiffs' causes of action—wrongdoing, causation,

9    and harm—was satisfied, and Plaintiffs' claims accrued, at the moment they purchased their

10   Devices, and were not dependent on or related to Plaintiffs' use of those Devices.  *See, e.g.*, *Mazza v.*

11   *Am. Honda Motor Co.*, 666 F.3d 581, 593–94 (9th Cir. 2012) ("The last events necessary for

12   liability" in a product defect claim were "communication of the advertisements to the claimants and

13   their reliance thereon in purchasing vehicles."); *In re IKO Roofing Shingle Prod. Liab. Litig.*, 757

14   F.3d 599, 603 (7th Cir. 2014) (affirming theory that damages under deceptive advertising/product

15   defect claims are sustained upon receipt of the defective product); *McManus v. Fleetwood*

16   *Enterprises, Inc.*, 320 F.3d 545, 552 (5th Cir. 2003) (where plaintiffs' claims are "rooted in . . . the

17   fact that they did not receive the benefit of their bargain . . . it is immaterial whether or not the class

18   members even intended to use their" defective product . . . "because all a jury need determine is that

19   the [products] were defective with respect to [the products'] ordinary purpose").

20        Here, Plaintiffs' claims arise from—and at the time of—the sale of the Products, not from

21   the Plaintiffs' later use thereof.  If, for example, someone purchases a purported miracle cure that

22   turns out to be snake oil, the consumer is injured by being tricked into buying the item and by

23   paying too much for it, regardless of whether she used the product.  The same is true here.  As

24   such, Plaintiffs' claims fall outside the scope of Fitbit's Terms of Service and arbitration

25   agreement, which purport to govern only Plaintiffs' *use* of the products and services.

26        Fitbit, the sophisticated drafter of the Terms of Service, could have designed the Terms to

27   cover the purchase transaction; in fact, it drafted a different document that did just that: the

28   "Terms of Sale."  The Terms of Sale (which are different than the Terms of Service) provide:

1    "These terms of sale ('Terms') apply to all orders accepted by Fitbit, Inc. ('Fitbit') *for the sale of*

2    *its personal fitness and electronic body monitoring products*…."  Selbin Decl. Ex. 11 at 1.  Those

3    Terms of Sale, however, apply only to those who purchased their Devices directly from Fitbit.

4    Tellingly, Fitbit required these purchasers to agree to the Terms of Sale during the sales

5    transaction, but *not to the Terms of Service*.  Selbin Decl. Ex. 12.  This further supports the most

6    natural interpretation of the Terms of Service—that they were intended to cover claims relating to

7    the post-purchase *use* of the Products and to the Fitbit service, not to cover claims arising from

8    purchase transactions and from defects inherent in the Devices themselves.

9            The scope of the Terms of Service cannot be expanded by the arguably broader language

10   found in the Terms' dispute resolution section, which refers to disputes "arising out of or relating to

11   these Terms of Service, the Fitbit Service, or any other Fitbit products or services."  Fundamental

12   principles of contract interpretation require that the scope of the subsection not exceed the scope

13   of the overall contract.  The Ninth Circuit has emphasized, for example, that "when we encounter

14   broad language such as 'for any purposes whatsoever,' we must extend the meaning of such

15   language to cover only those things which it appears the parties intended to contract."  *Kassbaum v.*

16   *Steppenwolf Prods., Inc.*, 236 F.3d 487, 491–92 (9th Cir. 2000) (citing *inter alia* Cal. Civ. Code

17   §§ 1641, 1648); *see also id.* (citing Cal. Civ. Code § 1650 ("Particular clauses of a contract are

18   subordinate to its general intent.")).  Further, "[w]hen broad language is at issue, we must look to the

19   circumstances under which the parties contracted to determine their intentions at the time of

20   contracting."  *Id.* (citations omitted); *see also Mike Rose's Auto Body, Inc. v. Applied Underwriters*

21   *Captive Risk Assurance Co., Inc.*, No. 16-CV-01864-EMC, 2016 WL 5407898, at *5 (N.D. Cal.

22   Sept. 28, 2016).  Here, the Terms govern only Plaintiffs' *use* of the Fitbit Devices, which provides

23   the context limiting the arguably more expansive language inserted into the arbitration clause.

24   Therefore, and for the reasons explained above, the Terms of Service and the arbitration clause

25   contained therein do not govern Plaintiffs' claims.

26                                                   **CONCLUSION**

27           For all the foregoing reasons, Plaintiffs respectfully request that the Court order that the

28   Plaintiffs' arbitration agreements were not properly formed and cannot be enforced.

1                                 Respectfully submitted,

2      Dated:  December 12, 2016     LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

3                                 By: */s/ Jonathan D. Selbin*

4                                       Jonathan D. Selbin

5                                Jonathan D. Selbin (CA SBN 170222)
jselbin@lchb.com

6                                LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor

7                                New York, NY  10013
Telephone:  (212) 355-9500
Facsimile:   (212) 355-9592

8                                Elizabeth J. Cabraser (CA SBN 083151)

9                                ecabraser@lchb.com
Kelly M. Dermody (CA SBN 171716)

10                             kdermody@lchb.com
Kevin R. Budner (CA SBN 287271)

11                             kbudner@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

12                             275 Battery Street, 29th Floor
San Francisco, CA  94111-3339

13                             Telephone:  (415) 956-1000
Facsimile:   (415) 956-1008

14                              Robert Klonoff (*pro hac vice*)
klonoff@usa.net

15                             ROBERT H. KLONOFF, LLC
2425 SW 76th Ave.

16                             Portland, OR 97225
Telephone:  (503) 291-1570

17                             Adam C. McCall (CA SBN 302130)

18                             amccall@zlk.com
LEVI & KORSINSKY LLP

19                             445 South Figueroa Street, 31st Floor
Los Angeles, CA  90071

20                             Telephone:  (213) 985-7290
Facsimile:   (866) 367-6510

21                             Lori G. Feldman (*pro hac vice*)
lfeldman@zlk.com

22                             Andrea Clisura (*pro hac vice*)
aclisura@zlk.com

23                             Courtney E. Maccarone (*pro hac vice*)
cmaccarone@zlk.com

24                             LEVI & KORSINSKY LLP
30 Broad Street, 24th Floor

25                             New York, NY 10004
Telephone:  (212) 363-7500

26                             Facsimile:   (212) 363-7171

27                             *Attorneys for Plaintiffs, individually and behalf of all others
similarly situated*

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I hereby certify that, on December 12, 2016, service of this document was accomplished pursuant to the Court's electronic filing procedures by filing this document through the ECF system.

*/s/ Jonathan D. Selbin*
Jonathan D. Selbin

- 17 -