1  Elizabeth J. Cabraser (CA SBN 083151)
   ecabraser@lchb.com
2  Kelly M. Dermody (CA SBN 171716)
   kdermody@lchb.com
3  Kevin R. Budner (CA SBN 287271)
   kbudner@lchb.com
4  LIEFF CABRASER HEIMANN &
   BERNSTEIN, LLP
5  275 Battery Street, 29th Floor
   San Francisco, CA  94111-3339
6  Telephone:  (415) 956-1000
   Facsimile:   (415) 956-1008
7
   Jonathan D. Selbin (CA SBN 170222)
8  jselbin@lchb.com
   LIEFF CABRASER HEIMANN &
9  BERNSTEIN, LLP
   250 Hudson Street, 8th Floor
10 New York, NY  10013
   Telephone:  (212) 355-9500
11 Facsimile:  (212) 355-9592

12 Robert Klonoff (*pro hac vice*)
   klonoff@usa.net
13 ROBERT H. KLONOFF, LLC
   2425 SW 76th Ave.
14 Portland, OR 97225
   Telephone:  (503) 291-1570

Rosemary M. Rivas (CA SBN 209147)
rrivas@zlk.com
Adam C. McCall (CA SBN 302130)
amccall@zlk.com
LEVI & KORSINSKY LLP
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Telephone: (213) 985-7290
Facsimile: (866) 367-6510

Andrea Clisura (*pro hac vice*)
aclisura@zlk.com
Courtney E. Maccarone (*pro hac vice*)
cmaccarone@zlk.com
LEVI & KORSINSKY LLP
30 Broad Street, 24th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

15  *Attorneys for Plaintiffs, individually and on behalf of all others similarly situated*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

18  KATE MCLELLAN, TERESA BLACK,
    DAVID URBAN, ROB DUNN, RACHEL
19  SAITO, TODD RUBINSTEIN, RHONDA
    CALLAN, JAMES SCHORR, BRUCE
20  MORGAN, and AMBER JONES, Individually
    and on Behalf of All Others Similarly Situated,

21                  Plaintiffs,

22  v.

23  FITBIT, INC.,

                    Defendant.

24  JUDITH LANDERS, LISA MARIE BURKE,
    and JOHN MOLENSTRA, Individually and on
25  Behalf of All Others Similarly Situated,

                    Plaintiffs,
26
    v.
27
    FITBIT, INC.,
28
                    Defendant.

Case Nos. 16-cv-00036-JD; 16-cv-00777-JD

**PLAINTIFFS' STATEMENT ON THE
STATUS OF ARBITRATION
PROCEEDINGS**

Date: TBD
Time: TBD
Ctrm:  11, 19th Floor

The Honorable James Donato

# TABLE OF CONTENTS

Page

I.  TIMELINE OF RELEVANT EVENTS ........................................................... 3

    A.  Fitbit Tells the Court That Arbitrability Defenses Can Be Heard Only by an Arbitrator.................................................................................................. 3

    B.  Ms. McLellan Initiates Arbitration to Seek a Ruling on Arbitrability................... 4

    C.  AAA Sets a Deadline of May 9, 2018, for Fitbit to Submit the Requisite Filing Fees. ................................................................................................... 5

    D.  Fitbit Makes a Settlement Offer; Ms. McLellan Rejects It to Seek a Determination on Arbitrability; Fitbit Unilaterally Concludes the Arbitration Before it Begins................................................................................. 5

    E.  At the May 31, 2018, Hearing, Fitbit Confirms That It Unilaterally Closed the Arbitration and That No "Rational" Fitbit Consumer Would Seek to Arbitrate Her Claims. ................................................................................. 8

    F.  After This Court Expresses Concern, Fitbit Attempts to Reverse Course and "Re-Open" the Arbitration, Falsely Claiming to Have "Misunderstood" Ms. McLellan's Intentions. ........................................................................ 9

II. IMPLICATIONS AND NEXT STEPS.......................................................... 11

    A.  Fitbit Breached the Arbitration Agreement and Has No Right to "Reverse" or "Re-open" Those Proceedings. .................................................................. 11

    B.  Fitbit Has Now Conceded That Arbitration Is Not a Viable Forum for Resolving Arbitrability or Hearing Any Other Aspect of These Claims. ............. 14

    C.  Fitbit Must Be Held to Account. ................................................................... 16

# TABLE OF AUTHORITIES

**Page**

## CASES

*Am. Exp. Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013) .................................................................................................. 15

*Anders v. Hometown Mortg. Services, Inc.*,
346 F.3d 1024 (11th Cir. 2003) ........................................................................... 14, 15

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ............................................................................................... 2, 12

*Brown v. Dillard's, Inc.*,
430 F.3d 1004 (9th Cir. 2005) ........................................................................... passim

*Campbell-Ewald Co. v. Gomez*,
136 S. Ct. 663 (2016) ................................................................................................ 13

*Chen v. Allstate Ins. Co.*,
819 F.3d 1136 (9th Cir. 2016) ................................................................................... 13

*Cigna Ins. Co. v. Huddleston*,
986 F.2d 1418 (5th Cir. 1993) ................................................................................... 16

*Green Tree Fin. Corp. v. Randolph*,
531 U.S. 79 (2000) .............................................................................................. 14, 15

*Int'l Union of Petroleum & Indus. Workers v. W. Indus. Maint., Inc.*,
707 F.2d 425 (9th Cir. 1983) ..................................................................................... 16

*Kristian v. Comcast Corp.*,
446 F.3d 25 (1st Cir. 2006) ....................................................................................... 15

*Legair v. Circuit City Stores, Inc.*,
2005 WL 1865373 (S.D. Ohio July 26, 2005) .......................................................... 16

*Nadeau v. Equity Residential Properties Mgmt. Corp.*,
251 F. Supp. 3d 637 (S.D.N.Y. 2017) ....................................................................... 13

*Pre-Paid Legal Servs., Inc. v. Cahill*,
786 F.3d 1287 (10th Cir. 2015) ................................................................................. 14

*Rapaport v. Soffer*,
No. 2:10-CV-00935-KJD, 2011 WL 1827147 (D. Nev. May 12, 2011) .................... 14

*Sheet Metal Workers' Int'l Ass'n Local Union No. 359 v. Madison Indus., Inc. of Ariz.*,
84 F.3d 1186 (9th Cir. 1996) ..................................................................................... 16

*Sink v. Aden Enterprises, Inc.*,
352 F.3d 1197 (9th Cir. 2003) .............................................................................. 13, 14

## OTHER AUTHORITIES

Black's Law Dictionary 428 (7th ed. 1999) ................................................................... 13

1    Pursuant to the Court's direction at the May 31, 2018 hearing and subsequent minute

2    order, Plaintiffs submit this statement setting forth the facts relating to the arbitration proceeding

3    initiated by Plaintiff Kate McLellan.[1]  *See* May 31, 2018, Hr'g Tr. 12:25-13:4; Dkt. 141.

4    Plaintiffs also address the implications of these facts for how this case proceeds.

5    At the hearing, the Court stressed:

6    > [I]f I find that Fitbit has forced this case out of court, and then has unilaterally
     > refused to arbitrate it, there will be an accounting.  And the accounting will have
7    > potentially grave consequences, both professionally for the attorneys and possibly
     > for the client, as well.  I am very disturbed that this would be the tactic that Fitbit
8    > would use. You cannot shut down people's claims through games. And I am
     > gravely concerned that that is what has happened here.
9

10   May 31, 2018, Hr'g Tr. 13:22-14:5.  The undisputed factual record substantiates the Court's

11   concerns.

12   In sum, and as detailed below: For two years Fitbit insisted to this Court that all Plaintiffs

13   and all claims in this case (other than those brought by arbitration opt outs) must go to arbitration,

14   including the threshold issue of arbitrability.  This Court ultimately granted Fitbit's motion to

15   compel, and sent the case to arbitration for the express purpose of deciding arbitrability—a

16   decision that became final with the Court's reconsideration order on January 24, 2018.

17   Ms. McLellan did as the Court instructed, and on April 3, 2018, she initiated an individual

18   arbitration in AAA, and paid her share of the filing fee.  She expressly requested an arbitrator

19   with "experience evaluating consumer claims contesting the scope and enforceability of the

20   arbitration agreement."  Rather than pay its share of the fees as required by its own Terms of

21   Service and as requested by AAA, Fitbit refused to arbitrate arbitrability, and, after

22   unsuccessfully trying to buy off her individual claim, unilaterally pronounced Ms. McLellan's

23   arbitration proceeding "concluded," and so informed AAA.

24   This was no "misunderstanding" or mistake: Fitbit knew precisely what it was doing.

25

---

26   [1] So as not to exceed the scope of the briefing ordered by the Court, Plaintiffs have not filed a
     motion to lift the stay with respect to Ms. McLellan and the other non-opt-out Plaintiffs, or a
27   formal motion to reconsider the Court's prior rulings compelling arbitration. However, the facts
     laid out below warrant both, and should the Court deem formal motions necessary, Plaintiffs will
28   file them.

1    Plaintiffs' counsel explained to Fitbit on a meet and confer call on May 14, 2018, that

2    Ms. McLellan intended to seek a ruling on arbitrability (as well as other relief) in arbitration, and

3    reconfirmed that fact by letter the same day.  Fitbit's counsel informed Plaintiffs' counsel on that

4    call that he had "no intention" of letting Ms. McLellan do that.  Fitbit then refused to arbitrate,

5    instructed AAA that it regarded the arbitration "concluded," remained silent after Plaintiffs filed

6    their sur-reply, and informed the Court at the hearing (some five times) that no "rational litigant"

7    would arbitrate such a claim.

8        Following the hearing, Fitbit rushed to try to undo the self-inflicted damage.  In a letter

9    sent the next day, Fitbit advanced a newly-minted assertion that it previously "misunderstood"

10   Ms. McLellan's intentions, and offered to now proceed with arbitration.  But Fitbit's post-hearing

11   attempt to reverse course is not only too little, too late under controlling Ninth Circuit law, but it

12   further evinces its gamesmanship because it is premised on a demonstrably false claim of

13   misunderstanding.

14       Plaintiffs respectfully submit that Fitbit must be held to account.  If nothing else, it has

15   violated this Court's orders, breached the terms of its own arbitration clause, and forfeited any

16   right to enforce the clause against Ms. McLellan.  Furthermore, by its conduct, and its repeated

17   admission in court that no "rational litigant" would arbitrate these claims individually, Fitbit has

18   given the lie to any claim that arbitration is an appropriate alternative forum for these claims to be

19   heard, as basic due process requires.  Far from furthering "[t]he overarching purpose of the

20   AAA . . . to ensure the enforcement of arbitration agreements according to their terms *so as to*

21   *facilitate streamlined proceedings*," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344

22   (2011) (emphasis added), Fitbit has ensured there will be *no* proceedings at all, thereby depriving

23   Ms. McLellan of her right to have these claims heard.  And Fitbit did not just admit that

24   arbitration of these claims is irrational for Ms. McLellan alone; it admitted that arbitration here is

25   irrational for *any* consumer.  As such, it has demonstrated that its arbitration clause is void and

26   unenforceable as to *all* consumers who purchased the class devices.  Finally, Plaintiffs submit that

27   if the Court is inclined to sanction Fitbit, either by way of civil contempt or under its inherent

28   authority, the most appropriate sanction would be to void the arbitration clause as to all Plaintiffs

1  and proposed class members in this case.

2  **I.**   **TIMELINE OF RELEVANT EVENTS**

3      **A.**   **Fitbit Tells the Court That Arbitrability Defenses Can Be Heard Only by an Arbitrator.**

4

5      As detailed in Plaintiff Dunn's sur-reply, Fitbit argued for two years that because its

6  Terms of Service incorporated a "delegation clause," only an arbitrator—and not this Court—

7  could review the non-opt-out Plaintiffs' challenges to the applicability and enforceability of the

8  arbitration clause and class action waiver.  *See, e.g.*, Dkt. 57 at 3 ("[T]he arbitrability of

9  Plaintiffs' claims in this case must be decided by an arbitrator."); *id.* at 8 ("The Court should refer

10  the parties to the AAA to decide whether the arbitration clause is to be enforced."); Dkt. 62 at 10

11  ("The Court should refer the parties to the AAA to decide whether the arbitration clause is to be

12  enforced."); Dkt. 88 at 5 ("[T]he parties agreed that arbitrability is for the arbitrator, not a

13  court."); Dkt. 94 at 7 ("The parties have clearly and unmistakably delegated all issues of

14  arbitrability to an arbitrator. The Court should refer the parties to the AAA to decide whether the

15  arbitration clause is to be enforced . . . ."); Dkt. 118 at 3 ("[T]he arbitrator" must consider whether

16  a "provision [that] purports to waive" a plaintiff's "right to seek public injunctive relief in all

17  fora" renders the arbitration provision unenforceable) (citation omitted); Dkt. 134 at 3 ("The

18  arbitrator must decide the arbitrability" of any claim brought by a non-opt out plaintiff).

19      The Court agreed, holding that the non-opt-out Plaintiffs' arguments that "Fitbit procured

20  the agreement to arbitrate by fraud" and that "the arbitration provision is unenforceable as applied

21  to plaintiffs' claims for public injunctive relief . . . *must be considered by the AAA arbitrator* in

22  the first instance," and that "the arbitrator *will resolve* [the non-opt-out] plaintiffs' challenges to

23  the scope and enforceability of the arbitration clause."  Dkt. 114 at 8-9 (emphasis added).  At the

24  most recent hearing, the Court again confirmed that

25          I sent the case to AAA to decide arbitrability; not to decide a $161 claim. That is
            not even a portion of my Order. It's not even mentioned in my Order. The Order as
26          to AAA was: Under the current state of the law, you, Mr. Arbitrator or
            Ms. Arbitrator, need to decide this question. The question goes to the heart of
27          which forum will hear this case. It had nothing to do, even remotely, with the
            dollar value of her watch. . . .
28

1  May 31, 2018, Hr'g Tr. 16:2-10.

2  **B.   Ms. McLellan Initiates Arbitration to Seek a Ruling on Arbitrability.**

3  Pursuant to the Court's order and the "delegation clause" incorporated into Fitbit's Terms

4  of Service, Ms. McLellan initiated arbitration on April 3, 2018, under AAA's Commercial

5  Arbitration Rules.[2]  *See* Exhibit A, Declaration of Jonathan Selbin ("Selbin Decl.") ¶ 1,

6  Attachment 1 (Arbitration Demand); *id.*, Attachment 2 (Terms of Service: "Arbitration

7  Procedures: The American Arbitration Association (AAA) will administer the arbitration under

8  its Commercial Arbitration Rules and the Supplementary Procedures for Consumer Related

9  Disputes.").  Upon filing her arbitration demand, Ms. McLellan paid the $750 dollar filing fee

10  required under the AAA's commercial rules.  *Id.* ¶ 2.

11  At the hearing, Fitbit made much of the fact that in the portion of the AAA form demand

12  addressing the "Dollar Amount of Claim," Ms. McLellan inputted the price of her defective

13  device.  As the Court observed, this is a red herring—especially so because Ms. McLellan made

14  clear in the very next section that the proceeding required an arbitrator with "experience

15  evaluating consumer claims contesting the scope and enforceability of the arbitration agreement":

16

17

18

19

20

| Dollar Amount of Claim: $ 161.94 | Other Relief Sought: ☑ Attorneys Fees ☑ Interest ☑ Arbitration Costs ☑ Punitive/ Exemplary ☑ Other |
|---|---|
| Amount enclosed: $ 750 | In accordance with Fee Schedule: ☐ Flexible Fee Schedule ☑ Standard Fee Schedule |
| Please describe the qualifications you seek for arbitrator(s) to be appointed to hear this dispute: Claimant submits that a qualified arbitrator shall have experience evaluating consumer claims contesting the scope and enforceability of the arbitration agreement. | |

21

22  *See* Ex. A (Selbin Decl.), Attachment 1.[3]  Ms. McLellan's intentions to seek a determination on

---

[2] Fitbit suggested in its reply to the motion to strike, and again at the hearing, that Ms. McLellan acted improperly in waiting "six months before filing her AAA claim."  Dkt. 134 at 5; *see also* May 31, 2018, Hr'g Tr. 6:19-21 ("Following the Court's ruling Your Honor made October 2017, six months went by.").  This is irrelevant (Fitbit raises no timeliness defense).  It is also misleading because the date after which Ms. McLellan might reasonably initiate arbitration was not October 11, 2017, as Fitbit states, but rather January 24, 2018, when the Court issued its order on the non-opt-out Plaintiffs' motion for reconsideration.

[3] Fitbit also highlighted the fact that under the "type of business" section of the form demand, Ms. McLellan identified herself as an "individual" as opposed to a corporate entity.  May 31, 2018, Hr'g Tr. 7:7-9.  In no way can this be interpreted as evidence that she did not intend to

PLAINTIFFS' STATEMENT RE STATUS OF ARBITRATION CASE NOS. 16-CV-00036-JD, 16-CV-00777-JD

1    her challenges to the scope and enforceability of the arbitration clause were clear, not only from

2    two years of briefing and this Court's orders, but also on the face of her arbitration demand itself.

3    **C.    AAA Sets a Deadline of May 9, 2018, for Fitbit to Submit the Requisite Filing Fees.**

4

5    On April 25, 2018, AAA informed the parties that it would apply the Commercial

6    Arbitration Rules and explained that under those rules, "the consumer pays a filing fee of $200

7    and the business pays a filing fee of $1,700." *See* Ex. A (Selbin Decl.), Attachment 3.  It went on

8    to note that the AAA had received Ms. McLellan's fee but that the "filing requirements" would

9    not be "complete" until Fitbit "**submit[ed] filing fees of $1,700 and the arbitrator's**

10   **compensation deposit of $2,500, totaling $4,200**." *Id.*  AAA set a deadline of May 9, 2018, for

11   Fitbit to tender the fees. *Id.* ("The requested payment should be received <u>no later than</u> **May 9th,**

12   **2018** and the AAA may decline to administer this dispute if the business does not timely

13   respond.") (underlining added).

14   **D.    Fitbit Makes a Settlement Offer; Ms. McLellan Rejects It to Seek a Determination on Arbitrability; Fitbit Unilaterally Concludes the Arbitration Before it Begins.**

15

16   Instead of paying the filing fees by the deadline, Fitbit made Ms. McLellan a settlement

17   offer on May 3, 3018.[4]  *See* Ex. A (Selbin Decl.), Attachments 4 and 5.  Notably, in those

18   settlement letters—which Ms. McLellan had not yet accepted and would ultimately reject—Fitbit

19   advised that it "consider[ed] the arbitration demand of Ms. McLellan resolved" and "regard[ed]

20   this matter as closed." *Id.*

21   Ms. McLellan, however, did not consider the matter resolved or closed.  She informed her

22   counsel that she intended to reject the settlement offer and to proceed to arbitrate the threshold

23   questions of arbitrability.  *See* Exhibit B, Declaration of Kate McLellan ("McLellan Decl.") ¶ 6.

24   pursue her arbitrability challenges, especially since Fitbit's Terms of Service allow her "only [to]

25   resolve Disputes with Fitbit on an individual plaintiff' and prohibit her from consolidating her arbitrations with others'. Ex. A (Selbin Decl.), Attachment 2.

26   [4] The offer was communicated via two letters, one addressed to Plaintiffs' counsel, and the other addressed directly to Ms. McLellan.  *See* Ex. A (Selbin Decl.), Attachments 4 and 5.  The letter

27   addressed to Ms. McLellan was signed by Fitbit's Associate General Counsel, Gloria Lee.  Fitbit did not couch either of these letters as privileged settlement communications, nor did either side

28   limit their subsequent discussions and communications as such.

PLAINTIFFS' STATEMENT
RE STATUS OF ARBITRATION
CASE NOS. 16-CV-00036-JD, 16-CV-00777-JD

1    Plaintiffs' counsel then requested a conference with Fitbit's counsel to communicate

2    Ms. McLellan's decision and to seek clarification on Fitbit's assertion that the arbitration

3    proceeding was "closed" regardless of Ms. McLellan's response.

4           That conference took place by telephone on May 14, 2018.  Although it was not

5    transcribed, a paralegal at Lieff Cabraser Heimann & Bernstein, LLP, took comprehensive and

6    contemporaneous notes, which he circulated to Plaintiffs' counsel later that afternoon.  *See*

7    Exhibit C, Declaration of Max Blaisdell ("Blaisdell Decl.") ¶¶ 4-5, Attachment 1.[5]  Those notes,

8    and the recollection of Plaintiffs' counsel, confirm that Plaintiffs' counsel communicated to Fitbit

9    that Ms. McLellan rejected the settlement offer because, among other reasons, "there are

10   unresolved issues on the delegation provision"—meaning the "scope" and enforceability of the

11   arbitration clause—"that she would like the arbitrator to decide."  *Id.*; Ex. A (Selbin Decl.) ¶¶ 3-4;

12   Exhibit D, Declaration of Kevin R. Budner ("Budner Decl.") ¶¶ 3-4.  Those notes also confirm

13   that Fitbit's counsel had no intention of proceeding with the arbitration, notwithstanding

14   Ms. McLellan's rejection.  Fitbit's full response, as found in the contemporaneous notes—which

15   again are not presented as a verbatim transcription, but which have not been altered in any way

16   after they were recorded—was as follows:

17          **We plan to tell AAA that we made an offer and regard the matter as
             concluded** even though Kate declining the offer and see what AAA will do. We to
18          [sic] offered her everything and there's nothing more she could get from AAA.
             **We'll enclose the letters and say that we regard it as concluded. We never
19          plan on getting to scope and enforceability with the arbitrator** and are not
             going to seeking to file briefs on those matters.
20

21   Ex. C. (Blaisdell Decl.), Attachment 1 (emphasis added).  The substance of this response is

22   confirmed by the recollection of Plaintiffs' counsel, *see* Ex. A (Selbin Decl.) ¶¶ 3-4; Ex. D,

23   ("Budner Decl.") ¶¶ 3-4, and tracks the language of Fitbit's subsequent letter to AAA, detailed

24   below.

25          After the call, Plaintiffs' counsel sent Fitbit a letter memorializing Ms. McLellan's

26

27   [5] As he explains in his accompanying declaration, paralegal Max Blaisdell endeavored to take
     "comprehensive and accurate" notes, and those notes, attached as Attachment 1 to his
28   Declaration, have not been altered or edited in any way.

position.  That letter stated, in relevant part:

> **Ms. McLellan maintains that**, as Fitbit has long argued and as Judge Donato **ruled, she has the right to have an arbitrator determine (1) whether the arbitration clause and class action waiver are enforceable and/or applicable to her claims**, and (2) whether she can bring a claim for public injunctive relief on behalf of all members of the proposed class. *See* Dkt. No. 114 at 9 ("The arbitrator will resolve [the non-opt-out] plaintiffs' challenges to the scope and enforceability of the arbitration clause."); *id.* at 8 (plaintiffs' arguments that "Fitbit procured the agreement to arbitrate by fraud" and that "the arbitration provision is unenforceable as applied to plaintiffs' claims for public injunctive relief . . . must be considered by the AAA arbitrator in the first instance"). **Ms. McLellan intends to enforce her right to seek this determination.**

Ex. A (Selbin Decl.), Attachment 6 (emphasis added).[6]  In other words, as of May 14, 2018, Ms. McLellan had (at least twice) made abundantly clear her intention to exercise her rights under this Court's orders and the delegation clause in Fitbit's Terms of Service to have arbitrability decided in arbitration.

But Fitbit would not let her.  After receiving Ms. McLellan's rejection, Fitbit did not pay the filing fees that it was contractually obligated to pay and that were, at that point, already five days overdue.  *See* Ex. A (Selbin Decl.), Attachment 2 (Terms of Service: "Fitbit will pay all arbitration fees for claims less than $75,000.").  Nor did it seek to retract or in any way revise its statement that it viewed the arbitration to be "closed."  Instead, Fitbit doubled down.

On May 16, 2018, Fitbit sent a letter to AAA terminating the arbitration.  It stated, in relevant part:

> Fitbit's goal is customer satisfaction. However, the filing fee alone ($750) is almost five times her total out-of-pocket claim, were she to succeed. We believe Fitbit's total offer of $2,814.75—which is more than 17 times what she paid—is many times more than what she could recover if she were to proceed to arbitration and prevail.
>
> **Fitbit regards this matter as concluded.**

*See* Ex. A (Selbin Decl.), Attachment 7 (emphasis added).  As Fitbit itself made clear in the meet and confer, it never intended to let Ms. McLellan arbitrate scope and arbitrability.  Its intention was to pick her off with an individual settlement.  When she refused, Fitbit concluded the

---

[6] Plaintiffs' counsel also stated in this letter that Ms. McLellan sought relief for the entire class of consumers, further undermining Fitbit's claim that it believed she was seeking only individual monetary relief. *Id.*

arbitration anyway.

E.     **At the May 31, 2018, Hearing, Fitbit Confirms That It Unilaterally Closed the Arbitration and That No "Rational" Fitbit Consumer Would Seek to Arbitrate Her Claims.**

More than two weeks passed between the date Fitbit sent its letter to AAA and the hearing before this Court.  During that time, Plaintiff Dunn filed a sur-reply, again explaining that Ms. McLellan "initiated an arbitration seeking a determination on precisely the arbitrability issues that the Court concluded must be determined by an arbitrator," and informing the Court that "Fitbit has acted to deprive Ms. McLellan of any opportunity to resolve her arbitrability challenges in any forum, including in arbitration."  *See* Dkts. 137, 139.  Fitbit made no effort to "dispel any" purported "misunderstanding," *see* Ex. A (Selbin Decl.), Attachment 8, and filed nothing in response.  Nor did it pay the arbitration fees necessary for the arbitration to proceed, or take any other action to revive the proceedings it had unilaterally "concluded."

At the hearing, Fitbit's counsel confirmed that "we've told AAA" about Ms. McLellan's decision to reject its settlement offer, "[a]nd we said, *We regard that matter as concluded*.  So we have had no further communications with them.  We haven't posted our fee with AAA."  May 31, 2018, Hr'g Tr. 11:5-6 (italics in original).  Only after it became obvious that the Court saw through and disapproved of Fitbit's tactics, Fitbit's counsel argued that, in his view, Fitbit's "decision" to terminate the arbitration "is not irreversible." *Id.* at 11:10.  Later, Fitbit's counsel reiterated his position that Fitbit's decision to end the arbitration "*isn't irreversible*.  And I can visit and I will revisit with the client whether we want to **re-open** the arbitration."  *Id.* at 14:24-15:1 (bolding added; italics in original). Whether that decision is actually "reversible" (it is not, as discussed below), these statements again verify that Fitbit had, in fact and in its own view, unilaterally *closed* the arbitration.

Fitbit's counsel also confirmed what Plaintiffs had long argued: that Fitbit used its arbitration clause *not* to provide an alternative, efficient forum to adjudicate consumers' claims, but to ensure that consumers would have no reasonable opportunity to bring their claims at all. Again and again, counsel explained that "a claim that is $162 -- an individual claim -- is not one that any rational litigant would litigate." *Id.* at 15:5-7; *see also, e.g.*, *id.* at 10:7-9 ("[I]n our view,

1   a rational litigant wouldn't litigate $162 claim where the filing fee, itself, is $750.").  Counsel

2   later explained:

3       [W]hat I understand Ms. McLellan wants . . . is a right to be heard. And my
        understanding of that right to be heard is simply to have, pursuant to the
4       Delegation Clause -- is to have the arbitrator decide the remaining two formation
        issues that Your Honor didn't decide, which would be fraudulent inducement, and
5       scope.

6       So when I'm hearing notions about she's been denied a right of Due Process, an
        opportunity to be heard, let's be clear on what that right is. What she is asking us to
7       do is go to arbitration on a claim of $162; that we have to pay $750 just to get the
        arbitrator, in order to have her two formation defenses decided. At least, that's the
8       first step.

9       As I said, we felt no rational litigant would require that.

10  *Id.* at 11:13-25.  In other words, Fitbit admitted that *no* rational consumer would ever seek to

11  individually arbitrate the claims in this case.  Nor will Fitbit permit any consumer to actually test

12  the arbitrability of these claims in arbitration, despite its argument that only an arbitrator can

13  decide that issue.  Fitbit's arbitration clause, as construed by Fitbit itself, thus precludes any

14  consumer—rational or not—from ever having these claims heard in *any* forum.

15          **F.**    **After This Court Expresses Concern, Fitbit Attempts to Reverse Course and
                    "Re-Open" the Arbitration, Falsely Claiming to Have "Misunderstood"
16                  Ms. McLellan's Intentions.**

17          This Court did not mince words at the hearing, and Fitbit surely understood that it was in

18  trouble.  Fitbit's response was a transparent effort to re-write history.  In a letter sent the day after

19  the hearing, Fitbit claimed that the whole thing had been a "misunderstanding" and that "it was

20  never Fitbit's intent to preclude Ms. McLellan (or any Fitbit customer) of their right to proceed in

21  arbitration."  Ex. A (Selbin Decl.), Attachment 8.  To justify its actions, Fitbit stated that it

22  previously understood Ms. McLellan to be seeking only

23      monetary relief. . . . As for a determination about contract formation, we assumed
        that Plaintiffs decided not to present that question to the arbitrator via
24      Ms. McLellan and instead might have been reserving that issue for one of the other
        eleven non-optouts (whose arbitration demands still have not been filed).
25

26  *Id.*  This is demonstrably false, as this Court foresaw:

27      I don't imagine that there could be a misunderstanding, because I sent the case to
        AAA to decide arbitrability; not to decide a $161 claim. That is not even a portion
28      of my Order. It's not even mentioned in my Order.

1

2

3

4

> The Order as to AAA was: Under the current state of the law, you, Mr. Arbitrator or Ms. Arbitrator, need to decide this question. The question goes to the heart of which forum will hear this case. It had nothing to do, even remotely, with the dollar value of her watch; and I'm taken aback that you keep focusing on that. You know that's not the case. Even the lawyer in this case, from Day One, you signed all of those briefs. You argued it to me. You know what was delegated to the AAA to decide. It was not a $161 claim.

5

May 31, 2018, Hr'g Tr. 16:1-14.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

   Furthermore, as shown above, Ms. McLellan's arbitration demand—a one-page form provided by AAA, with limited space—stated that the proceeding would require an arbitrator with "experience evaluating consumer claims contesting the scope and enforceability of the arbitration agreement."  Ex. A (Selbin Decl.), Attachment 1.  And Plaintiffs' counsel made crystal clear on May 14, 2018, both in the telephonic meet and confer and in the letter sent later that day, that "Ms. McLellan . . .  has the right to have an arbitrator determine . . .  whether the arbitration clause and class action waiver are enforceable and/or applicable to her claims," and that she "intend[ed] to enforce her right to seek this determination."  *Id.*, Attachment 6.  In response, Fitbit's counsel stated "We never plan on getting to scope and enforceability with the arbitrator," and, two days later, it sent a letter to AAA stating that the matter was "concluded."  Ex. C (Blaisdell Decl.), Attachment 1; Ex. A (Selbin Decl.) ¶¶ 2-3, Attachment 7; Ex. D (Budner Decl.) ¶¶ 2-3.  Fitbit did nothing in the following weeks that would even remotely suggest it had somehow misunderstood the situation, nor did it pay the filing fees necessary for the arbitration to proceed.  In light of the above, Fitbit's post-hoc assertion of "misunderstanding" is, at best, disingenuous, and appears to be yet another example of Fitbit's gamesmanship.

21

22

23

24

25

26

27

   Plaintiffs' counsel recounted these facts in a responsive letter sent on June, 4, 2018.  In that letter, counsel further articulated Ms. McLellan's intention "to present the full and accurate factual record to the Court as ordered by Judge Donato in our upcoming papers" and explained that "[u]ntil such time as Judge Donato rules, . . . it is her position that Fitbit has waived enforcement of, defaulted on, and/or voided its arbitration clause as to her and all absent class members by its failure to participate as required by Court order and its own Terms of Service."  Ex. A (Selbin Decl.), Attachment 9.

28

   Plaintiffs' counsel received a letter from AAA on June 11, 2018, indicating that Fitbit had

1  finally tendered the filing fees—more than a month late, and notwithstanding the fact that this

2  Court is now reviewing the propriety of Fitbit's actions and its effect on the enforceability of the

3  arbitration clause.  *Id.*, Attachment 10.  Plaintiffs' counsel then informed AAA that they intend to

4  await this Court's ruling before proceeding, and AAA stayed the case for 30 days.  *Id.*,

5  Attachment 11; *id.* ¶ 15.

6                                                              * * *

7       In sum, this undisputed record verifies the facts that caused this Court concern at the

8  hearing.  Fitbit unilaterally terminated the very arbitration proceeding that it long argued was the

9  only forum for Ms. McLellan to advance her arbitrability challenges, thereby denying her any

10  forum to be heard on those issues.

11  **II.     IMPLICATIONS AND NEXT STEPS**

12       **A.     Fitbit Breached the Arbitration Agreement and Has No Right to "Reverse" or
                  "Re-open" Those Proceedings.**

13

14       Controlling Ninth Circuit law is clear: a party that refuses to pay its portion of arbitration

15  fees or to otherwise participate in an arbitration proceeding is in breach of the arbitration

16  agreement and cannot later reverse course and compel arbitration.  *See Brown v. Dillard's, Inc.*,

17  430 F.3d 1004 (9th Cir. 2005).  In *Dillard's*, an employee (Brown) filed a notice of intent to

18  arbitrate a dispute with her employer (Dillard's) pursuant to the company's Fairness in Action

19  Program, which contained an arbitration clause.  *Id.* at 1008.  Soon after Brown filed the notice

20  and paid her portion of the arbitration fees, AAA requested that Dillard's pay its portion of the

21  fees.  *Id.*  Dillard's did not pay the fee or otherwise respond.  *Id.* at 1008-09.  Brown later spoke

22  to a representative at Dillard's who told Brown that the company refused to arbitrate.  *Id.* at 1009.

23  Brown then filed a complaint in court, and Dillard's moved to compel arbitration.  *Id.*

24       The district court denied the motion to compel, and the Ninth Circuit affirmed.  It held

25  that "Dillard's breached its agreement with Brown by refusing to participate in the arbitration

26  proceedings Brown initiated. Having breached the agreement, Dillard's cannot now enforce it."

27  *Id.* at 1010.  The Ninth Circuit further explained that

28       If Dillard's believed Brown's claim was meritless, its proper course of action was

to make that argument in arbitration. Instead, Dillard's refused to participate in the arbitration process at all. Under general principles of California contract law, Dillard's breach of its obligations under the arbitration agreement deprives it of the right to enforce that agreement . . . .

If we took Dillard's view and allowed it to compel arbitration notwithstanding its breach of the arbitration agreement, we would set up a perverse incentive scheme. Employers like Dillard's would have an incentive to refuse to arbitrate claims brought by employees in the hope that the frustrated employees would simply abandon them. This tactic would be costless to employers if they were allowed to compel arbitration whenever a frustrated but persistent employee eventually initiated litigation. We decline to adopt a rule that would encourage companies to refuse to participate in properly initiated arbitration proceedings. To promote our national policy in favor of arbitration, *see Southland Corp. v. Keating*, 465 U.S. 1, 10, 104 S.Ct. 852 (1984), we must decline to compel it in this case.

*Id.* at 1010-11. The Ninth Circuit also concluded that Dillard's waived its right to arbitrate. *Id.* at 1012.

The similarities between *Dillard's* and this case are striking. Fitbit, like Dillard's, refused to pay the arbitration fees and refused to arbitrate (that is, until this Court conveyed its disapproval of Fitbit's tactics). If anything, Fitbit's conduct here was more egregious than the conduct in *Dillard's*—it did more than simply remain silent and refuse to pay, it affirmatively communicated to AAA that it "regard[ed] the matter as concluded." Ex. A (Selbin Decl.), Attachment 7. Under the same California contract law principles applicable in *Dillard's*, Fitbit breached its arbitration agreement and waived its right to enforce it. Fitbit cannot turn back the clock to undo its breach, and it would not have even attempted to do so but for this Court's intervention.

Fitbit's actions, like Dillard's, "display[] the dark side of our nation's policy in favor of arbitration," in which companies force consumers and employees into arbitration not as an alternative forum to have claims heard, but to prevent them from being heard at all. *Dillard's*, 430 F.3d at 1013. As the Supreme Court noted in *Concepcion*, "[t]he overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms *so as to facilitate streamlined proceedings*." 563 U.S. at 344 (emphasis added). This, of course, presupposes the *existence* of such proceedings; here, Fitbit forced Ms. McLellan into arbitration and then unilaterally terminated them before they began. While certainly "streamlined," that does not qualify as a "proceeding" in any sense of the word, and thus neither serves the FAA's

-12-

1    "overarching purpose" nor comports with basic due process.  Under binding precedent, Fitbit's

2    actions must have consequences.  *Dillard's*, 430 F.3d at 1012-13; *see also Nadeau v. Equity*

3    *Residential Properties Mgmt. Corp.*, 251 F. Supp. 3d 637, 644 (S.D.N.Y. 2017) (following

4    *Dillard's* and holding that an employer refusing to pay arbitration fees or participate in arbitration

5    after employee rejected employer's settlement offer breached its arbitration agreement and could

6    not later enforce it).[7]

7         For similar reasons, Fitbit also defaulted on its contractual obligations under its own

8    arbitration agreement.  *Sink v. Aden Enters., Inc.*, 352 F.3d 1197, 1199 (9th Cir. 2003).  In *Sink*,

9    an employee (Sink) initiated arbitration against its employer (Aden).  The employer was

10   contractually required to pay the arbitration fees and, as in *Dillard's*, it did not do so by the

11   deadline imposed by the arbitrator.  *Id.* at 1198-99.  The arbitrator and district court found that the

12   employer had defaulted on its arbitration obligations. The Ninth Circuit affirmed, interpreting

13   "'default' to mean '[t]he omission or failure to perform a legal or contractual duty; esp., the

14   failure to pay a debt when due.'"  *Id.* at 1999 n.2 (quoting Black's Law Dictionary 428 (7th ed.

15   1999)).  The Ninth Circuit further held that the employer could not later compel arbitration, and

16   noted that "Aden's failure to pay required costs of arbitration was a material breach of its

17   obligations in connection with the arbitration. Aden had a fair chance to proceed with arbitration,

18   but Aden scuttled that prospect by its non-payment of costs . . . ."  *Id.* at 1201.

19        As with *Dillard's*, the application of *Sink* to this case is clear.  Like Aden, Fitbit failed to

20   pay its contractually-required arbitration fees by the deadline.  And, although no formal default

21   was requested or entered here, Fitbit unilaterally informed Ms. McLellan and AAA that it

22   regarded the matter closed.  Until this Court's intervention, Fitbit displayed absolutely no

23

24   [7] As confirmed in *Nadeau*, the fact that Ms. McLellan rejected Fitbit's settlement offer does not
     change this analysis.  As this Court correctly noted at the hearing, Ms. McLellan had every right
25   to do so.  May 31, 2018, Hr'g Tr. at 10:16-19 ("[T]he Supreme Court has said you cannot
     unilaterally moot a claim. And you certainly can't moot standing, simply by tendering what you
26   consider to be full relief."); *see also Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016)
     ("[A]n unaccepted settlement offer or offer of judgment does not moot a plaintiff's case."); *Chen*
27   *v. Allstate Ins. Co.*, 819 F.3d 1136, 1144 (9th Cir. 2016) ("As we read *Campbell–Ewald*, a
     lawsuit—or an individual claim—becomes moot when a plaintiff *actually receives* all of the relief
28   he or she could receive on the claim through further litigation.") (emphasis in original).

1    intention to ever pay its fees or otherwise revive the arbitration.  The same principles therefore

2    apply: a party that "fail[s] to pay a debt when due" forfeits its right to arbitrate.  *See id.* at 1198-

3    1201; *accord Pre-Paid Legal Servs., Inc. v. Cahill*, 786 F.3d 1287, 1295, 1299 (10th Cir. 2015)

4    (following *Sink* and confirming that the same result follows whether or not the arbitrator

5    "formally entered default"); *Rapaport v. Soffer*, No. 2:10-CV-00935-KJD, 2011 WL 1827147, at

6    *3 (D. Nev. May 12, 2011) (same).

7         Fitbit failed to timely pay its filing fees and refused to participate in Ms. McLellan's

8    arbitration.  It cannot now "reverse" that decision and has lost its right to compel arbitration.

9    **B.    Fitbit Has Now Conceded That Arbitration Is Not a Viable Forum for**
      **Resolving Arbitrability or Hearing Any Other Aspect of These Claims.**

10

11        Fitbit unilaterally imposed an arbitration clause in post-purchase Terms of Service.  As the

12   Court knows, Plaintiffs challenged the enforceability of that clause in a host of ways, including

13   that the manner in which Fitbit imposed the arbitration clause itself was a scheme by Fitbit to

14   immunize itself from all liability.  *See, e.g.*, Dkt. 42 at 27-29, 41-42.  When Ms. McLellan and

15   other consumers sought to challenge the clause in court, Fitbit argued for two years that such

16   arguments must be heard *only* by an arbitrator.  After the Court ruled in Fitbit's favor, Ms.

17   McLellan tried to seek that determination in arbitration.  But Fitbit wouldn't let her.  This is a

18   direct violation of the Court's order, and it reveals that Fitbit never intended arbitration to be a

19   viable alternative to have these claims heard—it was only ever meant to preclude consumers from

20   having them heard at *all*.  *See Dillard's*, 430 F.3d at 1012-13.

21        This is further evidenced by Fitbit's counsel's repeated admission that, notwithstanding its

22   repeated prior insistence that *all* issues in this case—including arbitrability—must go to

23   arbitration for resolution, no "rational litigant" would arbitrate these claims individually.  These

24   admissions also make clear that, as applied to any claims that the proposed class of consumers

25   might reasonably bring here, "the cost of arbitration precludes the effective vindication of

26   statutory rights in arbitration," and the "agreement to arbitrate is unenforceable."  *Anders v.*

27   *Hometown Mortg. Servs., Inc.*, 346 F.3d 1024, 1028 (11th Cir. 2003) (citing *Green Tree Fin.*

28   *Corp. v. Randolph*, 531 U.S. 79, 90 (2000)); *see also Am. Exp. Co. v. Italian Colors Rest.*, 570

U.S. 228, 236 (2013) (citing *Green Tree* and confirming the validity of the "effective vindication" exception to arbitration); *Kristian v. Comcast Corp.*, 446 F.3d 25, 52 (1st Cir. 2006).

In *Italian Colors*, the Supreme Court made it clear that effective vindication requires "a *right to pursue* statutory remedies" in arbitration.  570 U.S. at 235 (emphasis in original; citation omitted).  That is, at minimum, a plaintiff must be afforded the right to pursue statutory remedies in arbitration if she is to be compelled to do so.  The Supreme Court went on to explain that its minimum requirement rule "would certainly cover a provision in an arbitration agreement forbidding the assertion of certain statutory rights. And it would perhaps cover filing and administrative fees attached to arbitration that are so high as to make access to the forum impracticable."  *Id.* at 236.

Here, Fitbit has done both:  it has foreclosed Ms. McLellan from pursuing her statutory rights in arbitration, and it has—by its own admission—required filing and administrative fees that are so high relative to the value of her individual claim so as to render access impracticable or, in its counsel's words, irrational.  While, ordinarily, one party's agreement to pay the arbitration fees would undermine this position, *see Anders*, 346 F.3d at 1030, Fitbit's repeated statements that *no* rational litigant would arbitrate low-value claims under *Fitbit's Terms of Service* set this case apart.  This conclusion applies to all members of the proposed class, and Plaintiffs submit that the arbitration agreement is unenforceable as to all of them.

Much of the current Supreme Court jurisprudence around arbitration clauses is already fiction built upon fiction.  The fiction that consumers knowingly waive their Seventh Amendment right to a jury trial every time they buy a product and click "agree" next to tens of pages of miniature text often, as here, after they have already paid for the product or service.  The fiction that they knowingly delegate arbitrability to an arbitrator.  The fiction that individual arbitration is a viable alternative forum for consumers with small value claims.  But one does not have to view these fictions as bad law or bad policy to agree that, here, Fitbit has conceded that its entire arbitration procedure is nothing more than a fraud, a scheme designed to prevent consumers from having their claims heard in any forum.

C.      **Fitbit Must Be Held to Account.**

The Court already concluded that if the facts demonstrate that "Fitbit has forced this case out of court, and then has unilaterally refused to arbitrate it, there will be an accounting. And that accounting will have potentially grave consequences, both professionally for the attorneys and possibly for the client, as well." May 31, 2018, Hr'g Tr. 13:23-14:2. If the Court makes such a finding on the full record now before it, Plaintiffs respectfully submit that the most appropriate way to hold Fitbit to account for attempting to "shut down people's claims though games" would be to invalidate the arbitration clause as to all members of the proposed class and permit them to be brought in court.

Plaintiffs recognize that a common sanction for bad-faith conduct related to arbitration is an award of attorneys' fees. *See, e.g.*, *Int'l Union of Petroleum & Indus. Workers v. W. Indus. Maint., Inc.*, 707 F.2d 425, 428 (9th Cir. 1983) ("[W]e agree with other circuits . . . that an unjustified refusal to abide by an arbitrator's award may equate an act taken in bad faith, vexatiously or for oppressive reasons."); *Sheet Metal Workers' Int'l Ass'n Local Union No. 359 v. Madison Indus., Inc. of Ariz.*, 84 F.3d 1186, 1192 (9th Cir. 1996) (same); *Legair v. Circuit City Stores, Inc.*, 2005 WL 1865373 (S.D. Ohio July 26, 2005) (finding plaintiff's counsel "in contempt of this court's order to arbitrate" and granting monetary sanctions to "reimburse defendant for any excess costs and expenses caused by [counsel's] obstructionist actions"); *Cigna Ins. Co. v. Huddleston*, 986 F.2d 1418 (5th Cir. 1993) (upholding district court's award of attorney's fees as sanction for party's "bad-faith refusal to be bound by the arbitration award"). Here, however, sanctions in the amount of the relatively modest attorneys' fees associated with these latest proceedings would do little to alter the "perverse incentive scheme" or to "[dis]courage companies [like Fitbit from] refus[ing] to participate in properly initiated arbitration proceedings." *See Dillard's, Inc.*, 430 F.3d at 1011.

The record is clear: Fitbit has abused this process, and its arbitration clause, to avoid *all* accountability for these claims in *any* forum. It would not even allow an arbitrator to decide the very issue—arbitrability—it spent two years telling this Court must *only* be decided by an arbitrator. It did so, we now know thanks to its counsel's candor, because it knows no rational

1    consumer would actually arbitrate these claims individually, and if anyone dares try—as Ms.

2    McLellan did—Fitbit will unilaterally shut it down.  This is not about an alternative forum for

3    claims to be pressed, it is about insulating Fitbit altogether from legitimate claims.  Respectfully,

4    in light of its conduct, Fitbit should not have the ability to invoke its arbitration clause again, at

5    least not as to these claims by these Plaintiffs and the consumers they seek to represent.

6                                    Respectfully submitted,

7    Dated:  June 14, 2018          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

8                                    By: */s/ Jonathan D. Selbin*
                                          Jonathan D. Selbin
9
                                     Jonathan D. Selbin (CA SBN 170222)
10                                   jselbin@lchb.com
                                     LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
11                                   250 Hudson Street, 8th Floor
                                     New York, NY  10013
12                                   Telephone:  (212) 355-9500
                                     Facsimile:  (212) 355-9592
13
                                     Elizabeth J. Cabraser (CA SBN 083151)
14                                   ecabraser@lchb.com
                                     Kelly M. Dermody (CA SBN 171716)
15                                   kdermody@lchb.com
                                     Kevin R. Budner (CA SBN 287271)
16                                   kbudner@lchb.com
                                     LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
17                                   275 Battery Street, 29th Floor
                                     San Francisco, CA  94111-3339
18                                   Telephone:  (415) 956-1000
                                     Facsimile:  (415) 956-1008
19
                                     Robert Klonoff (*pro hac vice*)
20                                   klonoff@usa.net
                                     ROBERT H. KLONOFF, LLC
21                                   2425 SW 76th Ave.
                                     Portland, OR 97225
22                                   Telephone:  (503) 291-1570

23                                   Rosemary M. Rivas (CA SBN 209147)
                                     rrivas@zlk.com
24                                   Adam C. McCall (CA SBN 302130)
                                     amccall@zlk.com
25                                   LEVI & KORSINSKY LLP
                                     445 South Figueroa Street, 31st Floor
26                                   Los Angeles, CA 90071
                                     Telephone: (213) 985-7290
27                                   Facsimile: (866) 367-6510

28

1572150.8                           -17-                    PLAINTIFFS' STATEMENT
                                                            RE STATUS OF ARBITRATION
                                                            CASE NOS. 16-CV-00036-JD, 16-CV-00777-JD

1                                         

Andrea Clisura (*pro hac vice*)
aclisura@zlk.com
Courtney E. Maccarone (*pro hac vice*)
cmaccarone@zlk.com
LEVI & KORSINSKY LLP
30 Broad Street, 24th Floor
New York, NY 10004
Telephone:  (212) 363-7500
Facsimile:  (212) 363-7171

*Attorneys for Plaintiffs, individually and behalf of all others similarly situated*

PLAINTIFFS' STATEMENT
RE STATUS OF ARBITRATION
CASE NOS. 16-CV-00036-JD, 16-CV-00777-JD

1

## **CERTIFICATE OF SERVICE**

2
I hereby certify that, on June 14, 2018, service of this document was accomplished

3
pursuant to the Court's electronic filing procedures by filing this document through the ECF

4
system.

5

6
*/s/ Jonathan D. Selbin*
Jonathan D. Selbin

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28