1   Elizabeth J. Cabraser (CA SBN 083151)
    ecabraser@lchb.com
2   Kelly M. Dermody (CA SBN 171716)
    kdermody@lchb.com
3   Kevin R. Budner (CA SBN 287271)
    kbudner@lchb.com
4   LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP
5   275 Battery Street, 29th Floor
    San Francisco, CA  94111-3339
6   Telephone:  (415) 956-1000
    Facsimile:   (415) 956-1008
7
    Jonathan D. Selbin (CA SBN 170222)
8   jselbin@lchb.com
    LIEFF CABRASER HEIMANN &
9   BERNSTEIN, LLP
    250 Hudson Street, 8th Floor
10  New York, NY  10013
    Telephone:  (212) 355-9500
11  Facsimile:  (212) 355-9592

12  Robert Klonoff (*pro hac vice*)
    klonoff@usa.net
13  ROBERT H. KLONOFF, LLC
    2425 SW 76th Ave.
14  Portland, OR 97225
    Telephone:  (503) 291-1570

Rosemary M. Rivas (CA SBN 209147)
rrivas@zlk.com
LEVI & KORSINSKY LLP
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

Adam C. McCall (CA SBN 302130)
amccall@zlk.com
LEVI & KORSINSKY LLP
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Telephone: (213) 985-7290
Facsimile: (866) 367-6510

Andrea Clisura (*pro hac vice*)
aclisura@zlk.com
Courtney E. Maccarone
cmaccarone@zlk.com (*pro hac vice*)
LEVI & KORSINSKY LLP
30 Broad Street, 24th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

15  *Attorneys for Plaintiff, individually and on behalf of all others similarly situated*

16              UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
17              SAN FRANCISCO DIVISION

18  ROB DUNN, Individually and on Behalf of
    All Others Similarly Situated,
19
                    Plaintiff,
20
    v.
21  FITBIT, INC.,

                    Defendant.
22

23

Case Nos. 16-cv-00036-JD; 16-cv-00777-JD

**THIRD AMENDED CONSOLIDATED
MASTER CLASS ACTION
COMPLAINT**

**JURY DEMAND**

Ctrm:  11, 19th Floor

The Honorable James D. Donato

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................ 1

JURISDICTION AND VENUE ...................................................................................... 2

INTRADISTRICT ASSIGNMENT ................................................................................ 3

PARTIES ........................................................................................................................ 3

COMMON FACTUAL ALLEGATIONS ...................................................................... 4

    I.    Fitbit Falsely Claims the PurePulse Trackers Consistently Record Accurate
Heart Rate............................................................................................................ 5

    II.    The PurePulse Trackers Fail to Consistently Record Accurate Heart Rate as
Promised and Warranted. ................................................................................. 14

          A.    Comprehensive Expert Analysis Further Confirms That The PurePulse
Trackers Cannot Provide Meaningful Heart Rate Data........................... 16

          B.    Third-Party, Independent Media Reviews Also Confirm Fitbit's Failures. ........... 18

          C.    Fitbit Has Not Credibly Responded and Cannot Credibly Respond to These
Studies. .................................................................................................... 20

CLASS ACTION ALLEGATIONS ............................................................................. 24

CHOICE OF LAW ALLEGATIONS ........................................................................... 27

CLAIMS FOR RELIEF ................................................................................................ 28

        FIRST CLAIM FOR RELIEF Violations of California's Consumers Legal
Remedies Act, Cal. Civ. Code § 1750, *et seq.* ....................................... 28

        SECOND CLAIM FOR RELIEF Violations of California's False Advertising
Law, Cal. Bus. & Prof. Code §§17500, *et seq.* ...................................... 30

        THIRD CLAIM FOR RELIEF Violations of California's Unfair Competition Law,
Cal. Bus. & Prof. Code § 17200, *et seq.* ............................................... 31

        FOURTH CLAIM FOR RELIEF Common Law Fraud ................................... 33

        FIFTH CLAIM FOR RELIEF Fraud in the Inducement .................................. 35

        SIXTH CLAIM FOR RELIEF Breach of Express Warranty ........................... 36

        SEVENTH CLAIM FOR RELIEF Violations of the Magnuson-Moss Act –
Implied Warranty, 15 U.S.C. § 2301, *et seq.* ........................................ 37

        EIGHTH CLAIM FOR RELIEF Violations of the Arizona Consumer Fraud Act,
Arizona Rev. Stat. § 44-1521, *et seq.*.................................................... 39

PRAYER FOR RELIEF................................................................................................ 41

DEMAND FOR JURY TRIAL..................................................................................... 42

## INTRODUCTION

1.      In widespread national advertising, Defendant Fitbit, Inc. ("Fitbit") touted the purported ability of its wrist-based "activity trackers" to accurately record a wearer's heart rate during intense physical activity.  To perform this function, Fitbit equipped its "Charge HR," "Surge," and "Blaze" fitness watches (the "PurePulse Trackers") with an LED-based technology called "PurePulse™."

2.      Fitbit's representations are repeated in and echoed throughout its advertising of the PurePulse Trackers—including, for example, in commercials run repeatedly during Major League Baseball's nationally-televised 2015 World Series[1]—which employs such descriptive slogans as "Every Beat Counts" and "Know Your Heart."  But those representations are false.  Far from "counting every beat," the PurePulse Trackers *do not* and *cannot* consistently and accurately record wearers' heart rates during the intense physical activity for which Fitbit expressly markets them.

3.      Plaintiff Rob Dunn ("Plaintiff") and many consumers like him have observed that the PurePulse Trackers consistently mis-record heart rates by a very significant margin, particularly during exercise (described herein as the "Heart Rate Defect").

4.      Expert testing confirms these observations.  Professors from California State Polytechnic University, Pomona ("Cal Poly Pomona") conducted far and away the most comprehensive study to date, and found that Fitbit's PurePulse Trackers are inaccurate by an average of approximately 20 bpm during moderate to high intensity exercise.  They therefore concluded that the devices could not provide meaningful heart rate data.  Additional, independent reviewers have reached the same conclusion.

5.      This failure did not keep Fitbit from heavily promoting the heart rate monitoring feature of the PurePulse Trackers and from profiting handsomely from it.  In so doing, Fitbit defrauded the public and cheated its customers, including Plaintiff.

6.      The heart rate monitoring function of the PurePulse Trackers is a material— indeed, in some cases, vital—feature of the product.  Not only are accurate heart readings

---

[1] Available at https://www.youtube.com/watch?v=x0Ok-EgCHjc (last visited June 18, 2018).

1  important for all those engaging in fitness, they are critical to the health and well-being of those

2  Class members whose medical conditions require them to maintain (or not to exceed) a certain

3  heart rate.

4       7.     Plaintiff brings this action on behalf of himself and all those who purchased the

5  Fitbit PurePulse Trackers and who opted out of the arbitration clause in Fitbit's Terms of Service

6  to seek redress through this proposed class action in the form of injunctive relief, damages,

7  restitution, and all other relief this Court deems equitable.[2]

8                                         **JURISDICTION AND VENUE**

9       8.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act

10  ("CAFA"), 28 U.S.C. § 1332(d), because many members of the proposed Plaintiff Class,

11  including Plaintiff Dunn, are citizens of states different from Fitbit's home states, and the

12  aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.  As this

13  Court previously concluded, "jurisdiction was established under CAFA at the time the complaint

14  was filed and is not defeated by post-filing developments."  Dkt. 125 (citing *Rea v. Michaels*

15  *Stores Inc.*, 742 F.3d 1234, 1237 (9th Cir. 2014); *Visendi v. Bank of Am., N.A.*, 733 F.3d 863, 868

16  (9th Cir. 2013)).

17       9.     Jurisdiction is also proper pursuant to 28 U.S.C.  § 1332 because the amount in

18  controversy, including the requested injunctive relief applicable to all putative Class members,

19  exceeds $75,000, and Plaintiff and Defendant are citizens of different states.

20       10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because (1) the only

21  defendant in this action resides in this District and (2) a substantial part of the events and

22  omissions giving rise to Plaintiff's claims occurred in this District—specifically, Fitbit designed

23

24  [2] Plaintiff Dunn asserts, and has argued, that he can represent a class of *all* consumers who
purchased a PurePulse Tracker, as defined herein, whose contractual arbitration opt-out

25  period had not expired when the class action complaint was filed. *See, e.g.*, Dkt. 133 at 1-2, 8-11
The Court subsequently granted Fitbit's motion to strike class allegations for non-opt-out

26  consumers "without prejudice" and "subject to reconsideration if warranted by future
developments."  Dkt. 141.  Plaintiff maintains that the contractual period for absent class

27  members to opt out of arbitration remains tolled until those class allegations are dismissed with

28  prejudice, and reserves all rights and arguments related to this issue.

and marketed its product from its headquarters in San Francisco, California, and some Class

members reside in and purchased their PurePulse Trackers in this District.

11.     The Court has general personal jurisdiction over Defendant Fitbit, Inc., whose

headquarters is located in San Francisco, California.

**INTRADISTRICT ASSIGNMENT**

12.     Pursuant to Local Rule 3-2(c), this civil action has been assigned to the San

Francisco Division, because a substantial part of the events or omissions giving rise to the claim

occurred in the county of San Francisco, where Fitbit is headquartered.

**PARTIES**

13.     Plaintiff ROB DUNN is an Arizona citizen and resident domiciled in Yuma,

Arizona.  Plaintiff Dunn is also a fitness enthusiast.  In late 2015, Mr. Dunn heard from his wife

that Fitbit was selling a fitness watch that purported to track heart rate.  He was initially skeptical,

but began researching the product online, including on Fitbit's website.  There, he viewed and

relied on Fitbit's many representations that that the PurePulse Trackers could record real-time

heart rate, even during exercise.  Mr. Dunn then visited a Bed Bath & Beyond store in Yuma,

Arizona, on December 26, 2015.  There, he spoke to a sales representative about the Charge HR,

compared the Charge HR to the Charge (the comparable version without heart rate monitoring),

viewed and relied upon Fitbit's representations on the Charge HR product packaging —including

statements that the device provided "Heart Rate," "CONTINUOUS HEART RATE,"

"PUREPULSE CONTINUOUS HEART RATE,"  "Automatic, 24/7 wrist-based heart rate," and

"Continuous workout heart rate"—and then purchased the product.[3]  Later that day, he purchased

another Charge HR for himself at a Best Buy, also in Yuma, Arizona.  At no point before or

during the purchase of either Charge HR was Plaintiff Dunn or his wife provided with or required

to agree to an arbitration clause or class action ban, nor were they put on notice that they would

be required to agree to an arbitration clause or class action ban for their PurePulse Trackers to

function as intended.  Soon after purchasing the Charge HR, Plaintiff Dunn noticed the heart rate

---

[3] The packaging of the products that Mr. Dunn purchased was substantially similar, if not
identical, to the packaging described and displayed in ¶ 30, *infra*.

function did not work as represented.  During exercise, his PurePulse tracker returned inconsistent and inaccurate readings, often recording well below (and occasionally well over) the readings from the heart rate monitors on his stationary cardiovascular machine.  Had Fitbit disclosed that the PurePulse Trackers cannot consistently deliver accurate heart rate readings, even during exercise, Plaintiff Dunn would not have purchased his Charge HR or would have paid significantly less for it.  Plaintiff Dunn is now stuck with a PurePulse Tracker that cannot perform the precise task for which he purchased it and which does not function as Fitbit expressly promised and warranted.  On January 15, 2016, twenty days after they registered for accounts on Fitbit.com, Plaintiff Dunn and his wife opted out of the arbitration provision in the Terms of Service purportedly governing the use of their PurePulse Trackers.

14.     The remaining plaintiffs named in the Amended Consolidated Master Class Action Complaint (Dkt. 42) have been ordered to arbitrate the enforceability and applicability of their purported agreement to arbitrate their claims with Defendant Fitbit, Inc., and, if that agreement is found to be enforceable and applicable, to arbitrate the merits of their claims.  *See* Dkts. 114, 126 (the "arbitration orders").  Those plaintiffs' claims have not been dismissed, however.  Thus, the arbitration orders are interlocutory orders "directing arbitration to proceed" or "compelling arbitration" and are not yet appealable under 9 U.S.C. § 16, barring certification pursuant to 28 U.S.C. § 1292(b).  These plaintiffs reserve the right to file an appeal at the appropriate time.

15.     Defendant Fitbit, Inc. is a corporation doing business in all 50 states.  Fitbit designs, manufactures, promotes, and sells the PurePulse Trackers described herein.  Fitbit is organized and incorporated under the laws of Delaware, and its principal place of business is in San Francisco, California.  It is therefore a citizen of Delaware and California.  *See* 28 U.S.C. § 1332(c)(1).

## COMMON FACTUAL ALLEGATIONS

16.     Fitbit is a manufacturer of activity trackers founded in 2007 and headquartered in San Francisco, California.  Its products' functions have included, among other things, step counting, distance calculating, calorie calculating, and sleep monitoring.

17.     In October 2014, Fitbit announced a new feature: wrist-based heart rate monitoring.  The two products first equipped with this technology, dubbed PurePulse, were the Charge HR and Surge, which were released January 2015 and initially retailed at approximately $150[4] and $250 respectively.  In March 2016, Fitbit released a third PurePulse Tracker, the Blaze, which retails for approximately $200.  All three products are shown below:



## I.     Fitbit Falsely Claims the PurePulse Trackers Consistently Record Accurate Heart Rate.

18.     Heart rate monitoring is an important feature for exercisers.  Among other things, it can help users achieve and maintain proper intensity, measure effort, track progress, and stay motivated.  And for those with certain health conditions, monitoring one's heart rate can be essential to staying safe.  Traditionally, however, accurate heart rate monitoring required a chest strap, which can be uncomfortable, distracting, difficult to clean, and may not work with dry skin.

19.     Fitbit attempted to circumvent these problems with its wrist-based PurePulse technology, which it expressly contrasts with "uncomfortable" chest straps.

20.     Per Fitbit's promotional materials, PurePulse uses LED lights to detect changes in capillary blood volume.  It then applies "finely tuned algorithms" to "measure heart rate automatically and continuously" and allow users to "accurately track workout intensity."[5]

---

[4] In contrast, the Charge model without a heart rate monitor originally retailed for approximately $130, and has been available for as low as $90.

[5] Previously available at: http://help.fitbit.com/articles/en_US/Help_article/Heart-rate-

*Footnote continued on next page*

21.     Unsurprisingly, the feature is the centerpiece of Fitbit's promotional efforts.  The widely-circulated advertisements include slogans like: "The Difference Between Good and Great…Is Heart"; "For Better Fitness, Start with Heart"; "Get More Benefits with Every Beat—Without An Uncomfortable Chest Strap"; "Know Your Heart"; and, most egregiously, "Every Beat Counts."

22.     These representations feature in an extensive and widespread advertising campaign.  As noted, the "Know Your Heart" commercial, for example, appeared prominently throughout Major League Baseball's nationally-televised 2015 World Series, which averaged 14.7 million viewers per game.

23.     Importantly, these advertisements and product descriptions do not state or even remotely suggest that the PurePulse technology works only at low or resting heart rates.  To the contrary, Fitbit expressly markets the PurePulse Trackers for activity and fitness, and depicts them in use during high-intensity workouts.

24.     The following advertisement, for example, shows a user wearing a Charge HR and jumping rope.  That, combined with the elevated heart rate shown on the featured device—135 bpm—and the tag line's promise that "Every beat counts," indicates that the product accurately records every beat, even during high-intensity exercise.

_____

*Footnote continued from previous page*
FAQs#How.

1
2
3
4
5
6
7
8
9
10
11
12
13



14    25.    Similarly, the following commercial and website screenshots purport to show the

15  PurePulse Trackers delivering real-time, elevated heart rate readings during strenuous activity:

16
17
18
19
20
21
22
23
24
25
26
27
28



1
2
3
4
5
6
7
8
9



10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



25          26.      In addition, the following promotional materials from Fitbit's website tout the

26   PurePulse Trackers' ability to monitor "real-time heart rate" at intensity, to "track[] your heart

27   rate all day and during exercise," promises users the ability to "[c]heck heart rate at a glance to

28   gauge your effort and adjust workouts on the spot."







27.     Fitbit's representations are also present at many points of sale.  Some Best Buy

locations, for example, maintain a full comparative display with an interactive touchscreen and

video feature, as shown below.

 

28.     Some Target sites feature a similar, though lower-tech, display:



29.     Fitbit's representations even permeate electronic points of sale of third-party

online retailers.  For example, in advertising the Charge HR, the Kohl's website encourages

consumers to "Make every beat count!" and promises that the  "Charge HR delivers continuous,

1    wrist-based heart rate and activity tracking during workouts and beyond."[6]  These representations

2    track Fitbit's advertisements verbatim.

3         30.    Fitbit made similar representations on the product packaging for all three

4    PurePulse devices.  The Charge HR packaging included representations that the device provided

5    "Heart Rate," "CONTINUOUS HEART RATE," "PUREPULSE CONTINUOUS HEART

6    RATE,"  "Automatic, 24/7 wrist-based heart rate," and "Continuous workout heart rate."  Next to

7    those statements, the packaging also depicts an image of a heart with an electrocardiograph line

8    running through them and a user running while wearing the device.  As sold, the device also

9    displays an elevated heart rate of 135 bpm.  Images of the Charge HR product packaging,

10   including the design layout produced by Fitbit, are shown below:



6 Available at: http://www.kohls.com/product/prd-2389728/fitbit-charge-hr-wireless-activity-
heart-rate-wristband.jsp (last visited January 28, 2016).

- 11 -

1566262.2

THIRD AM. CONSOL. MASTER
CLASS ACTION COMPL.
NOS. 16-CV-00036-JD; 16-CV-00777-JD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

 

23   31.   Similarly, on the Surge packaging, Fitbit represents that the device offers "HEART

24   RATE CONTINUOUS WRIST-BASED" and "CONTINUOUS HEART RATE" and can "Track

25   workout intensity automatically with PurePulse™ wrist-based heart rate."  It also depicts the

26   device displaying an elevated heart rate of 162 BPM.  Relevant excerpts from the design layout of

27   the Surge product packaging produced by Fitbit are shown below:

28

1566262.2




32.     Likewise, on the Blaze packaging, Fitbit represents the device offers "PurePulse Heart Rate" that is "Automatic & continuous."  It also represents the feature will allow users to "KNOW YOUR HEART" and again features the heart image with the electrocardiograph line running through it, and shows the device displaying an elevated heart rate of 135 bpm.  Relevant excerpts from the design layout of the Blaze product packaging produced by Fitbit are shown below:

1566262.2







33.     In sum, Fitbit's representations regarding the ability of the PurePulse Trackers to consistently record accurate heart rates, even during exercise, are unambiguous and widespread.

## II.     The PurePulse Trackers Fail to Consistently Record Accurate Heart Rate as Promised and Warranted.

34.     Unfortunately, the PurePulse Trackers do not work, and their heart rate readings are wildly inaccurate.

35.     Plaintiff Dunn, for example, cross-checked the heart rate readings from his Charge HR against other heart rate monitors during intense physical activity and found that the Charge HR's readings were radically lower than those from the other devices.

36.     Teresa Black (whose claims have been sent to arbitration), observed that her Charge HR under-recorded her heart rate while exercising with her personal trainer.  Shortly after

THIRD AM. CONSOL. MASTER
CLASS ACTION COMPL.
NOS. 16-CV-00036-JD; 16-CV-00777-JD

a high-intensity routine, they compared her Charge HR's heart reading with a manual heart rate test, and found the PurePulse Tracker significantly under-recorded her heart rate.

37.     Kate McLellan (also sent to arbitration) had the same problem.  She cross-referenced the heart rate readings from her Charge HR with the readings from a stationary cardiovascular machine.  Again, the readings from her PurePulse Tracker were too low.

38.     David Urban (sent to arbitration) had the same problem, which he verified by checking his Surge against his chest strap heart rate monitor.

39.     Indeed, every plaintiff named in the Amended Consolidated Consumer Class Action Complaint observed significant inaccuracies, which rendered their PurePulse Trackers effectively worthless as high-intensity heart rate monitors.

40.     Scores of customer complaints confirm these are not isolated incidents.  The following, for example, is a non-exhaustive sampling of complaints about the PurePulse Trackers drawn from user reviews on Amazon.com:

- "The HR technology is not accurate. It's close enough below 100bpm. But 100+ and it's consistently off by 30-50%. I tested this multiple times against my chest strap and other monitors in the gym."

- "The FitBit is regularly lower than the Polar [chest strap monitor] or cannot capture a reading at all."

- "Workouts I know I've kept my heart rate in the 140-170 range, Fitbit says an average of 100 bpm and a max of 120. I've measure it against a chest strap as well as machines at the gym. It's just not accurate, simple as that. Huge disappointment. Not to mention it randomly stops tracking heart rate during the workout…"

- "I checked the HR accuracy of the new fitbit Charge by using it along with my Zephyr HRM which is worn on the chest and I have used for several years now. The accuracy of the fitbit swung wildly even when I switched the HR controls of the Charge from 'auto' to 'on'. It could be off by as much as 20 BPM! That's fricken robbing me of my workout!"

- "I followed all the directions very closely as far as placement, etc, but there is a 30 beat/min difference between the fitbit and my Timex HR chest strap HR monitor with the discrepancy increasing as my heart rate increased."

- "[A]s soon as my HR got above 120 [the Charge HR] either shuts down or just sits on 120. On a couple different occasions I wore my Polar at the same time. Polar had my highest heart rate at 160 BPM while the charge hr had me resting at 75."

- "Paid extra money for HR function and it's useless....If accuracy is important to you, this isn't for you."

- "If you are buying the HR version you are essentially just buying a more expensive Charge that has two green lights on the back and has a nicer strap because the heart rate function is useless."

- "While working out, the heart rate jumps around for no reason. I have tried many different positions and modified the tightness. Nothing seems to help....What good is tracking your heart rate when it's mostly wrong[?]"

- "I am a 82 year old with a resting heart rate of 50 BPM just trying to stay in good basic shape using a stationary bike and rowing machine. I do 30-60 minute sessions at about 100-110 BPM...When I am working the exercise machines the reading is far short of my actual heart rate. I have tried all the suggestions here and on the Fitbit site. No luck. I am reminded of the proverbial broken clock which is 100% accurate twice a day."

- "During my workouts the heart rate goes all over the place, [my Fitbit Blaze] will show my heart rate at 150 then will go up to 200 and down to 108 within a couple of minutes and takes forever to register the proper heart rate. I would imagine this has to do with my wrist sweating and is I have to take it off and keep drying it then what good is it."

- "DO NOT BUY THIS AS A 'FITNESS' WATCH or a heartrate monitor.... I've used the Blaze during numerous workouts over the course of three weeks. I've used it on the treadmill, weight lifting (all muscle groups), kettlebell and plyometics.  I can now confidently say the Blaze HR monitor is BAD at detecting my heart rate during all of those activities, except on the treadmill, it did fine there. MOST of the time it is not even in the correct zone, always low. Within the mentioned activities, I've tried every combination of tightness and placement on my wrist. From time to time it'll be accurate, but it's rare and not often enough to use that HR in my workout. The higher my heart rate the worse it gets. It MIGHT be okay if your heartrate never get over 120-130."

- "I bought [the Blaze] to replace my chest strap (I hate wearing them) during workouts. Here's where the trouble starts. Depending on the workout my heart rate according to my manual measurement and the chest strap is MUCH higher than the Blaze would suggest. Sometimes the actual heart rate was double or more! At best this can lead to a gross miscalculation of calories burned. At worst it could be dangerous for someone not familiar with their target zones."

### A.     Comprehensive Expert Analysis Further Confirms That The PurePulse Trackers Cannot Provide Meaningful Heart Rate Data.

41.     Expert analysis confirms that the PurePulse Trackers cannot perform as promised and warranted.  Before filing this lawsuit, Plaintiff's counsel consulted a board-certified cardiologist to test the PurePulse Trackers against an electrocardiogram ("ECG"), the gold standard of heart rate monitoring, on a number of subjects at various exercising intensities.

42.     The results corroborated the consumer complaints: the PurePulse Trackers consistently mis-recorded the heart rates by a significant degree.  At intensities over 110 bpm, the PurePulse Trackers often failed to record any heart rate at all.  And even when they did record heart rates, the PurePulse Trackers were inaccurate by an average of 24.34 bpm, with some readings off by as many as 75 bpm.  With those margins of error, the PurePulse Trackers are effectively worthless as heart rate monitoring devices.

43.     Since then, researchers at Cal Poly Pomona conducted the most thorough and comprehensive study of the PurePulse Trackers performed to date, which resulted in a peer-review-quality report, attached as Exhibit 1.  The study authors, Drs. Edward Jo and Brett Dolezal, have considerable experience with product validation studies and set out to determine whether the PurePulse Trackers are statistically-valid heart rate monitors.  As the report unequivocally demonstrates, they are not.

44.     The professors tested the Trackers on 43 separate subjects during a variety of activities, including the precise exercises depicted by Fitbit when marketing the Trackers, such as jogging, stair climbing, jump roping, and plyometrics.  While performing these activities, each subject wore two PurePulse Trackers—a Charge HR and a Surge—on different wrists, which were measured against a time-synchronized ECG.

45.     After carefully analyzing the more than 46 hours' worth of comparative data—including hundreds of thousands of individual data points—that resulted from this testing, Drs. Jo and Dolezal concluded that the Fitbit devices simply could not accurately track users' actual heart rates, particularly during exercise.

46.     Indeed, the data revealed that "during moderate to high intensity exercise, the PurePulse Trackers recorded a heart rate that differed from the ECG by an average of 19.2 bpm."

47.     Even that grossly inaccurate number is generous to Fitbit since it disregards the many instances in which the Fitbit devices recorded no heart rate at all.  Interpret those readings as a heart rate of zero, and the average discrepancy balloons to 24.23 bpm.

48.     The report also confirms that the devices are not only inaccurate, but also surprisingly inconsistent. The two devices simultaneously recording the same users' heart rate were off even from each other by an average of 10 bpm.

49.     The report thus concludes: "The PurePulse Trackers do not accurately measure a user's heart rate, particularly during moderate to high intensity exercise, and cannot be used to provide a meaningful estimate of a user's heart rate."  This is precisely what Plaintiff has alleged.

50.     The Cal Poly Pomona study is no anomaly.  Indeed, the lead author of a subsequent study conducted at the Cleveland Clinic Heart and Vascular Institute, the top ranked heart hospital in the nation, noted that "as people moved, the study had readings that could be off by 30 and 40 bpm, so it's not a small difference."[7]  Yet another independent study, this one conducted by researchers at the University of Leeds, concluded that the "precision" of the PurePulse technology "is poor" and that "an individual heart rate measure could plausibly be underestimated by almost 30 bpm."[8]

**B.     Third-Party, Independent Media Reviews Also Confirm Fitbit's Failures.**

51.     Several independent reviews reached similar conclusions.  Wareable.com, for instance, concluded that the Charge HR heart rate readings were "criminally wide of the mark," even at rest.[9]  Similarly, it found that the Surge took between five and eight minutes to get even close to the proper heart rate during exercise, and even then, it failed to record heart rates in even the right "zone" about twenty percent of the time.[10]  Ultimately, the review concluded that the

---

[7] Karen Pallorito, HealthDay, *Fitbit, Other Heart Rate Wristbands Often Inaccurate: Study* (Oct. 12, 2016), https://consumer.healthday.com/fitness-information-14/misc-fitness-health-news-312/fitbit-other-heart-rate-wristbands-often-inaccurate-study-715766.html  (last visited April 6, 2018) (quoting study author); *see also* Dkt. 86-2 (Research Letter).

[8] Simone Benedetto et al., *Assessment of the Fitbit Charge 2 for monitoring heart rate* (Feb. 28, 2018), http://journals.plos.org/plosone/article?id=10.1371/journal.pone.0192691 (last visited April 6, 2018).

[9] James Stables, *Fitbit Charge HR review, UPDATED: Fitbit's flagship tracker now lags behind the competition*, Wareable (Dec. 15, 2015), http://www.wareable.com/fitbit/fitbit-charge-hr-review.

[10] Shane Richmond, *The real world wrist-based heart rate monitor test: Are they accurate enough? Fitbit, Mio and Basis versus the trusty chest strap*, Wareable (July 3, 2015), http://www.wareable.com/fitness-trackers/heart-rate-monitor-accurate-comparison-wrist.

THIRD AM. CONSOL. MASTER
CLASS ACTION COMPL.
NOS. 16-CV-00036-JD; 16-CV-00777-JD

1    PurePulse Trackers offer nothing more than an "estimate" of heart rate, and the publication could

2    not recommend the PurePulse Trackers for "those doing training based on heart rate zones."[11]

3         52.     A German consumer organization, Stiftung Warentest, conducted a comparable

4    test pitting a PurePulse Tracker against an ECG on five subjects at a variety of intensities.  After

5    the testing, the reviewers found the heart rate readings "imprecise" and gave the heart rate

6    functionality a "D" grade.[12]

7         53.     Another striking example comes from a broad study commissioned by a TV

8    station in Indiana, WTHR, in collaboration with researchers at the Human Performance

9    Laboratory at Ball State University.[13]  There, the researchers compared the Charge HR (and other

10   devices) against sophisticated laboratory fitness equipment—including a pulse oximeter and a

11   metabolic analyzer—during hour-long tests which included a variety of both high and low

12   intensity activities.

13        54.     The results were very, very bad for Fitbit.  The heading of the section of the article

14   addressing heart rate read "Heart rate: Bordering on dangerous."  It went on to note:

15            The box for the Fitbit Charge HR says "every beat counts."  Despite
         what the package says, the tracking device inside missed lots of
16       them.

17            For example, when the Fitbit detected Alexis' heart rate at 68 beats
         per minute, the portable pulse oximeter showed her real heart rate
18       was actually much higher at 91.

19            . . .

20            Calculating a heart rate that's off by 20 or 30 beats per minute can
         be dangerous -- especially for people at high risk of heart disease.
21

22            "That's too high to be acceptable to us," Montoye said. "Heart rate
         is a measure of exercise intensity. Small changes in intensity can
23       affect the benefit you'll receive, but they also increase your risk
         associated with the activity. That risk can be very real … so the
24       heart rate has to be accurate."

25   [11] *Id.*

26   [12] *Noch nicht in Topform*, Stiftung Warentest (Jan. 2016), https://www.test.de/Fitnessarmbaender-
     Nur-zwei-von-zwoelf-sind-gut-4957497-0/

27   [13] Bob Segall, *Sometimes your fitness tracker lies – a lot*, WTHR (Feb. 22, 2016),
     http://www.wthr.com/story/31285468/sometimes-your-fitness-tracker-lies-a-lot-fitbit-jawbone-
28   garmin-ifit-misfit-accuracy.

1566262.2

In sum, the study concluded that the average error rate for the PurePulse heart rate readings was about 14%, which is ***almost triple what the researchers deemed to be an acceptable margin of error***.  (The PurePulse Tracker was also 40% less accurate than the competitor device.)

55.     Notably, the calorie counting functionality—which relies on the heart rate readings, as Fitbit's own promotional materials explain—also performed terribly.  The lead researcher concluded that "[t]he numbers aren't even close," and the article noted that the Charge HR over-recorded one subject's calorie burn by ***122%***.

56.     Based on these "woeful test results," the WTHR reviewers gave the Charge HR one star out of four for both the heart rate and calorie counting features, which denoted a greater than 12% and 30% error rate, respectively.

**C.     Fitbit Has Not Credibly Responded and Cannot Credibly Respond to These Studies.**

57.     Fitbit's response to the WTHR study, and to the allegations in previous versions of this Complaint, is telling. Fitbit has repeatedly told the press that "our team has performed and continues to perform internal studies to validate our products' performance."[14]  Yet, in response to Plaintiff's Complaint, Fitbit has not referenced a single, specific study which it contends in fact validates its products' performance, nor has it disclosed the details of *any* study to Plaintiff's counsel, despite their repeated requests.

58.     Instead, in discussions with Plaintiff's counsel, Fitbit has relied on a meager test conducted by Consumer Reports,[15] which post-dates Plaintiff's original Complaint and Fitbit's representations about its internal studies.  But the Consumer Reports experiment suffers from serious flaws—it did not use sophisticated laboratory equipment and tested a only small range of activities—and does not begin to counter the overwhelming evidence demonstrating the inaccuracy of the PurePulse Trackers.

---

[14] *See, e.g.*, Jason Cipriani, *Lawsuit Says Fitbit Fitness Trackers Are Inaccurate*, Fortune (Jan. 6, 2016), http://fortune.com/2016/01/06/fitbit-heart-rate-accuracy-lawsuit/.

[15] Patrick Austin, *Taking the Pulse of Fitbit's Contested Heart Rate Monitors*, Consumer Reports (Jan. 22, 2016), http://www.consumerreports.org/fitness-trackers/taking-the-pulse-of-fitbits-contested-heart-rate-monitors.

59.     Notably, long after the initial Complaint was filed, Fitbit doubled down on its unsupported claim that the devices had been validated by scientific research.  Fitbit's website now boasts that the PurePulse technology "required an extraordinary amount of research and refining: and resulted from "5000+ hours of activity, exercise & sleep tested" and "over 50 prototype iterations since 2010."  Yet, Fitbit does not provide any details regarding the purported validation studies it performed, and still has not produced that data to Plaintiff, despite his repeated efforts to discover that critical information.  A screenshot of Fitbit's website representations is shown below:[16]

60.     Fitbit also now claims that the "PurePulse technology has surpassed industry expectations" and has received "validation from a number of external studies."  Notably, however, the only "study" actually quoted or referenced is the unscientific Consumer Reports test

---

[16] Available at https://www.fitbit.com/technology (last visited February 1, 2018).

1   discussed above.  Fitbit's website deceptively fails to mention the many other studies that reached

2   the opposite conclusion. The relevant website representations are depicted below: [17]

3

4   ## We proved it could be done.
    ## They proved us right.

5

6   With validation from a number of external studies, PurePulse technology has surpassed industry expectations and is fueling research across the globe.



7   **19+ PATENTS**
    awarded to Fitbit's heart rate innovation

8

9

10  ### "Both the Fitbit Charge HR and Fitbit

11  ### Surge passed our tests handily,

12  ### accurately recording heart rates at

13  ### everything from a leisurely walk up to a

14  ### fast run."

15  *- CONSUMER REPORTS*

16          61.     Fitbit's other public defense to the damning reviews and to the allegations in this

17  Complaint is an (irrelevant) after-the-fact disclaimer.  Fitbit has pleaded with the press that the

18  PurePulse Trackers "are not intended to be scientific or medical devices."[18]  This plea has fallen

19  on deaf ears.  The author of the WTHR article, commenting on Fitbit's written response to the

20  article, astutely asked: "since when does a wristband accelerometer with a built-in heartbeat

21  monitor not qualify as a scientific or medical device?"

22          62.     No amount of post-hoc disavowals can change the fact that Fitbit has marketed the

23  PurePulse Trackers as medical devices.  For example, Fitbit claims on its website that "the

24  technology inside PurePulse was inspired by hospitals."  The company also recommends that

25  consumers "[s]et a target heart rate zone to ensure you're pushing yourself hard enough, but not

26  ───────────────

    [17] Available at https://www.fitbit.com/technology (last visited February 1, 2018).

27  [18] *Fitbit accused of putting customers in danger with 'wildly inaccurate' heart rate readings*, ITV
    Report (Jan. 8, 2016), http://www.itv.com/news/2016-01-08/fitbit-accused-of-putting-customers-

28  in-danger-with-wildly-inaccurate-heart-rate-readings/.

THIRD AM. CONSOL. MASTER
CLASS ACTION COMPL.
NOS. 16-CV-00036-JD; 16-CV-00777-JD

1  overtraining," and advises them to "[t]alk to your doctor to learn which heart rate zones are right

2  for you."

3       63.    Fitbit's own CEO, James Park has also promoted the medical potential of the

4  devices, as reflected in his statement from Fitbit's February 22, 2016, Earnings Call:

> While Fitbit is known as a consumer brand, the real potential of our brand and technology is to become a digital health platform that improves people's health and integrates into their healthcare ecosystem.  Digital health refers to the emergence of powerful technologies that combined can help people lead healthier lives, reduce healthcare costs and broaden the reach of our healthcare system.
>
> These technologies include what Fitbit is already pioneering, more powerful sensors that continuously monitor useful biometrics, massive sets of health data in the cloud where analytics enable insights, and guidance and coaching to help consumers make important changes to their lifestyles and daily behaviors.
>
> …
>
> Fitbit trackers are distributed as the device of choice in several disease management programs for two of the largest U.S. health insurers.
>
> …
>
> Fitbit also is increasingly active in the medical research community by supporting researchers who are incorporating Fitbit trackers and interactive features into their efforts.

18       64.    But perhaps more importantly, whether the PurePulse Trackers are "medical

19  devices" is beside the point.  Representations regarding the accuracy of heart rate monitors have

20  significant health and safety implications regardless of how the devices are labeled.  What matters

21  in this case is that Fitbit represented to Plaintiff and the Class that the PurePulse Trackers could

22  consistently record accurate heart rates when in fact they cannot.  This is classic consumer fraud.

23       65.    Interestingly, Fitbit even *admitted* informally to some Class members that the

24  PurePulse Trackers are inaccurate during high-intensity workouts.  As such, the PurePulse

25  Trackers fail to perform the precise task for which they are expressly marketed, and Class

26  members are deprived of the clear benefit of the bargain.

27

28

**CLASS ACTION ALLEGATIONS**

66.     Plaintiff bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed Class, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), and/or (b)(1), (b)(2), and/or (c)(4).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

67.     The proposed **Nationwide Class** is defined as:

> All persons or entities in the United States who purchased a Fitbit PurePulse Tracker, as defined herein, and who opted out of the arbitration clause contained in Fitbit's Terms of Service.

68.     California law applies to the claims of all Class members, for the reasons outlined below.  In the alternative, however, Plaintiff proposes an **Arizona Subclass**, defined as:

> All persons or entities in Arizona who purchased a Fitbit PurePulse Tracker, as defined herein, and who opted out of the arbitration clause contained in Fitbit's Terms of Service.

69.     Excluded from the Nationwide Class and Arizona Subclass (the "Classes") are: (A) Fitbit, any entity or division in which Fitbit has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (B) the Judge to whom this case is assigned and the Judge's staff; (C) governmental entities; and (D) those persons who have suffered personal injuries or actionable emotional distress as a result of the facts alleged herein. Plaintiff reserve the right to amend the Class definitions if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses, or modified in any other way.

**Numerosity and Ascertainability**

70.     Although the exact number of Class members is uncertain, the size of the Classes can be estimated with reasonable precision, and the number is great enough that joinder is impracticable.

71.     Per Fitbit's records, as of August 1, 2016, 188 PurePulse Tracker purchasers had opted out of the arbitration clauses in Fitbit's Terms of Service.  It is likely that more have opted out in the intervening years.  The disposition the Class members' claims in a single action will

1    provide substantial benefits to all parties and to the Court.  Class members are readily identifiable

2    from information and records in possession, custody, or control of Fitbit, the Class members, and

3    the PurePulse Tracker retailers.

4                                              **Typicality**

5           72.     The claims of the representative Plaintiff are typical of the claims of the Classes in

6    that the representative Plaintiff, like all Class members, purchased a PurePulse Tracker designed,

7    manufactured, and distributed by Fitbit.  The representative Plaintiff, like all Class members, was

8    damaged by Fitbit's misconduct in that he has suffered actual damages as a result of his purchase

9    of the PurePulse Trackers.  Furthermore, the factual bases of Fitbit's misconduct represent a

10   common thread of misconduct resulting in injury to all Class members.

11                                      **Adequate Representation**

12          73.     Plaintiff is a member of the Classes and will fairly and adequately represent and

13   protect the interests of the Classes.  Plaintiff has retained counsel with substantial experience in

14   prosecuting consumer class actions, including actions involving defective products.

15          74.     Plaintiff and his counsel are committed to vigorously prosecuting this action on

16   behalf of the Classes and have the financial resources to do so.  Neither Plaintiff nor his counsel

17   have interests adverse to those of the Classes.

18                                  **Predominance of Common Issues**

19          75.     There are numerous issues of law and fact common to Plaintiff and Class members

20   that predominate over any issue affecting only individual Class members.  Resolving these

21   common issues will advance resolution of the litigation as to all Class members.  These common

22   legal and factual issues include:

23                  a.      whether the PurePulse Trackers fail to consistently deliver accurate heart

24   rate monitoring, as advertised and warranted;

25                  b.      whether Fitbit knew or should have known that the PurePulse Trackers do

26   not consistently deliver accurate heart rate monitoring;

27                  c.      whether the inability of the PurePulse Trackers to consistently record

28   accurate heart rates constitutes a material fact that reasonable consumers would have considered

1  important in deciding whether to purchase a PurePulse Tracker or pay an increased price for

2  them;

3         d.      whether Fitbit's concealment of the Heart Rate Defect in the PurePulse

4  Trackers induced reasonable consumers to act to their detriment by purchasing a PurePulse

5  Tracker;

6         e.      whether Fitbit made material misrepresentations regarding PurePulse

7  Trackers;

8         f.      whether Fitbit had a duty to disclose the true nature of the PurePulse

9  Trackers to Plaintiff and Class members;

10        g.      whether Fitbit omitted and failed to disclose material facts about the

11  PurePulse Trackers;

12        h.      whether Plaintiff and Class members are entitled to a declaratory judgment;

13        i.      whether Plaintiff and Class members are entitled to equitable relief,

14  including, but not limited to, a preliminary and/or permanent injunction, and /or rescission;

15        j.      whether Plaintiff and Class members are entitled to restitution and/or

16  disgorgement and the amount of such;

17        k.      whether Plaintiff and Class members are entitled to actual damages and the

18  amount of such; and

19        l.      whether Plaintiff and Class members are entitled to punitive or exemplary

20  damages and the amount of such.

21                              **Superiority**

22        76.     Plaintiff and Class members all suffered—and will continue to suffer—harm and

23  damages as a result of Fitbit's uniformly unlawful and wrongful conduct.  A class action is

24  superior to other available methods for the fair and efficient adjudication of this controversy.

25        77.     Absent a class action, most Class members would likely find the cost of litigating

26  their claims prohibitively high and would have no effective remedy at law.  Because of the

27  relatively small size of the individual Class members' claims, it is likely that few, if any, Class

28  members could afford to seek legal redress for Fitbit's misconduct.  Absent a class action, Class

THIRD AM. CONSOL. MASTER
CLASS ACTION COMPL.
NOS. 16-CV-00036-JD; 16-CV-00777-JD

1    members' damages will go uncompensated, and Fitbit's misconduct will continue without
2    remedy.

3    78.    Class treatment of common questions of law and fact would also be a superior
4    method to multiple individual actions or piecemeal litigation in that class treatment will conserve
5    the resources of the courts and the litigants, and will promote consistency and efficiency of
6    adjudication.

7    79.    Fitbit has acted in a uniform manner with respect to the Plaintiff and Class
8    members.

9    80.    Classwide declaratory, equitable, and injunctive relief is appropriate under
10   Rule 23(b)(1) and/or (b)(2) because Fitbit has acted on grounds that apply generally to the class,
11   and inconsistent adjudications with respect to the Fitbit's liability would establish incompatible
12   standards and substantially impair or impede the ability of Class members to protect their
13   interests.  Classwide relief assures fair, consistent, and equitable treatment and protection of all
14   Class members, and uniformity and consistency in Fitbit's discharge of their duties to perform
15   corrective action regarding the PurePulse Trackers.

16                        **CHOICE OF LAW ALLEGATIONS**

17   81.    Because this Complaint is brought in California, California's choice of law regime
18   governs the state law allegations in this Complaint.

19   82.    Under California's governmental interest/comparative impairment choice of law
20   rules, California law applies to the claims of all Class members, regardless of their state of
21   residence or state of purchase.

22   83.    Because Fitbit is headquartered—and made all decisions relevant to these
23   claims—in California, California has a substantial connection to, and materially greater interest
24   in, the rights, interests, and policies involved in this action than any other state.

25   84.    Nor would application of California law to Fitbit and the claims of all Class
26   members be arbitrary or unfair.  Indeed, in its Terms of Service, Fitbit declares that, regardless of
27   any state's conflict of law principles, "the resolution of any Disputes shall be governed by and
28   construed in accordance with the laws of the State of California."

- 27 -

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
Violations of California's Consumers Legal Remedies Act,
Cal. Civ. Code § 1750, *et seq.*

85.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

86.     This claim is brought on behalf of the Nationwide Class to seek injunctive relief as well as monetary damages against Fitbit under California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*

87.     Fitbit is a "person" as defined by the CLRA.  Cal. Civ. Code § 1761(c).

88.     Plaintiff and Class members are "consumers" within the meaning of the CLRA, as defined by Cal. Civ. Code § 1761(d), who purchased one or more PurePulse Trackers.

89.     The CLRA prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]"  Cal. Civ. Code § 1770(a).

90.     Fitbit engaged in unfair or deceptive trade practices that violated Cal. Civ. Code § 1770(a), as described above and below, by, among other things, failing to disclose the defective nature of the PurePulse Trackers, representing that the PurePulse Trackers had characteristics and benefits that they do not have (e.g., the ability to consistently record accurate heart rates, even during high-intensity exercise), representing that the PurePulse Trackers were of a particular standard, quality, or grade when they were of another, and advertising PurePulse Trackers with the intent not to sell them as advertised.  *See* Cal. Civ. Code §§ 1770(a)(5), (a)(7), (a)(9).

91.     Fitbit knew, should have known, or was reckless in not knowing that its products did not have the qualities, characteristics, and functions it represented, warranted, and advertised them to have.

92.     Fitbit's unfair and deceptive acts or practices occurred repeatedly in Fitbit's course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public, and imposed a safety risk to Plaintiff and Class members.

93.     Fitbit was under a duty to Plaintiff and Class members to disclose the deceptive and defective nature of the PurePulse Trackers because:

a.     The defect in the PurePulse Trackers presents a safety hazard because Class members could jeopardize their health by relying on the inaccurate heart rate readings and potentially achieving dangerous heart rates;

b.     Fitbit was in a superior position to know the true state of facts about the Heart Rate Defect in the PurePulse Trackers;

c.     Plaintiff and Class members could not reasonably have been expected to learn or discover that the PurePulse Trackers contained the Heart Rate Defect; and

d.     Fitbit knew that Plaintiff and Class members could not reasonably have been expected to learn or discover the defect in the PurePulse Trackers.

94.     In failing to disclose the defective nature of the PurePulse Trackers, Fitbit knowingly and intentionally concealed material facts and breached its duty not to do so.

95.     The facts that were misrepresented, concealed, or not disclosed by Fitbit to Plaintiff and Class members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase a PurePulse Tracker.  Had Plaintiff and other Class members known about the true nature and quality of the PurePulse Trackers, they would not have purchased a PurePulse Tracker or would have paid significantly less than they did for their PurePulse Trackers.

96.     Plaintiff and Class members are reasonable consumers who expect that their PurePulse Trackers will consistently record accurate heart rates, as represented.

97.     As a result of Fitbit's conduct and unfair or deceptive acts or practices, Plaintiff and Class members suffered actual damages in that the PurePulse Trackers do not function as represented and are not worth the amount paid and Fitbit has deprived Plaintiff and Class members the benefit of the bargain.

98.     Plaintiff and the Class seek an order enjoining Fitbit's unfair or deceptive acts or practices, equitable relief, an award of attorneys' fees and costs under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

99.     In addition, many Class members are senior citizens or disabled persons, as defined by Cal. Civ. Code §§ 1761(f) and (g), who suffered substantial economic damage resulting from the Fitbit's fraudulent representations regarding the PurePulse Trackers.  Each of those Class members is entitled to up to an additional $5,000.  Cal. Civ. Code § 1780(b).

100.     In accordance with section 1782(a) of the CLRA, on November 16, 2015, counsel in the *McLellan* action served Fitbit with notice of its alleged violations of Cal. Civ. Code § 1770(a) relating to the Heart Rate Defect in the PurePulse Trackers purchased by Plaintiff and Class members.  Counsel in the *Landers* action did the same on February 22, 2016.  Those letters are attached to this Complaint as Exhibits 2 and 3, for reference.  Fitbit did not correct or agree to correct the actions described in the letter and in this Complaint within thirty (30) days of the notices.  Fitbit's responses are attached as Exhibits 4 and 5.  Plaintiff and Class members thus seek an award of compensatory, monetary, and punitive damages based on the conduct described herein, as well as any other relief the Court deems proper.

## SECOND CLAIM FOR RELIEF
Violations of California's False Advertising Law,
Cal. Bus. & Prof. Code §§17500, *et seq*.

101.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

102.     Plaintiff brings this cause of action for himself and on behalf of the Nationwide Class.

103.     California's False Advertising Law ("FAL"), Bus. & Prof. Code §§17500, *et seq*., makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

104.     Fitbit committed acts of false advertising, as defined by the FAL, by using false and misleading statements, and material omissions, to promote the sale of the PurePulse Trackers,

- 30 -

as described above, and including, but not limited to, representing that the PurePulse Trackers would continuously and accurately record and report Class members' real time heart rate.

105.   Fitbit knew or should have known, through the exercise of reasonable care, that its statements were untrue and misleading.

106.   Fitbit's actions and omissions in violation of the FAL were false and misleading such that the general public is and was likely to be deceived.

107.   As a direct and proximate result of these acts and omissions, consumers have been and are being harmed.  Plaintiff and Class members have suffered injury and actual out-of-pocket losses as a result of Fitbit's FAL violation because: (a) Plaintiff and Class members would not have purchased the PurePulse Trackers or would not have paid as much for them if they had known the true facts; (b) Plaintiff and Class members purchased the PurePulse Trackers due to Fitbit's misrepresentations and omissions; and (c) the PurePulse Trackers did not have the level of quality or value as promised.

108.   Plaintiff brings this action pursuant to Bus. & Prof. Code § 17535 for, among other relief, injunctive relief to enjoin the practices described herein and to require Fitbit to issue corrective disclosures to consumers. Plaintiff and the Class are therefore entitled to: (a) an order requiring Fitbit to cease the acts of unfair competition alleged herein; (b) full restitution of all monies paid to Fitbit as a result of its deceptive practices; (c) interest at the highest rate allowable by law; and (d) the payment of Plaintiff's attorneys' fees and costs pursuant to, inter alia, California Code of Civil Procedure §1021.5.

### THIRD CLAIM FOR RELIEF
Violations of California's Unfair Competition Law,
Cal. Bus. & Prof. Code § 17200, *et seq.*

109.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

110.   Plaintiff brings this cause of action for himself and on behalf of the Nationwide Class.

111.   California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair,

deceptive, untrue or misleading advertising." Fitbit's conduct related to the Heart Rate Defect violated each of this statute's three prongs.

112.    Fitbit committed an unlawful business act or practice in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, by their violations of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, as set forth above, by the acts and practices set forth in this Complaint.

113.    Fitbit committed unfair business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, when it represented that the PurePulse Trackers could consistently record accurate heart rate, even during exercise, when in fact they cannot. The Heart Rate Defect also presents a safety hazard as it can jeopardize the health and safety of users who rely on the inaccurate heart rate readings and unknowingly achieve dangerous heart rates.

114.    Fitbit committed fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, when it affirmatively and knowingly misrepresented that the PurePulse Trackers consistently record accurate heart rates, even during high-intensity exercise, when in fact they do not. Fitbit's representations and concealment of the Heart Rate Defect are likely to mislead the public with regard to the true defective nature of the PurePulse Trackers.

115.    Fitbit also disseminated unfair, deceptive, untrue and/or misleading advertising in violation of Cal. Bus. & Prof. Code § 17200, *et seq.* and § 17500, *et seq.* when it distributed advertisements falsely representing that the PurePulse Trackers consistently record accurate heart rates, even at high intensity, when in fact they do not.

116.    Fitbit's unfair or deceptive acts or practices occurred repeatedly in the course of Fitbit's trade or business, and were capable of deceiving a substantial portion of the purchasing public.

117.    As a direct and proximate result of Fitbit's unfair and deceptive practices, Plaintiff and Class members suffered and will continue to suffer actual damages.

118.    As a result of its unfair and deceptive conduct, Fitbit has been unjustly enriched and should be required to disgorge its unjust profits and make restitution to Plaintiff and Class members pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

119.    Plaintiff and the Class further seek an order enjoining Fitbit's unfair or deceptive acts or practices, and an award of attorneys' fees and costs under Cal. Code of Civ. Proc. § 1021.5.

**FOURTH CLAIM FOR RELIEF**
Common Law Fraud

120.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

121.    Plaintiff brings this cause of action for himself and on behalf of the Nationwide Class.

122.    Fitbit engaged in both speaking and silent fraud, and in fraudulent and deceptive conduct.  As described above, Fitbit's conduct defrauded Plaintiff and Class members, by intentionally leading them to believe, through affirmative misrepresentations, omissions, suppressions, and concealments of material fact, that the PurePulse Trackers possessed important characteristics that they in fact do not possess—namely that they could consistently record accurate heart rate, even during high-intensity exercise—and inducing their purchases.

123.    Fitbit's intentional and material misrepresentations included, among other things, its advertising, marketing materials and messages, and other standardized statements claiming the PurePulse Trackers consistently record accurate heart rates.

124.    The foregoing misrepresentations were uniform across all Class members.  The same extensive and widespread advertising campaign was promoted nationwide, and all of the promotional materials contained the same material representations regarding the PurePulse Trackers' ability consistently record accurate heart rates.

125.    These representations were false, as detailed herein.  Fitbit knew the representations were false when it made them and intended to defraud purchasers thereby.

126.    Fitbit also had a duty to disclose, rather than conceal and suppress, the full scope and extent of the Heart Rate Defect because:

a.      Fitbit had exclusive knowledge of the Heart Rate Defect in the PurePulse Trackers and concealment thereof;

1566262.2

1           b.     The details regarding the Heart Rate Defect in the PurePulse Trackers and

2    concealment thereof were known and/or accessible only to Fitbit;

3           c.     Fitbit knew Plaintiff and Class members did not know about the Heart Rate

4    Defect in the PurePulse Trackers and concealment thereof; and

5           d.     Fitbit made general representations about the qualities of the PurePulse

6    Trackers, including statements about their performance and abilities that were misleading,

7    deceptive, and incomplete without the disclosure of the fact that the PurePulse Trackers could not

8    consistently record accurate heart rates, particularly during exercise.

9         127.    Fitbit's actions constitute "actual fraud" within the meaning of Cal. Civ. Code §

10   1572 because Fitbit did the following with the intent to deceive Plaintiff and Class members and

11   to induce them to enter into their contracts:

12          a.     Suggested that the PurePulse Trackers can consistently record accurate

13   heart rates, even at high intensities, even though it knew this to be not true;

14          b.     Positively asserted that the PurePulse Trackers can consistently record

15   accurate heart rates, even at high intensities, in a manner not warranted by the information

16   available to Fitbit;

17          c.     Suppressed the true nature of the Heart Rate Defect from Plaintiff and

18   Class members; and

19          d.     Promised it would deliver PurePulse Trackers that consistently record

20   accurate heart rates, even at high intensities, with no intention of so doing.

21        128.    Fitbit's actions, listed above, also constituted "deceit" as defined by Cal. Civ.

22   Code § 1710 because Fitbit willfully deceived Plaintiff and Class members with intent to induce

23   them to alter their positions to their detriment by purchasing defective PurePulse Trackers.

24        129.    Fitbit's fraud and concealment were also uniform across all Class members; Fitbit

25   concealed from everyone the true nature of the Heart Rate Defect in the PurePulse Trackers.

26        130.    Fitbit's misrepresentations and omissions were material in that they would affect a

27   reasonable consumer's decision to purchase a PurePulse Tracker.  Consumers paid a premium for

28

1    the PurePulse Trackers precisely because they purportedly offered continuous, accurate heart rate

2    readings.

3         131.    Fitbit's intentionally deceptive conduct induced Plaintiff and Class members to

4    purchase the PurePulse Trackers and resulted in harm and damage to them.

5         132.    Plaintiff believed and relied upon Fitbit's misrepresentations and concealment of

6    the true facts.  Class members are presumed to have believed and relied upon Fitbit's

7    misrepresentations and concealment of the true facts because those facts are material to a

8    reasonable consumer's decision to purchase the PurePulse Trackers.

9         133.    As a result of Fitbit's inducements, Plaintiff and Class members sustained actual

10   damages including but not limited to receiving a product that performs as promised and not

11   receiving the benefit of the bargain of their PurePulse Tracker purchases.  If Plaintiff and Class

12   members had known about the Heart Rate Defect, they would not have purchased the PurePulse

13   Trackers or would have paid significantly less for them.  Fitbit is therefore liable to Plaintiff and

14   Class members in an amount to be proven at trial.

15        134.    Fitbit's conduct was systematic, repetitious, knowing, intentional, and malicious,

16   and demonstrated a lack of care and reckless disregard for Plaintiff's and Class members' rights

17   and interests.  Fitbit's conduct thus warrants an assessment of punitive damages under Cal. Civ.

18   Code § 3294 and other applicable states' laws, consistent with the actual harm it has caused, the

19   reprehensibility of its conduct, and the need to punish and deter such conduct.

20                              **FIFTH CLAIM FOR RELIEF**
                                  Fraud in the Inducement
21

22        135.    Plaintiff hereby incorporates by reference the allegations contained in the

23   preceding paragraphs of this Complaint.

24        136.    Plaintiff brings this cause of action for himself and on behalf of the Nationwide

25   Class.

26        137.    Fitbit's fraud and false affirmations of fact, described herein, induced Plaintiff and

27   Class members to purchase the PurePulse Trackers and thereby enter into a contract with Fitbit.

28

1566262.2

138.    As described above, Fitbit had a duty to disclose the Heart Rate Defect in the PurePulse Trackers to Plaintiff and Class members.

139.    As described above, Fitbit's actions constituted actual fraud and deceit as defined by Cal. Civ. Code §§ 1572 and 1710.

140.    Plaintiff justifiably relied to his detriment on the truth and completeness of Fitbit's material representations regarding the PurePulse Trackers. Class members are presumed to have relied upon Fitbit's misrepresentations and concealment of the true facts because those facts are material to a reasonable consumer's decision to purchase the PurePulse Trackers.

141.    Fitbit's fraud and concealment was also uniform across all Class members; Fitbit concealed from everyone the true nature of the Heart Rate Defect in the PurePulse Trackers.

142.    Plaintiff and Class members would not have agreed to purchase their PurePulse Trackers, or would have paid less for them, if they had not been deceived by Fitbit.

143.    As a result of Fitbit's inducements, Plaintiff and Class members sustained actual damages including but not limited to not receiving a product that performs as promised and not receiving the benefit of the bargain of their PurePulse Tracker purchases.

144.    Fitbit's conduct was systematic, repetitious, knowing, intentional, and malicious, and demonstrated a lack of care and reckless disregard for Plaintiff's and Class members' rights and interests.  Fitbit's conduct thus warrants an assessment of punitive damages under Cal. Civ. Code § 3294 and other applicable states' laws, consistent with the actual harm it has caused, the reprehensibility of its conduct, and the need to punish and deter such conduct.

### SIXTH CLAIM FOR RELIEF
Breach of Express Warranty

145.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

146.    Plaintiff brings this cause of action for himself and on behalf of the Nationwide Class.

THIRD AM. CONSOL. MASTER
CLASS ACTION COMPL.
NOS. 16-CV-00036-JD; 16-CV-00777-JD

147.   By advertising the heart rate function of the PurePulse Trackers, Fitbit expressly warranted to Plaintiff and Class members that the PurePulse Trackers would record heart rate accurately, even during exercise.

148.   By way of non-exhaustive example, Fitbit represented that

a.     the PurePulse Trackers provide "continuous, automatic . . . heart rate" monitoring which allows users to "maintain intensity";

b.     "Surge tracks your heart rate all day and ***during exercise***" (emphasis added); and

c.     Charge HR "is an advanced heart rate and activity-tracking wristband, built for all-day activity, ***workouts*** and beyond." (emphasis added).

149.   Such statements became the basis of the bargain for Plaintiff and other Class members because such statements are among the facts a reasonable consumer would consider material in the purchase of a heart rate monitoring fitness product.

150.   Fitbit breached this express warranty by delivering PurePulse Trackers that do not deliver as promised and fail to consistently record accurate heart rates, especially during exercise.

151.   As a result of the foregoing breaches of express warranty, Plaintiff and other Class members have been damaged in that they purchased PurePulse Trackers that could not perform as warranted and did not receive the benefit of the bargain of their PurePulse Tracker purchases.

152.   Plaintiff and Class members seek all damages permitted by law in an amount to be proven at trial.

**SEVENTH CLAIM FOR RELIEF**
Violations of the Magnuson-Moss Act – Implied Warranty,
15 U.S.C. § 2301, *et seq.*

153.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

154.   Plaintiff brings this cause of action for himself and on behalf of the Nationwide Class.

155.   The PurePulse Trackers are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

156.     Plaintiff and Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3), because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

157.     Fitbit is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

158.     Section 2310(d)(1) of Chapter 15 of the United States Code provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

159.     Fitbit provided Plaintiff and the other Class members with an implied warranty of merchantability in connection with the purchase or lease of the PurePulse Trackers is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).   As a part of the implied warranty of merchantability, Fitbit warranted that the PurePulse Trackers would pass without objection in the trade as designed, manufactured, and marketed, and were adequately labeled.

160.     Fitbit breached these implied warranties, as described in more detail above, and are therefore liable to Plaintiff and the Class pursuant to 15 U.S.C. § 2310(d)(1).

161.     Any efforts to limit the implied warranties in a manner that would exclude coverage of the PurePulse Trackers is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the PurePulse Trackers is null and void.

162.     Plaintiff and the other Class members have had sufficient direct dealings with either Fitbit or its agents to establish privity of contract.

163.     Nonetheless, privity is not required here because Plaintiff and other Class members are intended third-party beneficiaries of contracts between Fitbit and its retailers, and specifically, of the implied warranties.  The retailers were not intended to be the ultimate consumers of the PurePulse Trackers and have no rights under the warranty agreements provided with the PurePulse Trackers; the warranty agreements were designed for and intended to benefit consumers.

- 38 -

164.    Pursuant to 15 U.S.C. § 2310(e), Plaintiff is entitled to bring this class action and is not required to give Fitbit notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiff pursuant to Rule 23 of the Federal Rules of Civil Procedure.

165.    Furthermore, to the extent such notice is required, it has been provided through the letter sent to Fitbit by Plaintiff's counsel on November 16, 2015 (Ex. 2), described herein, as well as through complaints lodged by Plaintiff McLellan and other Class members.  Fitbit refused to remedy its wrongs after receiving these notifications and any further notice would be futile.

166.    Plaintiff's individual claims place into controversy an amount equal to or exceeding $25.00.  The amount in controversy of this entire action exceeds the sum of $50,000.00, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.  Plaintiff, individually and on behalf of the other Class members, seeks all damages permitted by law in an amount to be proven at trial.

167.    In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiff and the other Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiff and the other Class members in connection with the commencement and prosecution of this action.

168.    Further, Plaintiff and the Class are also entitled to equitable relief under 15 U.S.C. § 2310(d)(1).

## EIGHTH CLAIM FOR RELIEF
Violations of the Arizona Consumer Fraud Act,
Arizona Rev. Stat. § 44-1521, *et seq.*

169.    Plaintiff Dunn hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

170.    As described above, California law applies to the claims of all Plaintiff and Class members.  In the alternative, Plaintiff Dunn brings this cause of action for himself and on behalf of the Arizona Subclass, and reserves the right to bring additional and/or different state-law claims should the Court determine that California law does not apply to all Class members.

- 39 -

THIRD AM. CONSOL. MASTER
CLASS ACTION COMPL.
NOS. 16-CV-00036-JD; 16-CV-00777-JD

171.   Fitbit and the Arizona Subclass members are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), Ariz. Rev. Stat. § 44-1521(6).

172.   The PurePulse Trackers are "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

173.   The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, . . . misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale . . . of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A).

174.   In the course of its business, Fitbit willfully failed to disclose and actively concealed the Heart Rate Defect in the PurePulse Trackers as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  Fitbit also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of PurePulse Trackers.

175.   As alleged above, Fitbit made material statements about the characteristics and efficacy of the PurePulse Trackers that were either false or misleading.

176.   Fitbit knew, should have known, or was reckless in not knowing that its products did not have the qualities, characteristics, and functions it represented, warranted, and advertised them to have.

177.   Fitbit owed the Arizona Subclass a duty to disclose the defective nature of PurePulse Trackers, including the Heart Rate Defect because it:

a.   Possessed exclusive knowledge of the Heart Rate Defect in the PurePulse Trackers;

b.   Intentionally concealed the Heart Rate Defect in the PurePulse Trackers through their deceptive marketing campaign; and/or

1            c.      Made incomplete representations about the characteristics of the PurePulse

2 Trackers, while purposefully withholding material facts from the Arizona Subclass that

3 contradicted these representations.

4          178.     Fitbit's unfair or deceptive acts or practices were likely to deceive reasonable

5 consumers, including the Arizona Subclass, about the true characteristics of the PurePulse

6 Trackers. Fitbit intentionally and knowingly misrepresented material facts regarding the

7 PurePulse Trackers with intent to mislead the Arizona Subclass.

8          179.     The inability of the PurePulse Trackers to consistently record accurate heart rates,

9 even during exercise, was material to the Arizona Subclass. Had the Arizona Subclass known of

10 the Heart Rate Defect, they would either not have purchased their PurePulse Trackers, or would

11 have paid less for them than they did.

12          180.     All members of the Arizona Subclass suffered ascertainable loss caused by Fitbit's

13 failure to disclose material information. The Arizona Subclass did not receive the benefit of their

14 bargain.

15          181.     The Arizona Subclass members risk irreparable injury as a result of Fitbit's acts

16 and omissions in violation of the Arizona CFA, and these violations present a continuing risk to

17 the Arizona Subclass as well as to the general public. Fitbit's unlawful acts and practices

18 complained of herein affect the public interest.

19          182.     As a direct and proximate result of Fitbit's violations of the Arizona CFA, Plaintiff

20 Dunn and the Arizona Subclass have suffered injury-in-fact and/or actual damage.

21          183.     The Arizona Subclass seeks monetary relief against Fitbit in an amount to be

22 determined at trial. The Arizona Subclass also seeks punitive damages because Fitbit engaged in

23 aggravated and outrageous conduct with an evil mind.

24          184.     The Arizona Subclass also seeks an order enjoining Fitbit's unfair, unlawful,

25 and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the

26 Arizona CFA.

27                                 **PRAYER FOR RELIEF**

28      Plaintiff, individually and on behalf of all others similarly situated, requests the Court to

1566262.2

THIRD AM. CONSOL. MASTER
CLASS ACTION COMPL.
NOS. 16-CV-00036-JD; 16-CV-00777-JD

1    enter judgment against Fitbit, as follows:

2          A.      an order certifying appropriate Classes and/or Subclasses, designating Plaintiff as

3    Class Representative, and designating his counsel of record as Class Counsel;

4          B.      an order enjoining Fitbit from engaging in further deceptive distribution and sales

5    practices with respect to the PurePulse Trackers;

6          C.      a declaration that Fitbit is financially responsible for notifying all Class members

7    about the true nature of the PurePulse Trackers;

8          D.      an order requiring Fitbit to notify the Class that the PurePulse Trackers are

9    defective and cannot consistently record accurate heart rates;

10         E.      an order permitting Plaintiff and Class members to elect to affirm their contracts or

11   alternatively demand rescission and seek damages;

12         F.      a declaration that the Fitbit must disgorge, for the benefit of Plaintiff and Class

13   members, all or part of the ill-gotten profits received from the sale or lease of the PurePulse

14   Trackers, and make full restitution to Plaintiff and Class members;

15         G.      restitution in the amount of monies paid by Plaintiff and Class members for the

16   PurePulse Trackers;

17         H.      an award to Plaintiff and Class members of compensatory, exemplary, punitive,

18   and statutory penalties and damages as allowed by law, including interest, in an amount to be

19   proven at trial;

20         I.      an award of attorneys' fees and costs, as allowed by law;

21         J.      an award of pre-judgment and post-judgment interest, as provided by law;

22         K.      leave to amend this Complaint to conform to the evidence produced at trial; and

23         L.      such other relief as may be appropriate under the circumstances.

24                         **DEMAND FOR JURY TRIAL**

25         Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff, individually and on behalf of

26   the Class, demand a trial by jury of any and all issues in this action so triable of right.

27

28

THIRD AM. CONSOL. MASTER
CLASS ACTION COMPL.
NOS. 16-CV-00036-JD; 16-CV-00777-JD

1    Dated:  June 19, 2018                         Respectfully submitted,

2                                                  LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

3

4                                                  By: _____

5                                                      Jonathan Selbin

6                                                  Jonathan D. Selbin (CA SBN 170222)
                                                   jselbin@lchb.com
7                                                  LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                                   250 Hudson Street, 8th Floor
8                                                  New York, NY  10013
                                                   Telephone:  (212) 355-9500
9                                                  Facsimile:  (212) 355-9592

10                                                 Elizabeth J. Cabraser (CA SBN 083151)
                                                   ecabraser@lchb.com
11                                                 Kelly M. Dermody (CA SBN 171716)
                                                   kdermody@lchb.com
12                                                 Kevin R. Budner (CA SBN 287271)
                                                   kbudner@lchb.com
13                                                 LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                                   275 Battery Street, 29th Floor
14                                                 San Francisco, CA  94111-3339
                                                   Telephone:  (415) 956-1000
15                                                 Facsimile:  (415) 956-1008

16                                                 Robert Klonoff  (pro hac vice)
                                                   ROBERT H. KLONOFF, LLC
17                                                 2425 SW 76th Ave.
                                                   Portland, OR 97225
18                                                 Telephone:  (503) 291-1570

19                                                 Rosemary M. Rivas (CA SBN 209147)
                                                   rrivas@zlk.com
20                                                 LEVI & KORSINSKY LLP
                                                   44 Montgomery Street, Suite 650
21                                                 San Francisco, CA 94104
                                                   Telephone: (415) 291-2420
22                                                 Facsimile: (415) 484-1294

23                                                 Adam C. McCall (CA SBN 302130)
                                                   amccall@zlk.com
24                                                 LEVI & KORSINSKY LLP
                                                   445 South Figueroa Street, 31st Floor
25                                                 Los Angeles, CA  90071
                                                   Telephone:  (213) 985-7290
26                                                 Facsimile:   (866) 367-6510

27

28

THIRD AM. CONSOL. MASTER
CLASS ACTION COMPL.
NOS. 16-CV-00036-JD; 16-CV-00777-JD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Andrea Clisura (*pro hac vice*)
aclisura@zlk.com
Courtney E. Maccarone (*pro hac vice*)
cmaccarone@zlk.com
LEVI & KORSINSKY LLP
30 Broad Street, 24th Floor
30 Broad Street, 24th Floor
New York, NY 10004
Telephone:  (212) 363-7500
Facsimile:   (212) 363-7171

*Attorneys for Plaintiff, Individually and on Behalf of All Others Similarly Situated*