1  WILLIAM L. STERN (CA SBN 96105)
   WStern@mofo.com
2  MORRISON & FOERSTER LLP
   425 Market Street
3  San Francisco, California  94105
   Telephone: 415.268.7000
4
   ERIN M. BOSMAN (CA SBN 204987)
5  EBosman@mofo.com
   JULIE Y. PARK (CA SBN 259929)
6  JuliePark@mofo.com
   KAI S. BARTOLOMEO (CA SBN 264033)
7  KBartolomeo@mofo.com
   MORRISON & FOERSTER LLP
8  12531 High Bluff Drive
   San Diego, California  92130-2040
9  Telephone: 858.720.5100
   Facsimile: 858.720.5125
10
   Attorneys for Defendant
11 FITBIT, INC.

12                    UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14

15 | KATE MCLELLAN, TERESA BLACK, | Case No. 16-cv-00036-JD |
   DAVID URBAN, ROB DUNN, RACHEL
16 SAITO, TODD RUBINSTEIN, RHONDA | **FITBIT, INC.'S RESPONSE TO**
   CALLAN, JAMES SCHORR, BRUCE | **PLAINTIFFS' STATEMENT ON THE**
17 MORGAN, and AMBER JONES, Individually | **STATUS OF ARBITRATION**
   and on Behalf of All Others Similarly Situated, | **PROCEEDINGS**
18
                           Plaintiffs,         | Date:   N/A
19                                             | Time:   N/A
          v.                                   | Ctrm:   11, 19th Floor
20
   FITBIT, INC.,                               | The Honorable James Donato
21
                           Defendant.          | Date Action Filed:    May 8, 2015
22
23 | JUDITH LANDERS, LISA MARIE BURKE, | Case No. 16-cv-00777-JD
   and JOHN MOLENSTRA, Individually and on
24 Behalf of All Others Similarly Situated,
25                         Plaintiffs,
26        v.
27 FITBIT, INC.,
                           Defendant.
28

FITBIT'S RESPONSE RE: ARBITRATION ISSUES
Case Nos. 16-cv-00036-JD; 16-cv-00777-JD
sd-720416

## TABLE OF CONTENTS

Page

I.     INTRODUCTION ........................................................................................................... 1

II.    THE FACTS .................................................................................................................... 3

       A.     All Plaintiffs Agreed to Arbitrate Their Claims Against Fitbit, and Fitbit
              Encouraged Them to Do So ................................................................................... 3

       B.     The Parties Spent Over Two Years Litigating Fitbit's Arbitration Clause ........... 5

       C.     Mr. Dunn Purports to Continue to Represent McLellan and the Eleven
              Other Non-Opt-Outs in Court ............................................................................... 6

       D.     Mr. Dunn Continues to Try to Represent Ms. McLellan's Class Claims
              While Fitbit Offers to Settle Her Individual Claim .............................................. 7

       E.     The Parties Address the Status of Arbitration ..................................................... 10

              1.     Mr. Dunn Files a Sur-Reply ..................................................................... 10

              2.     Fitbit Did Not Terminate the Arbitration ................................................ 11

              3.     The May 31 Hearing Where the Court Struck Mr. Dunn's Class
                     Claim and Plaintiffs Misinterpreted Counsel's Statements ...................... 11

       F.     Fitbit and AAA Are Ready to Proceed ................................................................ 12

III.   FITBIT'S RESPONSE REGARDING "NEXT STEPS" ............................................. 13

       A.     Ms. McLellan's Arbitration Should Proceed Pursuant to the TOS, the
              Court's Orders, and AAA's Open Case File ....................................................... 13

       B.     Fitbit Has Neither Breached Nor "Defaulted" On Its Obligations Under the
              Agreement to Arbitrate ....................................................................................... 14

              1.     No Material Breach .................................................................................. 14

              2.     No Default ................................................................................................ 17

              3.     No Waiver ................................................................................................ 18

       C.     Arbitration Under Fitbit's TOS Is, and Always Has Been, a Viable Forum
              for Consumers Like Ms. McLellan ..................................................................... 19

       D.     Ms. McLellan's Requested Remedy Is Without Support..................................... 19

IV.    CONCLUSION.............................................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AT&T Mobility LLC v. Concepcion,*
563 U.S. 333 (2011)................................................................................................20

*Brown v. Dillard's, Inc.,*
430 F.3d 1004 (9th Cir. 2005)........................................................................... *passim*

*Edwards v. Symbolic Int'l, Inc.,*
414 Fed. Appx. 930 (9th Cir. Feb. 7, 2011) (Unpub. Disp.)....................................16

*Fisher v. A.G. Becker Paribas Inc.,*
791 F.2d 691 (9th Cir. 1986)............................................................................18, 20

*Nadeau v. Equity Residential Properties Mgmt. Corp.,*
251 F. Supp. 3d 637 (S.D.N.Y. 2017)......................................................................17

*Planned Parenthood of Columbia/Willamette Inc. v. American Coalition of Life Activists,*
422 F.3d 949 (9th Cir. 2005)......................................................................................9

*Pre-Paid Legal Servs., Inc. v. Cahill,*
786 F.3d 1287 (10th Cir. 2015).................................................................................18

*Rapaport v. Soffer,*
No. 2:10-CV-00935-KJD, 2011 WL 1827147 (D. Nev. May 12, 2011) ..................18

*Saint Agnes Med. Ctr. v. PacifiCare of Cal.,*
31 Cal. 4th 1187 (2003) ...........................................................................................20

*Samson v. Nama Holdings, LLC,*
637 F.3d 915 (9th Cir. 2011).....................................................................................17

*Shinto Shipping Co., Ltd. v. Fibrex & Shipping Co.,*
572 F.2d 1328 (9th Cir.1978).....................................................................................20

*Sink v. Aden Enterprises, Inc.,*
352 F.3d 1197 (9th Cir. 2003)................................................................14, 17, 18, 20

*Van Ness Townhouses v. Mar Indus. Corp.,* 862 F.2d 754, 758 (9th Cir. 1988) ...........................18

**Other Authorities**

AAA Consumer Rule 39 ...........................................................................................14

AAA Consumer Rule 54 ....................................................................8, 13, 16, 17, 18

## I.     INTRODUCTION

This litigation is like a game of chess that Fitbit and Plaintiffs have been playing for the past two and a half years.  Rob Dunn and Kate McLellan are two of the pieces on the board, and the players' moves have consisted of pleadings, motions, meet-and-confers, and arbitration demands.  It was on this chess board that Mr. Dunn sought to represent a class of non-opt-out individuals (including Ms. McLellan), even after the Court ordered those individuals' claims to arbitration.  And it was on this chess board that Fitbit offered to settle Ms. McLellan's individual arbitration demand to see what effect that would have on Mr. Dunn's out-of-the-box move.  Fitbit responded to Ms. McLellan's arbitration demand in this context, and this context only.  Never did it intend to curb its customers' ability to raise and resolve any disputes with the company in arbitration.

In their May 29, 2018 sur-reply (Dkt. No. 139), Plaintiffs attempted to narrow the Court's focus to the single chess piece, Ms. McLellan, yet at the same time broaden the impact of her individual arbitration to every one of Fitbit's consumers.  Fitbit submits that once the Court views the entire context of the litigation at hand, it will become apparent that Plaintiffs' accusations about Fitbit's conduct, and the resulting implications, are incorrect and have no place in the unique context of this case.

In early 2016, thirteen plaintiffs sued Fitbit in this Court, despite previously agreeing to resolve any claims against the company in arbitration before the American Arbitration Association ("AAA").  From the very beginning, Fitbit argued that the case belonged in arbitration pursuant to Fitbit's Terms of Service.  But Plaintiffs disagreed.  For two years, Fitbit pursued its arbitration rights.  In October 2017, the Court granted Fitbit's motion to compel arbitration, finding that the parties agreed to delegate any threshold arbitrability questions to the arbitrator itself.  Only the claims of Mr. Dunn would remain in court, as he opted out of Fitbit's arbitration agreement.  The remaining twelve, including Ms. McLellan, were ordered to arbitration.

Months went by and not a single claim was tendered.

Meanwhile, in the federal case, Plaintiffs took the position that the Court's arbitration

1   orders did not matter:  Mr. Dunn could represent all Fitbit customers, including the twelve whose

2   claims were ordered to arbitration and the absent class members in their same position.  In

3   Plaintiffs' view, the preceding two and a half years of litigation were for naught.  Only after Fitbit

4   called out Plaintiffs' tactics did they file a demand with AAA.  On April 3, 2018, *one* of the

5   twelve Plaintiffs ordered to arbitration, Ms. McLellan, submitted her demand for an "individual"

6   arbitration.

7           Confused by Mr. Dunn's position that he could represent Ms. McLellan and by his

8   counsel's inability to provide supporting case law, Fitbit made what it saw as its next logical

9   move:  Fitbit offered to fully resolve Ms. McLellan's claim by paying 100% of her alleged

10   damages, *plus* interest, punitive damages, costs, and attorneys' fees.  If Mr. Dunn could in fact

11   represent Ms. McLellan in court, settling her arbitration was the only way Fitbit could consolidate

12   her claims into one proceeding.  Ms. McLellan rejected Fitbit's offer.  Following a meet-and-

13   confer call, the parties found themselves at an impasse.  Fitbit expressed its intention to await

14   guidance from AAA.  Plaintiffs' counsel indicated that they intended to contact the Court to do

15   the same.

16           At no point did Fitbit unilaterally "terminate" Ms. McLellan's arbitration proceeding.  Nor

17   could it under AAA's rules.  Rather, Fitbit relayed what happened to AAA and awaited next

18   steps.  Fitbit regarded the matter as "concluded"—i.e., Fitbit's offer of all damages and relief

19   requested by Ms. McLellan had been agreed to by Fitbit—pending further guidance from AAA or

20   the Court.

21           At the May 31 hearing on Fitbit's motion to strike Mr. Dunn's allegations, the Court made

22   clear that Mr. Dunn could not represent Ms. McLellan, at least not given the current status of the

23   various proceedings.  Fitbit was fully willing to proceed with Ms. McLellan's arbitration, just as

24   it would always honor its customers' desire to resolve any disputes as agreed to in the Terms of

25   Service.  Fitbit and AAA are ready, willing, and able to proceed.  All fees have been paid, and

26   AAA has assigned a case manager.  Yet Plaintiffs, despite having suffered no prejudice, claim

27   that Fitbit has lost its chance to proceed with AAA.  Neither the facts nor the law supports

28   Plaintiffs' unprecedented remedy.

Plaintiffs' accusations of gamesmanship and improper conduct are not supported by the record. Fitbit intends to comply fully with this Court's arbitration orders and fulfill the arbitration obligations it agreed to in its TOS. Fitbit asks the Court to reevaluate Plaintiffs' submissions in light of the broader context at play here—Plaintiffs' counsel claimed that Mr. Dunn could represent Ms. McLellan and others similarly situated, yet while opposing Fitbit's motion to strike the non-opt-out plaintiffs, Plaintiffs' counsel initiated an individual arbitration for Ms. McLellan. In light of Mr. Dunn's and Ms. McLellan's seemingly contradictory positions, Fitbit took what it felt was the most logical step at the time and offered to settle Ms. McLellan's individual claim.

Fitbit and Plaintiff Kate McLellan disagree about many things, but there is one they agree about. Ms. McLellan, to borrow her counsel's phrase from a letter posted a few weeks ago, has "the right to have an arbitrator determine . . . whether the arbitration clause and class action waiver are enforceable and/or applicable to her claims." Fitbit respectfully asks the Court to allow the AAA arbitration to proceed.

## II.    THE FACTS

Fitbit has always intended to honor the arbitration agreement it enters into with its customers through its TOS. This includes Ms. McLellan's claim. Plaintiffs' recital ignores the broader context of this litigation, leaving out over three years of the arbitration chronology— which began when Ms. McLellan activated her Fitbit tracker and agreed to arbitrate her claim—as well as Mr. Dunn's attempt to represent Ms. McLellan in court even though the Court ordered her to arbitration.

Fitbit presents the entire chronology to the Court to make clear that (1) faced with significant ambiguity regarding the scope and intent of her demand, Fitbit offered to resolve Ms. McLellan's claim in good faith; (2) Fitbit never intended to terminate Ms. McLellan's arbitration proceeding unilaterally; and (3) both Fitbit and AAA are ready, willing, and able to proceed with Ms. McLellan's arbitration.

### A.    All Plaintiffs Agreed to Arbitrate Their Claims Against Fitbit, and Fitbit Encouraged Them to Do So

Each of the Plaintiffs in this action, including Ms. McLellan and Mr. Dunn, claims to have

purchased one of three Fitbit devices from retailers in various states.  (Dkt. No. 42 ¶¶ 18-30.)

After their respective purchases, each Plaintiff completed a device registration and set-up process.

(*See* Dkt. No. 87 at 2:10-21; *see also* Dkt. No. 126 at 3:6-14, 5:16-17.)  As part of that process,

they were presented with and agreed to Fitbit's Terms of Service ("TOS").  (Dkt. No. 87 at 2:10-

21.)

In a section of the TOS called "Dispute Resolution," Fitbit and Plaintiffs agreed to try to

resolve their differences informally.  If that was unsuccessful, Plaintiffs would pursue claims in

arbitration, with all associated fees paid by Fitbit.  (Dkt. No. 87-5 at 7.)  The "Informal Dispute

Resolution" clause reads:

> [Fitbit] want[s] to address your concerns without needing a formal
> legal case.  Before filing a claim against Fitbit, you agree to try to
> resolve the Dispute informally by contacting support@fitbit.com.
> We'll try to resolve the Dispute informally by contacting you
> through email.  If a dispute is not resolved within 15 days after
> submission, you or Fitbit may bring a formal proceeding.

(*Id.*)  Fitbit's TOS also includes provisions to ensure that cost would not be an obstacle:

"Arbitration Fees:  The AAA rules will govern payment of all arbitration fees.  ***Fitbit will pay all***

***arbitration fees for claims less than $75,000***.  Fitbit will not seek its attorneys' fees and costs in

arbitration unless the arbitrator determines that your claim is frivolous."  (*Id.* (emphasis added).)

Each of the Plaintiffs alleges a similar claim to Ms. McLellan's:  at some point after her

purchase and registration, Ms. McLellan allegedly "noticed that [her device] was not consistently

delivering accurate heart rate readings, particularly during exercise."  (Dkt. No. 42 ¶ 18.)  She

contacted Fitbit and got technical help, but the problem allegedly recurred and she sought a full

refund.  (*Id.*)

On November 16, 2015, Plaintiffs' counsel wrote to Fitbit, demanding that Fitbit alter its

advertising of the heartrate feature and provide monetary relief to Ms. McLellan and a class

consisting of "all others similarly situated."  (Dkt No. 42-2 at 1, 3.)

Fitbit offered to proceed to arbitration immediately.  In Fitbit's December 16, 2015

response to the demand letter, Fitbit reminded Ms. McLellan that she was "welcome to initiate

arbitration against Fitbit in accordance with the Terms of Service she agreed to."  (Dkt. No. 42-4

at 2.)  Fitbit also reiterated its agreement to pay Ms. McLellan's AAA fees:  "We would be happy to work with you to facilitate the process, ***including Fitbit's payment of arbitration fees*** as specified in the Terms of Service, assuming that your client's individual claim is less than $75,000."  (*Id.* (emphasis added).)

Ms. McLellan declined and sued Fitbit three weeks later.  (*See* Dkt. No. 1.)

**B.  The Parties Spent Over Two Years Litigating Fitbit's Arbitration Clause**

Over a period of 15 months, from August 2016 to November 2017, Fitbit moved to compel arbitration.  In all, Fitbit filed twelve motions, responses, and supplemental submissions. (*See, e.g.*, Dkt. Nos. 57, 62, 64, 87, 88, 94, 97, 102, 105, 107, 113, 118.)  Ms. McLellan opposed and filed a comparable number of briefs and other submissions.  (*See, e.g.*, Dkt. Nos. 60, 75, 100, 101, 103, 110, 115, 119, 124.)

On October 11, 2017, the Court granted Fitbit's motion to compel arbitration as to Ms. McLellan and a group of eleven other plaintiffs who, like her, agreed to Fitbit's TOS but declined to opt out of the arbitration provision.  (Dkt. No. 114 at 9:6-9.)  These twelve non-opt-out Plaintiffs, the Court found, "agreed to a delegation clause" and to have questions of arbitrability—the scope and enforceability of the arbitration agreement—decided by an arbitrator. (*Id.* at 6:5-6.)  Only Mr. Dunn's case would remain in court since he opted out of the arbitration agreement.  (*Id.* at 8:14-9:5.)

On November 5, 2017, the twelve non-opt-out Plaintiffs asked the Court to reconsider its order.  (Dkt. No. 115.)  Two weeks later, in a contested Case Management Conference Statement, Plaintiffs argued that Mr. Dunn "can represent the entire class, even if certain absent class members would otherwise be required to arbitrate their claims."  (Dkt. No. 117 at 3:2-4.) Plaintiffs offered no legal authority for this position, even though Fitbit had asked Plaintiffs to provide it in October 2017.  (Decl. of Kai S. Bartolomeo ("Bartolomeo Decl.") ¶¶ 2-3, Exs. 1-2.) Fitbit was justifiably concerned that, despite the Court's arbitration orders, Plaintiffs would argue that the contours of the case remained exactly the same as the day the original complaint was filed.  (*See* Decl. of William L. Stern ("Stern Decl.") ¶ 4.)  If so, the last two years of motion practice would have been in vain.  (*Id.*)

On January 24, 2018, the Court confirmed its prior arbitration order. (*See* Dkt. No. 126 at 5:14-18 ("[t]he order compelling arbitration remains in full force and effect").)

Still, not one of the twelve non-opt-out Plaintiffs submitted their claims to AAA.

**C.    Mr. Dunn Purports to Continue to Represent McLellan and the Eleven Other Non-Opt-Outs in Court**

On February 20, 2018, Plaintiffs filed a Second Amended Consolidated Master Class Action Complaint ("SAC") on behalf of Mr. Dunn. (*See* Dkt. No. 127-1.) The SAC ignored the Court's arbitration orders. Instead, Mr. Dunn continued to plead claims on behalf of a class of purchasers (including Ms. McLellan) who agreed to arbitrate their claims.[1] Meanwhile, months passed without any indication that the non-opt-out Plaintiffs intended to initiate arbitration to address their arbitrability challenges. (Stern Decl. ¶ 4.)

On March 13, 2018, Fitbit moved to strike Plaintiffs' over-broad class allegations. (Dkt. No. 129 at 3:11-16 (seeking to strike those averments which were written "as though the Court's prior arbitration rulings never happened").) Fitbit noted that Plaintiffs had chosen not to seek arbitration on behalf of the twelve non-opt-outs, including Ms. McLellan. As Fitbit argued, "[t]his was no oversight. They are rightly worried that submitting their claims to AAA would be inconsistent with simultaneously 'litigating' them as absent class members, through Mr. Dunn's SAC. By postponing their AAA submission, Plaintiffs avoid the appearance of openly defying the Arbitration Order." (*Id.* at 10 n.7.)

During this entire time, Ms. McLellan (and the other eleven non-opt-out Plaintiffs) avoided AAA. (*See* Stern Decl. ¶ 4-5.) Instead, they attempted to reinject their class claims back into the litigation through the SAC. (*See id.* ¶ 4.) It appeared to Fitbit that Plaintiffs were delaying arbitration as part of a calculated strategy to avoid it altogether. (*Id.*) Allowing Mr. Dunn to proceed on behalf of all putative class members, as Plaintiffs hoped, would render

---

[1] Specifically, the class was defined as "[a]ll persons or entities" who "purchased a Fitbit PurePulse Tracker . . . ." (Dkt. No. 127-1 ¶¶ 63, 64.) It was not limited to those purchasers who opted out. Now it is. (*Cf.* Third Amended Consolidated Master Class Action Complaint ¶ 67, Dkt. No. 147 ("All persons or entities in the United States who purchased a Fitbit PurePulse Tracker, as defined herein, ***and who opted out of the arbitration clause contained in Fitbit's Terms of Service***") (emphasis added).)

1    the Court's arbitration ruling inconsequential.  (*Id.*)

2           It is against this backdrop that Ms. McLellan presented, and Fitbit responded to her

3    individual arbitration demand.

4           **D.    Mr. Dunn Continues to Try to Represent Ms. McLellan's Class Claims While
              Fitbit Offers to Settle Her Individual Claim**[2]

5

6           On April 3, 2018, Ms. McLellan submitted her arbitration demand as an "Individual."

7    (Dkt. No. 146-1; *see also* Stern Decl. ¶ 5, Ex. 1.)  She also described the dispute as follows:

8                   Consumer fraud claims regarding Fitbit's alleged deceptive
                     marketing of its activity trackers, as set forth in the complaint filed
9                   in the United States District Court, Northern District of California
                     (Exhibit 1; ***class claims not pursued in arbitration***).  Exhibits 2 and
10                  3 reflect court orders enforcing a "delegation clause" in the
                     arbitration provision.  The arbitration provision is found in
11                  Exhibit 4.

12   (Dkt. No. 146-1 at 7 (emphasis added))

13          Under "Dollar Amount of Claim," Ms. McLellan wrote "$161.94," the amount she paid

14   for her Charge HR.  (*Id.*; *see also* Dkt. No. 42 ¶ 18.)  Under "Other Relief Sought," Ms. McLellan

15   checked boxes for "Attorney's Fees," "Interest," "Arbitration Costs," "Punitive/Exemplary," and

16   "Other."  (Dkt. No. 146-1 at 7.)  Aside from "other," these are all monetary demands.

17          On April 10, 2018, Mr. Dunn filed his opposition to Fitbit's motion to strike the SAC's

18   overbroad class allegations.  (*See* Dkt. No. 133.)  There, Plaintiffs advanced an argument relevant

19   to the question the parties are addressing:  Even after Ms. McLellan's submission to AAA,

20   Mr. Dunn could represent absent class members whose claims had been sent to arbitration.  (Dkt.

21   No. 133 at 4:14-16.)  Thus, ***Ms. McLellan's*** claim (and the claims of the other eleven) was alive

22   and in court, both directly through the injunctive relief claim (*id*. at 14:19-15:16 (citing *McGill v.*

23   *Citibank, N.A.*, 2 Cal. 5th 945 (2017)), and indirectly through Mr. Dunn's opting out and pleading

24   a class of "all" purchasers without regard to opt-out status.  (*See* Stern Decl. ¶¶ 4, 6.)

25          On April 24, 2018, Fitbit filed its reply, noting the tension between Ms. McLellan's

26   individual arbitration and Mr. Dunn's attempt to represent a class that included Ms. McLellan:

27

28          [2] This is where in the timeline Plaintiff's chronology starts.  (*See* Statement at 4:2.)

1

2

3

4

> Ms. McLellan's arbitration is, by definition, individual.  She agreed to a class action waiver and underscored that when she typed the word "Individual" in characterizing her claim to AAA.  (*See* Selbin Decl., Ex. A (Dkt. No. 133-2).)  As such, nothing that happens in her individual arbitration can have any effect on Mr. Dunn.  ***Even if the arbitrator were to find for Ms. McLellan on her formation defenses***, as Mr. Dunn supposes, only her claim will come back to court—no one else's.

5

6

(Dkt. No. 134 at 5:1-6 (emphasis added).)  This submission clearly shows Fitbit's intent to have

AAA decide the arbitrability of Ms. McLellan's claim, just as the Court ordered.

7

8

9

10

On April 25, 2018, AAA acknowledged receipt of Ms. McLellan's demand and set forth

the parties' fee schedule.  (Stern Decl. ¶ 7, Ex. 2.)  Ms. McLellan would pay $200 (which would

be paid by Fitbit on her behalf, pursuant to the TOS), and Fitbit would pay $4,200—$1,700 in

filing fees and $2,500 in prepaid arbitrators' fees.  (*See id.* at 2.)  Fitbit's fees, AAA said, "should

11

12

be received no later than **May 9th, 2018** and AAA may decline to administer this dispute if the

business does not timely respond."  (*Id.* (bold in original).)

13

14

15

16

17

18

The operative word is "may."  As discussed more fully below, the AAA's Consumer

Rules, which are expressly incorporated into the arbitration provision in the TOS, contain clear,

express provisions governing nonpayment of fees.  Those rules provide for notice and other

remedial steps before the arbitration may be terminated.  (*See id.* ¶ 8, Ex. 3 at 32 (R-54, Remedies

for Nonpayment).)  Fitbit's decision not to remit fees on May 9 did not terminate the proceeding

under AAA rules.  (*See id.*)

19

20

21

22

23

24

25

Fitbit weighed the demand, as well as the provision in the TOS, discussed *ante*,

contemplating that parties would attempt to try to resolve disputes informally.  (Stern Decl. ¶ 9.)

Fitbit also tried to reconcile Ms. McLellan's individual arbitration claim with the class claims that

Mr. Dunn sought to pursue in court on her behalf and concluded that Ms. McLellan was

demanding monetary compensation for her "individual" claim.  (*Id.*)  Further, Fitbit knew that the

filing fees and compensation deposit came to $4,200, and that nothing in AAA rules or the TOS

precluded Fitbit from offering to settle her claim.  (*Id.* ¶¶ 9-10.)

26

27

28

On May 3, 2018, Fitbit made a written offer to Ms. McLellan.  (Stern Decl. ¶ 11, Exs. 4-

5.)  Specifically, Fitbit offered:

1.  A refund of the amount Ms. McLellan claims she paid for the
    Charge HR she purchased at Sports Chalet in Temecula,
    California on February 27, 2015 ($161.94 after tax), along with
    prejudgment interest on that amount;

2.  Punitive damages calculated as the total amount in #1, above,
    times four. We have followed the Ninth Circuit's lead that "a
    ratio of up to 4 to 1 serves as a good proxy for the limits of
    constitutionality." *Planned Parenthood of
    Columbia/Willamette Inc. v. American Coalition of Life
    Activists*, 422 F.3d 949, 962 (9th Cir. 2005)[]; and

3.  Reasonable attorneys' fees and costs associated with the
    arbitration in the amount of $1,750 (1,000 in fees, plus $750 in
    costs in accordance with the AAA's Standard Fee Schedule).

(*Id.*, Ex. 4 at 1-2.) In total, Fitbit offered to pay $2,814.75. (*Id.*) In Fitbit's view, the offer was in

keeping with Fitbit's commitment to informal resolution and (as will be discussed next) provided

full relief that exceeded what Ms. McLellan could reasonably expect, even from a "best-case

scenario" arbitration award. (*Id.* ¶¶ 11, 14; Decl. of Gloria Y. Lee ("Lee Decl.") ¶ 4.)

On May 14, 2018, the parties held a telephone conference. (Stern Decl. ¶¶ 12-16.) As

Plaintiffs put it, this was a "Meet and Confer" to discuss Fitbit's "McLellan Arbitration Offer."

(Dkt. No. 146-3 at 5.) Fitbit acknowledged in this telephone call that "Ms. McLellan is free to

accept or not accept" its offer. (*Id.*; *see also* Stern Decl. ¶ 13.)[3]

As Plaintiffs note in their Statement, according to notes taken by Plaintiffs' counsel's

paralegal, Fitbit's counsel also said something along the following lines:

> We plan to tell AAA that we made an offer and regard the matter as
> concluded even though Kate declining the offer and see what AAA
> will do. We to [sic] offered her everything and there's nothing more
> she could get from AAA. We'll enclose the letters and say that we
> regard it as concluded. We never plan on getting to scope and
> enforceability with the arbitrator and are not going to seeking to file
> briefs on those matters.

(Dkt. No. 146-3 at 5.) Viewed against the broader chess board of the litigation, it becomes clear

that Fitbit's counsel's intentions have been misconstrued. First, as discussed above, Fitbit felt

that Mr. Dunn and Ms. McLellan (both represented by the same counsel) were at odds with one

---

[3] This is consistent with what Fitbit told the Court: "We're not arguing that her claim has
been mooted. What we're saying is we made an offer." (May 31, 2018 Hrg. Tr. at 11:2-3; *see
also id.* at 15:20 ("we never intended to moot this claim").)

another.  (*See* Stern Decl. ¶ 4.)  Because of this conflict, and as the quoted statement makes clear, Fitbit needed guidance and wanted to "see what AAA" thought of the matter.  (*Id.* ¶¶ 13-15; Dkt. No. 146-3 at 5.)  It was in this context and against this backdrop that Fitbit offered to settle Ms. McLellan's claim.  Fitbit "offered her everything and there's no more she could get from AAA."  (Dkt. No. 146-3 at 5.)  This meant that if Ms. McLellan pursued her claims to an arbitration award, she would seek $162, prejudgment interest (10%), punitive damages, and attorneys' fees.[4]  (*See* Stern Decl. ¶¶ 5, 13-14, Ex. 1.)  Fitbit's offer accounted for all of this and more.  (*Id.* ¶ 11, Exs. 4-5.)  As to Mr. Stern's statement that "[w]e never plan on getting to scope and enforceability," Plaintiffs misinterpret this.  (*Id.* ¶ 15.)  Read in the context of ***this*** statement, Fitbit did not plan to address arbitrability ***until*** hearing further from AAA.  (*Id.*)  Read in the broader context of Mr. Dunn's SAC, Fitbit needed to understand the scope of Ms. McLellan's claims, individual or not.  (*Id.*)  The Court addressed both of these issues at the May 31 hearing: Ms. McLellan's claims would not proceed in court, and the arbitrator should address arbitrability. Fitbit acted promptly to have the arbitrator address those issues.  (*See* Section II.F., *infra*; Stern Decl. ¶¶ 21, 24.)

Fitbit did not preclude Ms. McLellan from enforcing any rights.  (Stern Decl. ¶ 19.)  It did not terminate the arbitration.  (*Id.*)  It met and conferred.  (*Id.*)  As with any meet-and-confer, the parties stated their positions.  (*Id.*)  Plaintiffs decided to take this up with the Court and Fitbit took no action to stop them from doing so.  (*See id.*)

### E.    The Parties Address the Status of Arbitration

#### 1.    Mr. Dunn Files a Sur-Reply

On May 29, 2018, Mr. Dunn filed a "sur-reply" in connection with Fitbit's motion to strike his class claims.  (Dkt. No. 139.)  Mr. Dunn claimed Fitbit "refus[ed] to engage in the arbitration it sought to compel" and offered to "address the matter with the Court at the upcoming hearing" on Fitbit's motion to strike two days later.  (*Id.* at 2:14-25.)  As noted above, at the hearing Fitbit made clear that its offer did not extinguish Ms. McLellan's claim:

---

[4] There is no right to attorneys' fees on this claim.

> Now, it's perfectly within their right to decline.  We are not saying,
> as Mr. Selbin is suggesting, that this is – that this extinguishes the
> claim.  It doesn't.  It's an offer.  It's good only upon acceptance,
> and she didn't accept.

(May 31, 2018 Hrg. Tr. at 8:11-14.)

### 2.   Fitbit Did Not Terminate the Arbitration

As noted above, there was no termination.  Fitbit does not have the right under AAA rules to terminate unilaterally.  (*See* Stern Decl. ¶¶ 8, 14, Ex. 3 at 32.)  The real issue is the effect of Fitbit's unaccepted offer.  That was the source of the dispute, and, as noted, Plaintiffs said they would ask the Court for guidance.  (*Id.* ¶ 13; Dkt. No. 146-3 at 5.)

### 3.   The May 31 Hearing Where the Court Struck Mr. Dunn's Class Claim and Plaintiffs Misinterpreted Counsel's Statements

Plaintiffs say Fitbit's counsel recited five times during the hearing that "'no rational litigant' would arbitrate" these claims individually.  (*See* Statement at 2:6.)  Plaintiffs misinterpret counsel's words.  (Stern Decl. ¶ 22.)

***First***, counsel was not speaking about Ms. McLellan.  He was speaking about Fitbit specifically, and defendants generally:

> What she is asking ***us*** to do is go to arbitration on a claim of $162;
> that ***we*** have to pay $750 just to get the arbitrator, in order to have
> her two formation defenses decided. At least, that's the first step.
> As I said, we felt no rational litigant would require that.

(May 31, 2018 Hrg. Tr. at 11:20-12:1 (emphasis added); *see also id.* at 2:6-7; 2:17; 2:24; 8:2-3; 8:27-28; 9:10-14; 14:23; 15:14; 15:15-16; 16:28.)[5]  Fitbit's point was that in this case it didn't make sense to pay the fees required to arbitrate Ms. McLellan's claim if she was demanding less than what those fees would amount to and would entertain an offer to resolve her claims.  (Stern Decl. ¶ 22.)  And because Fitbit felt it had offered more than Ms. McLellan's best-case award at arbitration, it considered the matter as concluded pending further guidance from AAA.  (Stern Decl. ¶ 22.)

***Second***, in light of Mr. Dunn's contradictory position, Fitbit felt that settling

---

[5] Mr. Stern misquoted the amount of respondent's AAA fees.  They are $4,200, not $750. (Stern Decl. ¶ 7, Ex. 2.)

1    Ms. McLellan's monetary demands was the most rational strategy to determine the scope of her

2    claims.  (*Id.*)  Ignoring this context, Plaintiffs seize upon the one instance in which counsel's

3    words were ambiguous, which they try to turn to rhetorical advantage.  (*Id.* ¶ 23.)  But even that

4    doesn't support their meaning.  Counsel referred to a letter in which "[w]e told AAA that, in our

5    view, a rational litigant wouldn't litigate $162 claim where the filing fee, itself, is $750."  (May

6    31, 2018 Hrg. Tr. at 10:7-9; Stern Decl. ¶ 23.)  Looking at what "we told AAA," which is Fitbit's

7    May 16, 2018 letter, clears up the apparent ambiguity.  (Stern Decl. ¶ 23.)  "Litigant" was meant

8    to refer to Fitbit, not Ms. McLellan.  (*Id.*)  Mr. Stern's point was that a rational litigant in Fitbit's

9    shoes—i.e., one that had already litigated vigorously for two years and faced an opt-out Plaintiff

10   (Dunn) who argued he could represent every putative class member in federal court, including

11   Ms. McLellan—would first attempt to resolve Ms. McLellan's demand informally after balancing

12   the total value of her claim against the cost of further litigation.  (*Id.*)  Ms. McLellan, like any

13   other claimant, would be free to accept or decline that offer.  (*Id.*)

14       **F.    Fitbit and AAA Are Ready to Proceed**

15       Fitbit believes it acted in good faith.  Still, Fitbit and its counsel take seriously the Court's

16   admonishments regarding perceived gamesmanship and noncompliance with the Court's

17   arbitration orders.  (*Id.* ¶ 24.)  Fitbit took immediate steps to dispel any gamesmanship concerns

18   and to ensure that its actions were not misconstrued as an attempt at unilateral termination of

19   Ms. McLellan's arbitration proceeding.  (*Id.*)  On June 1, 2018, the day after the hearing, Fitbit

20   paid its administrative and arbitrator fees ($4,200).  (Stern Decl. ¶ 24, Ex. 9.)  That same day,

21   Fitbit's counsel wrote to Ms. McLellan's attorneys and apologized for the misunderstanding:  "I

22   apologize if there was a misunderstanding, but it was never Fitbit's intent to preclude Ms.

23   McLellan (or any Fitbit customer) of their right to proceed in arbitration."  And that is still true

24   today.  (*Id.*, Ex. 10.)

25       On June 5, 2018, AAA confirmed receipt of its $4,200 payment and that the fees had been

26   "applied" to the matter.  (Bartolomeo Decl. ¶ 5.)  AAA stated that the case would be assigned a

27   case manager who would be reaching out to the parties to discuss the path forward.  (*Id.*)  On

28   June 7, 2018, Fitbit made a further payment to AAA to reimburse Ms. McLellan's filing fee,

1   pursuant to the arbitration provision in the TOS.  (Stern Decl. ¶ 26, Ex. 12.)  On June 11, 2018,

2   AAA wrote to confirm that "the filing requirements have been met" and the case has been

3   "assigned to me for administration."  (*Id.* ¶ 27, Ex. 13 at 1.)  The letter established Fitbit's

4   deadline to answer Ms. McLellan's demand and discussed the process for conflict checks and

5   arbitrator selection.  (*Id.* at 1-3.)

6        On June 13, 2018, Ms. McLellan's counsel wrote to AAA to request that the matter be

7   stayed pending resolution of the current proceedings before the Court.  (*Id.* ¶ 28, Ex. 14.)  AAA

8   stayed proceedings that same day.  (*Id.* ¶ 29, Ex. 15.)

9   **III.**    **FITBIT'S RESPONSE REGARDING "NEXT STEPS"**

10       **A.**    **Ms. McLellan's Arbitration Should Proceed Pursuant to the TOS, the Court's**

11            **Orders, and AAA's Open Case File**

12        The Court's October 11, 2017, arbitration order concludes with the following:

13           Fitbit's motion to compel arbitration is granted for the plaintiffs
           who did not opt out.  The arbitrator will resolve those plaintiffs'

14           challenges to the scope and enforceability of the arbitration clause.
           Fitbit's motion to stay or dismiss plaintiff Dunn's claims is denied.

15

16   (Dkt. No. 114 at 9:7-9; *see also* Dkt. No. 126 at 1:12-15 ("In an order that sent 12 of the 13

17   named plaintiffs to arbitration, the Court found that Fitbit's [TOS] delegated threshold questions

18   of arbitrability to the arbitrator, and that plaintiffs' challenges to the validity of the ToS and the

19   agreement to arbitrate should be decided by the arbitrator.").)  The Court's order after

20   reconsideration confirmed its prior ruling.  (*See* Dkt. No. 126 at 5:17-18 ("The order compelling

21   arbitration remains in full force and effect.").)

22        Plaintiffs claim that Fitbit violated these orders by not "let[ting]" Ms. McLellan pursue

23   her claims in arbitration.  (Statement at 14:14-20.)  But the facts do not support that assertion.  As

24   explained in detail in Section II above, Fitbit responded in good faith to what it reasonably

25   perceived as maneuvering via Mr. Dunn's SAC following the Court's orders on arbitration.

26        Fitbit did not "terminate" Ms. McLellan's AAA demand.  AAA's Consumer Rule 54 sets

27   out specific procedures for terminating an arbitration in instances of nonpayment.  It requires a

28   request for relief, a chance for the party opposing the request to respond, and a decision by the

1    arbitrator.  (Stern Decl. ¶ 8, Ex. 3 at 32; *see also id.* Ex. 3 at 26 (R-39, noting that an "arbitration

2    may proceed even if any party or representative is absent, so long as proper notice was given and

3    that party or representative fails to appear or obtain a postponement from the arbitrator").)  The

4    Consumer Rules provide that "a party shall never be precluded from defending a claim or

5    counterclaim."  (*Id.*, Ex. 3 at 32.)  The arbitrator may terminate only after first suspending the

6    proceedings if full payments have not been made.  (*Id.*)  None of these steps occurred before

7    Fitbit paid its fees in full.  Notably, as discussed below, in every one of Plaintiffs' cases where

8    waiver of the right to arbitrate was found, AAA exhausted its procedures for nonpayment, sent

9    multiple notices to the non-paying party, and/or waited extended periods (measured in months,

10   not weeks) to receive payment before terminating the proceeding.

11         Both Fitbit and AAA are prepared to proceed with Ms. McLellan's arbitration demand.

12   All fees have been paid, and the matter has been assigned an AAA administrator.  Only

13   Ms. McLellan's request to stay stands in the way.  Based on the foregoing facts, Fitbit

14   respectfully submits that Ms. McLellan's arbitration before AAA should be permitted to proceed.

15         **B.     Fitbit Has Neither Breached Nor "Defaulted" On Its Obligations Under the
16                  Agreement to Arbitrate**

17         Relying on the Ninth Circuit's decisions in *Brown v. Dillard's, Inc.*, 430 F.3d 1004 (9th

18   Cir. 2005), and *Sink v. Aden Enterprises, Inc.*, 352 F.3d 1197, 1199 (9th Cir. 2003),

19   Ms. McLellan argues that Fitbit has materially breached the arbitration agreement and/or

20   "defaulted" on its obligations, and is now barred from enforcing its arbitration rights.

21   Respectfully, she is wrong.  While there was a short delay in the arbitration proceedings while the

22   parties addressed issues raised by Mr. Dunn's attempt to continue pursuing Ms. McLellan's

23   claims via the SAC, Fitbit did not breach, default on, or waive the agreement between the parties

24   that Fitbit has sought to enforce for more than two years.  Neither the law nor the facts of this

25   case support the drastic consequence that Ms. McLellan now seeks.

26         **1.     No Material Breach**

27         In *Brown*, the Ninth Circuit held that a party in "***material*** breach" of an arbitration

28   agreement cannot compel another party to "honor" its terms.  430 F.3d at 1006 (emphasis added).

The Court's conclusion stemmed from a "bedrock principle" of California law: "he who seeks to enforce a contract must show that he has complied with the conditions and agreements of the contract on his part to be performed." *Id.* at 1010. On the particular facts before it, the *Brown* panel determined that the defendant, Dillard's, materially breached the arbitration agreement by "refusing to arbitrate." *Id.* at 1012. Ms. McLellan seeks to export that conclusion to this case, but the facts in *Brown* differ significantly from the facts here.

Stephanie Brown was terminated by Dillard's on May 3, 2002, after allegedly "falsifying" her timecard in order to "defraud Dillard's out of pay for ten minutes of time." *Id.* at 1008. On July 1, 2002, Brown initiated an arbitration for wrongful termination before AAA in accordance with Dillard's contractual arbitration program. *Id.* Shortly thereafter, AAA informed Brown that Dillard's had not responded to AAA's request for information. *Id.* AAA attempted to contact Dillard's multiple times. It sent letters to Dillard's on July 12 and July 18, requesting that Dillard's pay its portion of the filing fee. *Id.* Dillard's remained nonresponsive. *Id.* at 1008-09. Finally, after informing Brown on July 25 that Dillard's failed to pay its share of the fees, AAA "returned Brown's notice of intent to arbitrate" pursuant "to its own procedures." *Id.* In the months that followed, Brown tried, unsuccessfully, to contact Dillard's to discuss the company's refusal to arbitrate. *Id.* In October 2002, Brown spoke with Dillard's in-house counsel, who informed Brown that "her complaint had no merit and that Dillard's refused to arbitrate." *Id.* "Stymied in her attempt to participate in" proceedings before AAA, Brown filed suit in state court. *Id.* Dillard's responded by removing the action and moving to compel arbitration. *Id.*

Fitbit's actions in this case are a far cry from Dillard's actions in *Brown*. From the moment Fitbit received notice of Ms. McLellan's allegations in 2015, Fitbit insisted that the parties abide by the arbitration procedure set forth in the TOS. Indeed, in its very first exchange with Ms. McLellan's counsel on December 16, 2015, Fitbit reminded Ms. McLellan of her obligation to pursue her claims in arbitration and offered to "work with [her and her counsel] to facilitate the process, including Fitbit's payment of arbitration fees as specified in the [TOS]." (Dkt. No. 42-4 at 2.) Ms. McLellan declined, opting instead to file suit in federal court weeks later. (*See* Dkt. No. 1.) Fitbit steadfastly sought to enforce the parties' agreement under the TOS

for the next two years.  Thus, while Brown went to court as a last resort after being thwarted in her attempts to arbitrate, Ms. McLellan filed her lawsuit in the Northern District of California in the first instance, and over Fitbit's insistence that she follow the TOS's dispute resolution procedures.

Here, the Court ultimately granted Fitbit's motion to compel arbitration, unlike the court in *Brown*.  What followed was strategic silence on behalf of the twelve non-opt-outs ordered to arbitration, combined with a new strategy by Mr. Dunn, who insisted that he could represent all putative class members, including those who agreed to arbitrate.  When Fitbit finally received an arbitration demand, it was on behalf of just one of the twelve non-opt-out Plaintiffs— Ms. McLellan—and appeared to be an individual monetary demand in response to Fitbit's pending motion to strike Mr. Dunn's overly expansive class allegations.  AAA notified Fitbit of Ms. McLellan's demand on April 25, 2018, requiring payment of Fitbit's fees by May 9. Following extensive back-and-forth between the parties, and following the May 31 hearing, Fitbit tendered its fees, including Ms. McLellan's filing fee.  AAA never issued a notice to Fitbit about late payment and never contacted the parties about suspension or formal termination.

These differences matter.  The *Brown* court was confronted with an undisputed refusal to arbitrate and formal termination of proceedings after multiple warnings from AAA—a complete repudiation by Dillard's of the agreement to arbitrate.  Here, the only delay was due to Fitbit's offer to fully resolve Ms. McLellan's individual claim, lasted only three weeks until the parties had a chance to seek direction from the Court, and never caused AAA to issue a single follow-up notice, let alone invoke its procedures for suspending and terminating proceedings.  *See, e.g.*, *Edwards v. Symbolic Int'l, Inc.*, 414 Fed. Appx. 930, 931-32 (9th Cir. Feb. 7, 2011) (Unpub. Disp.) (noting that "[d]elay in performance is a material failure only if time is of the essence, i.e., if prompt performance is, by the express language of the contract or by its very nature, a vital matter").  Those procedures are expressly incorporated into the TOS (Dkt. No. 87-5 at 7) and provide, in relevant part, for notice regarding the failure to timely pay, an opportunity to cure, and suspension before formal termination.  (Stern Decl. ¶ 8, Ex. 3 at 32 (AAA Consumer Rules, R-54).)  Ms. McLellan's proceeding never reached the first step.

1       Ms. McLellan makes much of Fitbit's May 16 letter to AAA, in which Fitbit stated that it

2   "regards this matter as concluded."  Again, Fitbit did not intend this statement to serve as a

3   unilateral termination of proceedings, and AAA certainly did not interpret it that way.  Indeed,

4   AAA informed the parties on June 11 that it was fully prepared to proceed.  The Court itself noted

5   that Fitbit's statement in the May 16 letter was unclear.  (May 31, 2018 Hrg. Tr. at 5:9-11.)

6       The cases that follow *Brown* and bar enforcement of an arbitration agreement based on

7   breach or waiver—including the one cited in Ms. McLellan's submission—do not resemble the

8   facts here.  They involved parties who, like Dillard's, clearly and overtly refused to participate, or

9   who failed to engage in arbitration after multiple warnings, notice of default, and/or formal or de

10  facto termination of proceedings.  *See, e.g., Nadeau v. Equity Residential Props. Mgmt. Corp.*,

11  251 F. Supp. 3d 637, 640 (S.D.N.Y. 2017) (cited in Ms. McLellan's Statement at 13:2-6 and

12  involving defendant who failed to pay fees after receiving request from AAA; AAA

13  administratively closed matter pursuant to AAA Employment Arbitration Rules); *Samson v.*

14  *Nama Holdings*, *LLC*, 637 F.3d 915, 932 (9th Cir. 2011) (defendants refused to arbitrate even

15  after court compelled arbitration, then formally sought "to be dismissed from the arbitration").

16  Those facts are not present here.

17              **2.      No Default**

18      Citing *Sink*, Ms. McLellan argues that Fitbit "defaulted" on its contractual obligation to

19  arbitrate and, therefore, should be barred from proceeding before AAA.  (Dkt. No. 146 at 13:7-

20  14:8.)  Again, the facts of *Sink* are dramatically different from the facts of this case.  In *Sink*, the

21  Ninth Circuit upheld a district court's order refusing to stay the proceeding in favor of arbitration

22  when the moving party defaulted on his obligation to pay the arbitrator's fees.  352 F.3d at 1199-

23  1200.  The non-paying party, however, "received multiple notices that the costs were due by [a

24  certain] date and that [he] was responsible for payment."  *Id.* at 1199.  Ultimately, the arbitrator

25  was forced to enter an order of default.  *Id.*  The other cases Ms. McLellan cites are similar.  In

26  *Pre-Paid Legal Services, Inc. v. Cahill*, 786 F.3d 1287, 1288-89 (10th Cir. 2015),[6] the court found

27

28          [6] (Dkt. No. 146 at 14:3-5.)

1   default only after the non-paying party was "repeatedly warned" by AAA that the proceeding

2   would be suspended if payment was not made.  AAA then followed Rule 54 and suspended the

3   proceeding.  *Id.* at 1289.  After the non-paying party *still* refused to pay, the AAA terminated the

4   proceeding.  *Id.*  Likewise, in *Rapaport v. Soffer*, No. 2:10–CV–00935–KJD–RJJ, 2011 WL

5   1827147, at *1 (D. Nev. May 12, 2011),[7] AAA asked the non-paying party to tender fees and

6   formally terminated the proceeding after three months passed without payment.

7       *Sink*, *Pre-Paid*, and *Rapaport* are drastically different from this case.  Fitbit made clear in

8   its April 24 reply brief that it fully intended to have an arbitrator decide arbitrability.  Fitbit ***did***

9   pay, albeit after a short delay, and neither Fitbit nor the AAA terminated the proceeding, formally

10  or informally.  There is no basis for finding Fitbit in default.

11              **3.    No Waiver**

12      Ms. McLellan rightly does not argue that Fitbit "waived" its right to arbitration.[8]  To the

13  extent Ms. McLellan later seeks to argue waiver, Fitbit reserves its right to respond.  For present

14  purposes, however, there was no waiver here.  As the Court explained in its October 2017

15  arbitration order, "[w]aiver of the right to arbitration is disfavored because it is a contractual right,

16  and thus any party arguing waiver of arbitration bears a heavy burden of proof."  (Dkt. No. 114 at

17  7:10-12 (citing *Van Ness Townhouses v. Mar Indus. Corp.*, 862 F.2d 754, 758 (9th Cir. 1988).)

18  Waiver requires, *inter alia*, "acts inconsistent with" an existing right to compel arbitration and

19  "prejudice to the party opposing arbitration resulting from such inconsistent acts."  (*Id.* at 7:6-9

20  (citing *Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691, 694 (9th Cir. 1986); internal quotation

21  marks omitted).)  As explained above, Fitbit has acted consistent with its right to compel

22  arbitration, having pursued that right exhaustively for more than two years.  Further,

23  Ms. McLellan has identified no prejudice.  Nor could she.  The AAA and Fitbit are ready, willing,

24  and able to proceed with arbitration.

25

26  ───────────────

27      [7] (Dkt. No. 146 at 14:5-6.)

28      [8] In a passing sentence, she notes that the *Brown* court considered traditional waiver as a
separate basis for its holding.  (Dkt. No. 146 at 12:9-10.)

### C.  Arbitration Under Fitbit's TOS Is, and Always Has Been, a Viable Forum for Consumers Like Ms. McLellan

Ms. McLellan argues that Fitbit's actions and the statements of its counsel at the May 31 hearing serve as a concession that arbitration before the AAA is not a "viable alternative" to in-court litigation. (Dkt. No. 146 at 14:9-15:27.)  Ms. McLellan is mistaken for two reasons.

*First*, contrary to Ms. McLellan's contention, Fitbit did not "foreclose[]" her pursuit of arbitration.  Fitbit offered to facilitate arbitration from the outset. (*See* Dkt. No. 42, Ex. 4.)  And although Fitbit attempted to resolve her individual claims without the need for further litigation in response to Mr. Dunn's attempt to represent her class claims in court—echoing Fitbit's commitment to informal resolution in the TOS—Fitbit never took the position that its offer mooted Ms. McLellan's claim or somehow terminated proceedings before the AAA.  Those proceedings, though stayed at Ms. McLellan's request, remain open and available to her, with fees paid by Fitbit and under rules designed to facilitate fair and efficient resolution of disputes between a company and its customers.

*Second*, Ms. McLellan misconstrues Fitbit's counsel's comments at the May 31 hearing. When counsel remarked that Fitbit's TOS do not require what "no rational litigant would do," counsel was referring to Fitbit, not Ms. McLellan. (*See, e.g.*, May 31, 2018 Hrg. Tr. at 11:20-25, 11:25-12:2; Stern Decl. ¶¶ 22-23.)  Counsel's point was that Fitbit's decision to offer Ms. McLellan full relief in this case, in the broader context discussed above, was a reasonable one in view of the anticipated costs of arbitration, which Fitbit agreed to bear.  In this situation, a rational litigant in Fitbit's position would prefer to avoid a protracted individual arbitration if an offer of complete relief would satisfy the consumer's claim, when taken in context of the overlapping SAC pending in federal court claiming that Mr. Dunn still represented all non-opt-out Plaintiffs.  But, as Fitbit's counsel noted, Ms. McLellan declined that offer, as was her right, and Fitbit is now prepared to move forward.

### D.  Ms. McLellan's Requested Remedy Is Without Support

Ms. McLellan acknowledges that the "common sanction for bad-faith conduct related to arbitration is an award of attorneys' fees." (Dkt. No. 146 at 16:10-20.)  Nevertheless, she asks the

1   Court to issue a sweeping order that would bar Fitbit from invoking its arbitration provision as to

2   Ms. McLellan, the remaining Plaintiffs, and all of the "consumers they seek to represent." (*Id.* at

3   17:3-5.)  Ms. McLellan does not cite a single case approving of such a sanction.  That there is no

4   such authority comes as no surprise.  As this Court correctly recognized (Dkt. No. 114 at 7:5-12),

5   waiver of arbitration rights is a discouraged outcome that runs contrary to the policies embodied

6   in the FAA.  *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).  The California

7   Supreme Court has likewise held that "a party who resists arbitration on the ground of waiver

8   bears a heavy burden" under the FAA and California law, "and any doubts regarding a waiver

9   allegation should be resolved in favor of arbitration."  *Saint Agnes Med. Ctr. v. PacifiCare of*

10  *Cal.*, 31 Cal. 4th 1187, 1195 (2003); *see also Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691,

11  694 (9th Cir.1986) ("Any examination of whether the right to compel arbitration has been waived

12  must be conducted in light of the strong federal policy favoring enforcement of arbitration

13  agreements."); *Shinto Shipping Co., Ltd. v. Fibrex & Shipping Co.,* 572 F.2d 1328, 1330 (9th

14  Cir.1978) (waiver of the right to arbitrate "is not favored and the facts must be viewed in light of

15  the strong federal policy supporting . . . arbitration agreements").

16        Even if Fitbit somehow materially breached its arbitration agreement based on the facts

17  before the Court, that purported breach is between the parties to the agreement at issue:  Fitbit and

18  Ms. McLellan, and no one else.  (*See, e.g.*, Dkt. No. 87-5 at 8 ("You may not assign or transfer

19  these Terms, by operation of law or otherwise, without Fitbit's prior written consent.  Any

20  attempt by you to assign or transfer these Terms, without such consent, will be null.").)

21  Ms. McLellan herself characterized the proceeding as "Individual" in nature, and none of the

22  other eleven non-opt-out Plaintiffs have so much as submitted a demand to the AAA, let alone

23  been deprived of an opportunity to arbitrate.  Tellingly, in *Brown*, *Sink*, and each of the other

24  cases Ms. McLellan cites in her brief, the order barring further enforcement of the arbitration

25  remedy extended to the specific parties before the courts, and no others.

26        Fitbit apologizes for any confusion or inconvenience it may have caused the Court and the

27  parties as it sought to clarify the rights and remedies available to Ms. McLellan, Mr. Dunn, the

28  putative opt-out class members, the non-opt-out Plaintiffs, and any putative non-opt-out class

1  members, just as Plaintiffs sought to do.  Fitbit submits that no sanction is warranted here.

2  Ms. McLellan's arbitration should be permitted to proceed.

3  **IV.    CONCLUSION**

4          The facts and the law do not support Plaintiffs' assertion that Fitbit violated the Court's

5  arbitration orders and/or breached its arbitration obligations.  Fitbit respectfully requests that this

6  Court permit the parties to proceed with Ms. McLellan's currently pending arbitration.

7  Dated:  June 28, 2018                              MORRISON & FOERSTER LLP

8

9                                                    By:   /s/ William L. Stern
                                                           William L. Stern
10                                                   Attorneys for Defendant FITBIT, INC.